1   ROBBINS GELLER RUDMAN
        & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
        – and –
6   DARREN J. ROBBINS (168593)
    DAVID C. WALTON (167268)
7   655 West Broadway, Suite 1900
    San Diego, CA  92101-8498
8   Telephone:  619/231-1058
    619/231-7423 (fax)
9   darrenr@rgrdlaw.com
    davew@rgrdlaw.com
10
    Attorneys for Plaintiffs
11
    [Additional counsel appear on signature page.]
12
                        UNITED STATES DISTRICT COURT
13
                       NORTHERN DISTRICT OF CALIFORNIA
14

15  BABAK HATAMIAN and LUSSU DENNJ      )   Case No.
    SALVATORE, Individually and on Behalf of )
16  All Others Similarly Situated,           )   CLASS ACTION
                                             )
17                        Plaintiffs,        )   COMPLAINT FOR VIOLATION OF THE
                                             )   FEDERAL SECURITIES LAWS
18         vs.                               )
                                             )
19  ADVANCED MICRO DEVICES, INC.,            )
    RORY P. READ, THOMAS J. SEIFERT and      )
20  LISA T. SU,                              )
                                             )
21                        Defendants.        )
    _____ )   DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28

1   Plaintiffs Babak Hatamian and Lussu Dennj Salvatore ("plaintiffs") allege the following

2 based upon the investigation of plaintiffs' counsel, which included a review of United States

3 Securities and Exchange Commission ("SEC") filings by Advanced Micro Devices, Inc. ("AMD" or

4 the "Company"), as well as securities analysts' reports and advisories about the Company, press

5 releases, media reports, and other public statements issued by or about the Company.  Plaintiffs

6 believe that substantial additional evidentiary support will exist for the allegations set forth herein

7 after a reasonable opportunity for discovery.

8          **NATURE OF THE ACTION**

9   1.  This is a securities class action on behalf of purchasers of the common stock of AMD

10 between October 27, 2011 and October 18, 2012, inclusive (the "Class Period"), seeking to pursue

11 remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

12   2.  Defendant AMD is a multinational semiconductor company that develops computer

13 processors and related technologies for commercial and consumer markets.  The Company's main

14 products include microprocessors, motherboard chipsets, embedded processors, and graphics

15 processors for servers, workstations and personal computers, and embedded systems applications.

16   3.  This case concerns AMD's 32 nanometer ("nm") "Llano" (the "Llano") Accelerated

17 Processing Unit ("APU"), which is a type of microprocessor that combines AMD's central

18 processing unit and its graphics processing unit onto a single piece of silicon.  The Llano, AMD's

19 first generation, high-performance APU, was released in early 2011 and was followed by the

20 Company's second generation high-performance APU, the "Trinity," which AMD began shipping

21 during the first calendar quarter of 2012.

22   4.  During the Class Period, defendants repeatedly highlighted the "strong" and

23 "significant" interest in, demand for, and unit shipments of, its Llano APUs. Defendants falsely and

24 misleadingly represented that AMD's desktop business was in a "strong position" and that it would

25 "continue to rebound" in 2012.  As late as April 19, 2012, defendants stated that the demand for the

26 Llano APU was "higher than anticipated," particularly in the "emerging markets" and that there were

27 no "significant issues" in the important desktop market.  Defendants, however, concealed that

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS     - 1 -

1  demand for Llano APUs in desktop devices was much weaker than suggested by their statements,
2  especially in its Chinese and European markets.

3      5.      In July 2012, AMD announced that weak demand for Llano APUs in desktop devices,
4  particularly in its Chinese and European markets, resulted in AMD's reporting of lower than
5  expected revenue for the June 30, 2012 quarter. As defendants knew or recklessly ignored, such lack
6  of demand was compounded by a known, but undisclosed, "misalignment" between the amount of
7  Llano APUs and desktop motherboards in AMD's sales channel that originated in 2011. In addition,
8  defendants acknowledged that the issues causing AMD's revenue shortfall (*i.e.*, those causing
9  reduced desktop-related Llano sales in AMD's distribution channel) were "largely in our control."

10      6.      The revelation of this information caused the price of AMD stock to decline by nearly
11  25% on extremely heavy trading volume.

12      7.      Thereafter, when questioned by analysts, defendants deceptively dismissed the notion
13  that AMD's future gross margins would be adversely affected by the large amount of unsold Llano
14  inventory, when such inventory was unsalable, even at heavily discounted prices.

15      8.      Then just weeks later, the Company announced that its gross margins for the fiscal
16  2012 third quarter declined more than *31%* from its previous quarter, in large part, due to AMD's
17  recording of an approximate $100 million inventory write-down, mainly attributable to the
18  overstated value of the Llano. On this news, the price of AMD stock declined nearly another 17%
19  on extremely heavy trading volume.

20                          **JURISDICTION AND VENUE**

21      9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the
22  Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC
23  [17 C.F.R. §240.10b-5].

24      10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.
25  §1331 and §27 of the Exchange Act.

26      11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C.
27  §1391(b). Many of the acts charged herein, including the preparation and dissemination of
28  materially false and misleading information, occurred in substantial part in this District.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                     - 2 -

12.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), the world's largest stock exchange by market capitalization.

## PARTIES

13.     (a)     Plaintiff Babak Hatamian, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of AMD during the Class Period and has been damaged thereby.

(b)     Plaintiff Lussu Dennj Salvatore, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of AMD during the Class Period and has been damaged thereby.

14.     Defendant AMD describes itself as a designer and integrator of technology that powers intelligent devices, including personal computers, tablets, game consoles and cloud servers. Defendant AMD is a Delaware corporation that maintains its principal executive offices in Sunnyvale, California.  The Company utilizes a 52 or 53 week fiscal year ending on the last Saturday in December.

15.     Defendant Rory P. Read ("Read") served, at all relevant times, as AMD's President and Chief Executive Officer and as a member of the Company's Board of Directors.

16.     Defendant Thomas J. Seifert ("Seifert") served as AMD's Senior Vice President and Chief Financial Officer ("CFO") until he resigned from such positions on September 17, 2012.

17.     Defendant Dr. Lisa T. Su ("Su") has served as AMD's Senior Vice President and General Manager of Global Business Unit since January 3, 2012.

18.     Defendants Read, Seifert and Su are collectively referred to herein as the "Individual Defendants."

19.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of AMD, were privy to confidential and proprietary information concerning AMD, its products, operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 3 -

1   AMD, as discussed in detail below.  The Individual Defendants had access to non-public information

2   about AMD's business, finances, products, markets, and present and future business prospects via

3   internal corporate documents, conversations and connections with other corporate officers and

4   employees, attendance at management and/or board of directors meetings and committees thereof,

5   and via reports and other information provided to them in connection therewith.  Because of their

6   possession of such information, the Individual Defendants knew or recklessly disregarded that the

7   adverse facts specified herein had not been disclosed to, and were being concealed from, the

8   investing public.

9          20.     The Individual Defendants are liable as direct participants in the wrongs complained

10  of herein.  In addition, the Individual Defendants, by reason of their status as senior executive

11  officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange

12  Act and had the power and influence to cause the Company to engage in the unlawful conduct

13  complained of herein.  Because of their positions of control, the Individual Defendants were able to

14  and did, directly or indirectly, control the conduct of AMD's business.

15         21.     As executive officers of AMD, the Individual Defendants controlled and/or possessed

16  the authority to control the contents of its reports, press releases and presentations to securities

17  analysts and through them, to the investing public.  The Individual Defendants were provided with

18  copies of the Company's reports and press releases alleged herein to be misleading, prior to or

19  shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause

20  them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent

21  acts alleged herein.

22         22.     The Individual Defendants, as executive officers and/or directors and as controlling

23  persons of a publicly traded company whose common stock was, and is, governed by the federal

24  securities laws and is registered with the NYSE, had a duty to promptly disseminate accurate and

25  truthful information with respect to AMD's financial condition and performance, growth, operations,

26  financial statements, business, products, markets, management, earnings, and present and future

27  business prospects, and to correct any previously issued statements that had become materially

28  misleading or untrue, so that the market price of AMD common stock would be based upon truthful

1  and accurate information.  The Individual Defendants' misrepresentations and omissions during the

2  Class Period violated these specific requirements and obligations.

3      23.    The Individual Defendants are liable as participants in a fraudulent scheme and

4  course of conduct that operated as a fraud or deceit on purchasers of AMD common stock by

5  disseminating materially false and misleading statements and/or concealing material adverse facts.

6  The scheme: (i) deceived the investing public regarding AMD's products, business, operations and

7  management, and the intrinsic value of AMD common stock; and (ii) caused plaintiffs and members

8  of the Class to purchase AMD common stock at artificially inflated prices.

9                              **CLASS ACTION ALLEGATIONS**

10     24.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

11  Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common

12  stock of AMD between October 27, 2011 and October 18, 2012, inclusive, and who were damaged

13  thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and

14  directors of the Company, at all relevant times, members of their immediate families and their legal

15  representatives, heirs, successors or assigns, and any entity in which defendants have or had a

16  controlling interest.

17     25.    The members of the Class are so numerous that joinder of all members is

18  impracticable.  Throughout the Class Period, AMD common stock was actively traded on the NYSE.

19  While the exact number of Class members is unknown to plaintiffs at this time and can only be

20  ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in

21  the proposed Class.  Record owners and other members of the Class may be identified from records

22  maintained by AMD or its transfer agent and may be notified of the pendency of this action by mail,

23  using the form of notice similar to that customarily used in securities class actions.

24     26.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

25  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law

26  complained of herein.

27     27.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

28  and have retained counsel competent and experienced in class action and securities litigation.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and products of AMD;

(c)     whether the price of AMD common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

30.     Defendant AMD is a multinational semiconductor company whose main products include microprocessors, motherboard chipsets, embedded processors, and graphics processors for servers, workstations and personal computers, and embedded systems applications.

31.     During the Class Period, the Company managed its operations via two business segments: (1) the Computing Solutions segment, which includes microprocessors, as standalone devices or as incorporated within APUs, chipsets, and embedded microprocessors and embedded graphic processing units; and (2) the Graphics segment, which includes graphics, video and multimedia products and game console systems. On a company-wide basis, AMD's top five customers accounted for approximately 51% of its 2011 revenue and five customers accounted for approximately 56% of the net revenue of its Computing Solutions segment.

32.     The Company markets and sells its products directly to original equipment manufacturers ("OEMs") and through authorized third-party distributor channel partners, commonly referred to the distribution or sales channel or "the channel." AMD's authorized distributors resell to sub-distributors and mid-sized and smaller OEMs, original design manufactures ("ODMs") and add-in-board manufacturers ("AIBs").

33.     Typically, AMD's distributors maintain an inventory of its products, as well as products of the Company's competitors.  In most cases, AMD's agreements with its distributors provide the distributors with protection against reductions in the price of its products and provide them with certain rights for product returns

34.     In 2011, AMD launched a family of products it refers to as APUs, a type of microprocessor that combines AMD's central and graphics processing units onto a single piece of silicon.  This family of APU products include AMD's E-Series and C-Series APUs, codenamed "Brazos," designed for low-power desktop and mobile platforms, and its A-Series APUs, codenamed "Llano," for mainstream desktop and mobile platforms.  The operations of the Company's APU products, including the Llano, are included within its Computer Solutions business segment.

35.     While AMD had previously manufactured its own processors, the Company divested its semiconductor fabrication plant (commonly called a foundry or fab) when it spun off GLOBALFOUNDRIES Inc. ("GF") in 2009.  Thereafter, AMD agreed to purchase substantially all of its microprocessor product requirements from GF pursuant to the terms of a Wafer Supply Agreement (the "WSA").

36.     Pursuant to the WSA, AMD, during the Class Period, purchased all of its microprocessor unit product requirements, except for Brazos APUs, from GF.  On April 2, 2011 and March 4, 2012, GF and AMD amended the terms of the WSA, primarily to revise certain pricing and other terms applicable to wafers for the Company's microprocessor and APU products that were to be delivered by GF to the Company.  Pursuant to the WSA, AMD committed to purchase a fixed number of wafers from GF.

37.     During the Class Period, defendants repeatedly highlighted the "strong" and "significant" interest in, demand for, and unit shipments of, its Llano APUs. Defendants falsely and

1    misleadingly represented that AMD's important desktop business was in a "strong position" and that

2    it would "continue to rebound" in 2012. As late as April 19, 2012, defendants stated that the demand

3    for the Llano APU was "higher than anticipated," particularly in the "emerging markets"; that they

4    were "not seeing" any concern or pause in the purchase of Llano APUs; and that there were not "any

5    significant issues" in AMD's important desktop market.

6        38.    During the second half of 2011 into early 2012, defendants disclosed that GF was

7    experiencing manufacturing difficulties that caused disruptions in the supply Llano APUs. While

8    defendants told investors that such supply disruptions adversely impacted its ability to "fulfill

9    customer demand," in truth, and contrary to their representations, however, AMD's customers were

10   exhibiting little or no interest for Llano APUs in platforms for desktop devices, particularly in its

11   Chinese and European markets. As defendants knew or recklessly ignored, such lack of interest in

12   the Llano was compounded by a known, but undisclosed, "misalignment" between the amount of

13   Llano APUs and desktop motherboards in AMD's sales channel. As a result, AMD's distributors,

14   who possessed certain product return rights, accumulated a large inventory of unsold Llano APUs.

15       39.    In July 2012, defendants revealed that the existence of the above noted and previously

16   undisclosed conditions via two press releases, with the first press release pre-announcing AMD's

17   2012 revenue shortfall, and the second press release announcing its 2012 second quarter results.

18   Defendants acknowledged that the issues causing AMD's revenue shortfall (*i.e.*, those causing

19   reduced desktop-related Llano sales in AMD's distribution channel) were "largely in our control."

20       40.    This news, which was made public on two separate days, caused the price of AMD

21   stock to decline by a combined 24.91% on extremely heavy trading volume.

22       41.    Then just weeks later, the Company announced that its gross margins for the fiscal

23   2012 third quarter declined more than *31%* from its previous quarter, in large part, due to AMD's

24   recording of an approximate $100 million inventory write-down, mainly attributable to the

25   overstated value of the Llano. On this news, the price of AMD stock declined nearly another 17%

26   on extremely heavy trading volume.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                  - 8 -

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

42.     The Class Period begins on October 27, 2011. On that date, AMD issued a press release announcing its financial results for its fiscal 2011 third quarter, the period ended October 1, 2011. For the quarter, the Company reported revenue of $1.69 billion, up 7% from the prior quarter, and net income of $97 million, or $0.13 per common share. With respect to its then-current outlook, the press release noted that AMD expected its 2011 fourth quarter revenue to increase 3% sequentially, plus or minus 2%.

43.     Following the Company's 2011 third quarter earnings announcement, AMD held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, defendants made positive statements about AMD's 32 nm processors, including the Llano. For example, defendant Read noted that while AMD faced significant manufacturing difficulties during the quarter, Llano demand was strong and that its 32 nm product manufacturing performance was improving, stating, in pertinent part, as follows:

> From an execution standpoint, you know and we know *we faced significant manufacturing challenges in the quarter. Having said that, demand was strong and interest in our products is significant*. We will continue an aggressive effort with our foundry partner to improve manufacturing performance at this important 32 nm technology. And we are already seeing steady improvement day after day, week after week, but we are not out of the woods yet.

                              *        *        *

> What we've seen in the notebooks segment, JoAnne, is *we've seen strong uptake in the APU demand, whether it's in the Brazos area, and low power and more in the entry bands or into the Llano segment where it's a little bit more into the mainstream*.

44.     Then, defendants Read and Seifert explained that were "maniacal" in their focus and fully understood AMD's manufacturing processes with their "hands on the rudder and driving this boat," stating, in pertinent part, as follows:

Defendant Read:

> From a standpoint, clearly we were disappointed with the execution around the yields in the 32 nm space, and that occurred over sustained periods of time, and as I mentioned in my comments in earlier questions, we are not out of the woods yet.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 9 -

We're making progress and we're focused on it every single day, and we're seeing progress, but again *we are focused at a machine-by-machine level, step by step, and trying to improve both our sort yields, our total yields across the board.*

\* \* \*

We have work to do in the execution space, and while we're making progress, we need to continue that progress. I think we're seeing that steady improvement, and step by step, machine by machine, we'll make that progress in 32 [nanometer chip manufacturing].

\* \* \*

*I think it's unfair to kind of suggest that we don't have understanding of the root cause [of AMD's chip manufacturing difficulties]. The analysis that we're doing is machine by machine, step by step. We're making those changes as we speak and we begin – we have begun to see over the past several weeks, with this kind of intense maniacal focus on execution, that it starts – starts of improvements across that set.*

*So I don't want to leave anyone with a feeling that we aren't working that, understanding the issue and have our hands on the rudder and driving this boat.* We have work to do, I'll for sure share that, and you know it and I know it. We have to improve our execution, but we have the experience, the expertise that's getting underneath that that we believe will drive further improvements as we go through the quarter. Thomas, do you want to add anything?

Defendant Seifert:

It's not like this is an iterative process where we don't know where we go. It's a complex situation. It takes maniacal focus, as Rory said. *We've put lots of teams on this problem from our partner, from our Company, from outside, from the ecosystem,* and we work hard in that direction. We see the improvement. It is the steep road, but we know the direction and we know the path.

45.     Lastly, with respect to AMD's 2011 fourth quarter, defendant Seifert reiterated "[s]o we guided the revenue up quarter over quarter with a midpoint of 3%, and we also said that *this will include a significant increase of our shipments* on 32 nm and *Llano*."

46.     On November 9, 2011, AMD filed with the SEC its Form 10-Q, signed by defendant Seifert, for the 2011 third quarter ended October 1, 2011 (the "2011 Q3 Form 10-Q"). The 2011 Q3 Form 10-Q portrayed a materially false and misleading account for the demand for the Llano by highlighting that supply shortages adversely impacted AMD's ability to fulfill customer demand for the Llano, stating, in pertinent part, as follows:

*We also experienced challenges during the third quarter of 2011, particularly related to supply shortages of certain microprocessor products manufactured using the 32nm and 45nm technology nodes, which adversely impacted our ability to fulfill customer demand.* Specifically,

GLOBALFOUNDRIES Inc. (GF) experienced *yield and other manufacturing difficulties* related to 32nm wafer fabrication, *resulting in lower than expected supply* of AMD Fusion A-series APUs, codenamed *Llano*, to us.

47.   In addition, the 2011 Q3 Form 10-Q failed to furnish information that the known Llano supply disruptions, particularly as they related to desktop applications in the distribution channel,  were then having on the Company's current operating results and that were reasonably likely to have on its future operating results.  This information was required to be disclosed in the 2011 Q3 Form 10-Q pursuant to Item 2 of the instructions to Form 10-Q, which provides that companies disclose information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303]. Item 303(a) of Regulation S-K requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  In addition, Instruction 3 of Item 303(a) of Regulation S-K requires that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

48.   On January 24, 2012, AMD issued a press release announcing its financial results for its fiscal 2011 fourth quarter and year end, the periods ended December 31, 2011.  For the quarter, the Company reported revenue of $1.69 billion, in line with the previous quarter, and a net loss of $177 million, or $0.24 per common share.  For the year, the Company reported revenue of $6.57 billion, in line with the previous year, and net income of $491 million, or $0.66 per common share. With respect to its then-current outlook, the press release noted that AMD's revenue during the first quarter of 2012 was expected to decrease 8% sequentially, plus or minus 3%.

49.   The press release highlighted the shipments of the Company's APUs, with defendant Read stating, in pertinent part, as follows:

> "*AMD shipped more than 30 million APU's in 2011, resulting in record annual notebook revenue.* . . .   The unmatched combination of computing and graphics capabilities in our low-power 'Brazos'  platform has made it our fastest ramping platform ever, paving the way for continued growth in key segments and geographies."

50.   Following the Company's 2011 fourth quarter and year-end earnings announcement, AMD held a conference call with analysts and investors to discuss the Company's earnings and

operations.  During the conference call, defendant Read touted the demand for and improvements in the manufacturing and shipments of Llano APUs, stating, in pertinent part, as follows:

> We've been intensely focused on addressing this [32 nm manufacturing] execution challenge. *And there's no doubt that this kind of focus is producing benefit. Week in and week out, we've seen steady improvement from where we started the quarter and where we ended 3Q.*
>
> *We've actually increased our Llano 32-nanometer product delivery by 80% from the third quarter. And now Llano makes up almost 60% of the mobile microprocessing revenue.* I think this is a good step in the right direction. *This gives us the momentum, and we were able to deliver in a more effective way on the customer demands.*
>
> *Is there a strong interest in the product? Absolutely.* Do we need to continue to build on the execution progress that we've made? For sure. We're not out of the woods yet but we're making steady progress. And with that, we've been delivering each and every week better and better and better. *That 80% improvement quarter-quarter suggests a nice mix in terms of 32-nanometer, and positions us again for 1Q.*

51.     Defendant Seifert followed up, "I think it's fair to say from the improvements we have seen and our foundry partners that we are not going to be supply constrained in the [2012] first quarter."

52.     Defendants Read and Seifert then proclaimed the demand for AMD's APUs generally and the Llano specifically, stating, in pertinent part, as follow:

Defendant Read:

> Our strategy to deliver the best experiences possible, at mainstream price points, continues to pay off, resulting *in record APU unit shipments for the quarter. AMD APUs were in five of the top six best-selling systems in North America retail in the fourth quarter*, including two of the most popular systems.
>
> *         *         *
>
> So, in summary, *our APU momentum continues to accelerate.*
>
> *         *         *
>
> *There is no doubt that the customer acceptance of our APU architecture is quite strong. We've now shipped over 30 million of these APUs to date. And we're seeing a strong uptake in terms of that architecture* and what it means to the customer. They are looking for a better experience.  I think that's a key reason why we've seen the momentum in our business and the ability to deliver on that.
>
> *You know, our focus on execution around the APUs and around Llano is definitely paying off. And I think as we move forward, we should be able to continue to build on that momentum.*

Defendant Seifert:

*We achieved record quarter client revenue, driven by an increase in supply of Llano APUs. In Q4 of 2011, APUs accounted for nearly 100% of mobile microprocessors shipped in more than 60% of the total client microprocessors shipped.* Microprocessor ASP increased sequentially, due to an increase in mobile microprocessor ASP and an increase in server units shipped.

53.     On February 24, 2012, AMD filed with the SEC its Form 10-K, signed by the defendants Read and Seifert, for the 2011 fiscal year ended December 31, 2011 (the "2011 Form 10-K"). The 2011 Form 10-K contained materially false and misleading statements about the "strong demand" for the Company's Llano-based APU platforms, stating, in pertinent part, as follows:

**Computing Solutions**

Computing Solutions *net revenue* of $5.0 billion in 2011 *increased 4%* compared to net revenue of $4.8 billion in 2010, *primarily as a result of a 16% increase in unit shipments* partially offset by an 11% decrease in average selling price. *The increase in unit shipments was attributable to an increase in unit shipments of our microprocessors, including APU products for mobile devices, as well as our chipset products. Unit shipments of our microprocessors, including APU products for mobile devices increased due to strong demand for our Brazos and Llano-based APU platforms.* However, the increase in unit shipments in 2011 was limited by supply constraints with respect to certain microprocessor products manufactured using the 32nm technology node.

54.     In addition, the 2011 Form 10-K failed to furnish information about the effects that the known Llano supply disruptions, particularly as they related to desktop applications in the distribution channel, were then having on the Company's current operating results and that were reasonably likely to have on its future operating results. This information was required to be disclosed in the 2011 Form 10-K pursuant to Item 7 of the instructions to Form 10-K, which provides that companies disclose information called for under Item 303 of Regulation S-K.

55.     On February 2, 2012, AMD held its 2012 Financial Analyst Day webcast with analysts and investors to discuss the Company's operations. On the webcast, defendant Su touted the "great customer reception" and the market's adoption of AMD's APUs and noted that the Company saw it shipments of APUs "continuing to grow and the momentum continuing to grow into 2012 and 2013," stating, in pertinent part, as follows:

So, in 2011, we launched the AMD APUs, and it's been fantastic. You heard it from Rory. We'll say it many, many times today, first to introduce heterogeneous computing in the marketplace. *It had great customer reception. The performance of the Llano APU is 3x what a typical general purpose processor would do and*

*that's the power of bringing the processor and the graphics capability together.* When you look at the roadmap, and I'm going to talk to you about the roadmap for second generation and third generation APUs, we will take that in the mainstream to 1 teraflop and it's really just a couple of years away.

The thing about APUs is where do we think it can go in the market and if you look at the market adoption for this technology, it's been fantastic. We've shipped over 30 million APU units to date and if you look at it just started shipping in fourth [quarter] 2010, it really has made tremendous progress. 11 of the top 12 OEMs are shipping AMD APUs and we see that continuing to grow and the momentum continuing to grow into 2012 and 2013.

56. On March 1, 2012, defendant Seifert presented at the Morgan Stanley Technology, Media & Telecom Conference. At the conference, defendant Seifert reiterated his previous positive statements about AMD's ability to increase the output of and the momentum associated with Llano-based products, stating, in pertinent part, as follows:

[S]o *we've made significant progress on the foundry side.* Working together with GLOBALFOUNDRIES has allowed us to really get into gear. *We shipped 80% more 32-nanometer Llano-based products Q3 over Q4.* So, the team, both on the GLOBALFOUNDRIES side, as well as on our side, working together have done an outstanding job.

*So, with this momentum, we go – we went into 2012. '12 is important because on the Llano side, Llano will be replaced with Trinity.* It's our second generation of APUs for the mid performance segment. That's important because it has the next generation of [disk read] GPU, of course, and our next generation of Piledriver architecture on the CPU side, so a significant step forward.

*The momentum is good at this point in time.*

57. On April 19, 2012, AMD issued a press release announcing its financial results for its fiscal 2012 first quarter, the period ended March 31, 2012. For the quarter, the Company reported revenue of $1.59 billion, down 6% from the previous quarter but in line with AMD's guidance, and a net loss of $590 million, or $0.80 per common share. With respect to its then-current outlook, the press release noted that AMD expected its revenue during the second quarter of 2012 to increase 3% sequentially, plus or minus 3%.

58. The press release highlighted the "'ample'" supply of the Company's APUs the positioned AMD to "'win and grow,'" with defendant Read stating, in pertinent part, as follows:

"AMD delivered solid results in the first quarter as we remain focused on improving our execution, delivering innovative products, and building a company around a strategy to deliver strong cash flow and earnings growth. . . . A complete top-to-bottom introduction of *new APU offerings, combined with ample product*

*supply resulting from continued progress with our manufacturing partners, positions us to win and grow.*"

59.   Following the Company's 2012 first quarter earnings announcement, AMD held a conference call with analysts and investors to discuss the Company's earnings and operations.

60.   During the conference call, defendants Read and Seifert touted the "higher than anticipated" demand for the Llano APU, particularly in the emerging markets, stating, in pertinent part, as follows:

Defendant Read:

> *Adoption of our APUs continues to accelerate. APUs accounted for nearly 100% of our mobile unit shipments in the quarter, helping drive an approximate 30% increase in mobile processor unit shipments and significant mobile revenue growth from a year ago.*  We saw strong success in the critical 400 to 700 mainstream retail notebook price band, which accounts for nearly 50% of all notebooks sold in retail in 2011.

Defendant Seifert:

> The Graphics segment revenue was sequentially flat in the typically down quarter. Non-GAAP gross margin was 46%, flat sequentially and a point higher than expected.  The delta to guidance is the result of *higher than anticipated demand for certain 32-nanometer Llano products, particularly in emerging markets.*

> *             *             *

> *APUs continue to increase as a percentage of our client products, and Llano,* our first-generation 32-nanometer APU, *powered top-selling notebook SKUs in North America priced above $400.*

61.   Then, during the question and answer session of the conference call, defendants Read and Seifert touted production, shipment and positive gross margin impact associated with AMD's 32 nm products, which include the Llano.  First, defendant Seifert highlighted that AMD entered the quarter with "a lot of momentum," stating, in pertinent part, as follows:

> Yes, let me start with the gross margin question first.  *So without any doubt, we have made good progress on the yield side on 32-nanometer.  We entered the quarter with a lot of momentum and we saw some benefits in terms of product mix earlier than we expected.  We expected some of those benefits in the second quarter, and that has allowed us to come, gross margin-wise, in the first quarter a little bit higher than expected.*

> So moving into the second quarter, what are the headwinds and the tail winds?  *We expect to continue to build on our yield improvement on 32-nanometer. We expect to build on the momentum we see on the product mix side.*  And we will see some headwinds from quite a significant number of 28-nanometer products that are going to start to ramp in the second quarter.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 15 -

So if you put all the gives and takes together, we will see the benefit continue that we see in the first quarter and we expect gross margin to be slightly up, flat to slightly up, in the second quarter.

62. Then, defendant Read explained that, while supply constraints "kind of" held back 32 nm chip shipments in the desktop market during the fourth quarter of 2011, he did not see "any significant issues" in the important desktop market, and defendant Seifert noted that 32 nm shipments, including the Llano, were "up significantly" during the 2012 first quarter, stating, in pertinent part, as follows:

Defendant Read:

*From the standpoint of desktop, there's no doubt those earlier issues [supply constraints] kind of held that back.* We are intensely focused on increasing our ability to deliver and really recapture that share in desktop. *This is important for our business and it is important to go forward. I don't really see, from a desktop perspective, any significant issues.* We've just got to deliver the 45 [nm] processor load and the 32 [nm]. We've got to ramp that up as, now, supply positions are dramatically better.

Stacy Rasgon – Analyst, Sanford C. Bernstein & Company, Inc.:

Got it. *And so last quarter, you said Llano was up like 80%. What were your 32-nanometer shipments up this quarter in that environment?*

Defendant Seifert:

We are not going to comment, but *it was up significantly.* We are going to – (multiple speakers) stopping giving concrete guidance here. I think *it's important for you to understand that the progress is significant and we are not any longer supply limited on that note.*

63. In response to an analyst questioning whether new product introductions were resulting in a reallocation or reduced purchases of the Llano or Brazos shipments, defendant Read responded that he was "not seeing" any such impact and that "the Brazos APU has done very well in emerging market and Llano followed that up," stating, in pertinent part, as follows:

JoAnne Feeney – Analyst, Longbow Research:

Thanks and congrats on a nice quarter. I have a question about how your customers are handling the transition from Llano to Trinity and Brazos, the original version, to Brazos 2.0. *Are you seeing any of them pause in their purchases? And are you instead sending, perhaps, some of those existing inventories out to emerging markets and channel customers, rather than the OEMs? Can you give us (multiple speakers) transition, and if there's a lull in the second quarter here because of that?*

1     <u>Defendant Read</u>:

2     Okay, no problem. Thanks for the question. From the standpoint of emerging market I do want to reference the emerging market. ***In the quarter, we've definitely***

3     ***seen continued microprocessor revenue growth, up about 21% year-over-year. And clearly, the Brazos APU has done very well in emerging market and Llano***

4     ***followed that up.***

5     64.     On May 8, 2012, defendant Seifert presented at the Bank of America Merrill Lynch

6 Global Technology Conference. At the conference, defendant Seifert made positive statements

7 about AMD's gross margins, stating, in pertinent part, as follows:

8     <u>Vivek Arya</u> – Analyst, Bank of America Merrill Lynch:

9     Thomas, maybe one question ***on gross margins. So, obviously, a very strong performance over the last several quarters. How do we think about the trajectory***

10     ***from here*** because when I look out over the next several quarters, you do have to come out of new products based on these new nodes where the cost of manufacturing

11     is going up essentially, so does that become a headwind in terms of approaching your 50% [cost] long term?

12

13     <u>Defendant Seifert</u>:

14     Well, moving down or moving up the trajectory is always a balance of headwinds and tailwinds. And there will be certain headwinds for sure because we will see an

15     extended ramp on 28 nanometers and more products at TSMC, the first ramps that are going to start at GlobalFoundries.

16     But at the same time, we see ourself moving up the product stack, so to speak. ***The product mix is getting better, the momentum on the infrastructure side, on the***

17     ***service side hopefully continues. So we always set beyond this year. We have line of sight beyond 50% gross margin. And from today's perspective, there is no***

18     ***reason to deviate from that statement.***

19     65.     On May 9, 2012, AMD filed with the SEC its Form 10-Q, signed by defendant

20 Seifert, for the 2012 fiscal first quarter ended March 31, 2012 (the "2012 Q1 Form 10-Q"). The

21 2012 Q1 Form 10-Q failed to furnish information about the effects that the known Llano supply

22 disruptions, particularly as they related to desktop applications in the distribution channel, were then

23 having on the Company's current operating results and that were reasonably likely to have on its

24 future operating results. As noted above, this information was required to be disclosed in the 2012

25 Q1 Form 10-Q pursuant to Item 2 of the instructions to Form 10-Q, which provides that companies

26 disclose information called for under Item 303 of Regulation S-K.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 17 -

66.     Defendants' statements referenced above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     that supply constraints caused a known, but undisclosed, "misalignment" between the available Llano APUs and desktop product motherboards in AMD's sales channel;

(b)     that demand for Llano APUs in AMD's sales channel was much weaker than represented, particularly in the China and European markets;

(c)     that, as a result of the foregoing, AMD's distributors, ODMs and/or AIBs accumulated a large inventory of known, but undisclosed, unsold Llano APUs;

(d)     that (a)-(c) above were having a material adverse effect on the Company's operating results and were reasonably likely to have a material adverse effect on AMD's future revenues and operating income, particularly because the Company's agreements with its distributors protected them against reductions in the price of AMD's products and provided them with return rights for AMD's products; and

(e)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company, its then-current business, and future gross margins and financial prospects.

67.     After the market closed on July 9, 2012, AMD issued a press release announcing that its revenue for its fiscal 2012 second quarter, the period ended June 30, 2012, was expected to decrease approximately 11% after it had forecasted on April 19, 2012 that its 2012 second quarter revenue was expected increase 3%, plus or minus 3%. The press release stated that AMD's expected lower preliminary revenue was primarily due to softer than expected channel sales in China and Europe, as well as a weaker consumer buying environment impacting the Company's OEM business.

68.     In response to this news, AMD's stock price fell more than 11%, on heavy volume, to close at $4.99 per share on July 10, 2012, as a portion of the artificial inflation came out of AMD's share price.

69.     On July 19, 2012, AMD issued a press release announcing its financial results for its fiscal 2012 second quarter. For the quarter, the Company reported revenue of $1.41 billion, down

11% from the previous quarter, in line with AMD's preliminary 2012 second quarter announcement on July 9, 2012, and net income of $37 million, or $0.05 per common share. With respect to its then-current outlook, the press release noted that AMD expected revenue during the third quarter of 2012 to decrease 1%, plus or minus 3%.

70.     Following the Company's 2012 second quarter earnings announcement, AMD held a conference call with analysts and investors to discuss the Company's earnings and operations.

71.     During the conference call, defendants Read and Seifert explained that weak sales of Llano APUs for desktop products in the distribution channel, principally in the Chinese and European markets, was a primary reason for AMD's revenue miss. Defendants Read and Seifert also noted that Llano supply disruptions caused a "misalignment" in Llano and motherboard availability, stating, in pertinent part, as follows:

Defendant Read:

> For the second quarter, our revenue of $1.41 billion decreased 10% from a year ago and 11% sequentially, missing our expectations. After a reasonable start, we saw business velocity slow in the later part of the quarter, driving this revenue miss. ***This*** second-quarter revenue ***shortfall was largely driven by two key factors – first, weak sales of desktop processors in the channel, primarily in China and Europe***; and, secondly, a soft consumer PC market that impacted OEM notebook processor sales.

> We reacted quickly to this revenue softness by focusing on maintaining margin and effectively managing our expense position. As a result, we reduced expenses sequentially and maintained margin at approximately 46%, generating a net income of $37 million in the quarter.

> ***Looking at the specifics of the desktop business***, sales to OEMs increased sequentially based on their continued adoption of APUs. However, ***our desktop channel revenue declined significantly as our Llano product did not experience the same uptake it had with our OEM customers. Looking back, when we were significantly 32-nanometer supply constrained last year, we prioritized shipments of Llano to our OEM customers. As a result, channel partners saw a dramatic change in supply linearity and a misalignment with motherboard availability. This clearly impacted Llano sales and built inventory in the channel***.

> Correcting our channel challenges with Llano is largely within our own control. Moving forward, ***we will focus on accelerating desktop channel sell-through and share proper supply linearity*** and more effectively position Llano's value proposition in this area. It is clear that the overall PC market experienced softness in the second quarter, particularly in the consumer space. This impacted our notebook processor business.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 19 -

Defendant Seifert:

> Computing Solutions segment revenue was $1.05 billion, down 13% sequentially, ***driven primarily by lower channel sales in China and Europe, as well as a weaker consumer buying environment impacting sales to OEMs.*** Client product revenue declined 13% sequentially, primarily due to lower ASPs.

72. Then in response to an analyst question seeking clarification about the "misalignment" between in Llano and motherboard availability, defendant Read ***admitted the issue originated in 2011*** and that demand for the Llano in desktop applications was radically different than what AMD had experienced with its OEMs in mobile devices. Defendant Read also admitted that "damaged linearity" and "pricing" with the Llano APUs and motherboards in the sales channel "***wasn't at the right levels as we exited the year [2011],***" stating, in pertinent part, as follows:

Hans Mosesmann – Analyst, Raymond James & Associates:

> Rory, ***do you mind going through the mechanism that occurs in the channel in terms of the mismatch between motherboards with the Llano?*** I got a little confused in terms of what may have happened and how you can fix that here over the next several months.

Defendant Read:

> Sure, Hans. From the standpoint, ***this originated back and last year when we had that first Llano supply chain issue.*** And of course you know, Hans, that ***we had to target our supply to our OEMs.*** And that was the right thing to do.
>
> ***As we introduced Llano late in the year to the channel that those motherboards had been there for some period of time and really damaged linearity, and pricing wasn't at the right levels as we exited the year. As we move forward into 2012, the uptick [in demand] on Llano in the channel wasn't as strong as we expected.*** And what we are doing here moving forward, Hans, is we're focused on improving and focusing on sell-out activity throughout the tiers of the channel, improving the communication of our value proposition in this key segment and to make sure that we deliver on this momentum in the desktop channel around linearity with our channel partners. Does that help, Hans?

Hans Mosesmann – Analyst, Raymond James & Associates:

> Yes. Just to confirm, so the uptick in the channel was due to a sudden availability of Llano, or had the motherboards been already kind of designed for another processor?

Defendant Read:

> No, the mismatch occurred early in the cycle as we went through this in terms of they were introduced to the channel earlier in the cycle. ***Then, as the Llano product came in late in the year of [2011], there was a mismatch in terms of pricing, etc.*[1]**

---

[1] The conference call transcript reflects that defendant Read said "the Llano product came in late in the year of 2012." The conference call transcript is apparently incorrect or defendant Read

*This impacted linearity. And then we didn't enjoy the same uptick [in demand] that we saw around Llano that we saw with our OEMs.*

73.      Defendant Su explained that the supply of motherboards relative to the supply of the Llano is what caused the "nonlinearily" in AMD's sales channel, stating, in pertinent part, as follows:

JoAnne Feeney – Analyst, Longbow Research:

Okay, and when you refer to positioning being a bit off, is *this mismatch that you and Rory have talked about referring primarily to pricing or to the allocation of different qualities of Llano to different particular channel partners?*

Defendant Su:

It's really where we had *motherboard supply relative to CPU supply and the resulting nonlinearity in the channel.*

74.      Defendant Read then acknowledged that the issues causing AMD's revenue shortfall (*i.e.*, those causing reduced desktop-related Llano sales in AMD's distribution channel) were "largely in our control," stating, in pertinent part, as follows:

Uche Orji – Analyst, UBS:

Just real quick, I just wanted to clarify the weakness in desktops. Was it just CPU, or was it also a problem with graphics in desktop products?

Defendant Read:

Graphics enjoyed – had a solid quarter. It was within seasonal expectation and history. We saw good performance out of our next-generation 28-nanometer products, and we have strong supply there. We did not see issues in terms of the graphics space, in terms of that.

*Where the big issue in terms of the quarter – and that is largely in our control – is around the desktop business in the channel around CPUs and around the APU product. We did not see the same uptick* as I talked about earlier – uptake that we saw with the OEMs. And it's interesting, Uche; in the OEMs we've done very well with Llano in terms of the book and in desktop at the OEMs. So I believe that we have not done a good job in terms of linearity and managing our supply to our partners, communicating the strong value proposition deeper into the channel and to ensure that our promotions are focused on how to drive this launch. And that's what we're going to focus on in 3Q and 4Q.

                              *            *            *

*In the desktop channel, I believe that's more around our control.* I think *we executed not as effectively as we could have,* and I believe that we did not enjoy that same uptake in that channel space. We will make sure that our promotions and our

misspoke because "late in the year of 2012" had not yet occurred at the time defendant Read made, or was represented to have made, such statement.

incentives are focused around sales out and that our marketing communications help build the understanding deeper into tier 2, 3 and 4 in the channel to make sure that we get that velocity.

* * *

[A]s I've covered several times around the channel, I think we've articulated where the issue is around the uptake around the Llano business in the channel. And I believe that *our focus around the three core actions to improve linearity* – as you know, the channel partners make money based on their turns of their business and return on capital. *You must have strong linearity*. Second program – *make sure we focus on the promotions that drive sellout lower into the second and third tier of the channel*. And then, finally, *make sure we're educating and training the channel on the value proposition we offer*.

75.     Later, defendants Seifert and Su explained that AMD had accumulated a larger than normal amount of unsold Llano inventory, stating, in pertinent part, as follows:

JoAnne Feeney – Analyst, Longbow Research:

Okay, and then as a follow up *with regard to inventories*, can you describe a little bit the mix of inventories? *Is this because of the shortfall on Llanos sales, primarily Llano-based? And if so, what gives you confidence that the channel is going to continue to be enthusiastic for Llano when they know Trinity desktop is right around the corner?* Is that really part of it, that the channel just doesn't like to be second place to the OEMs in terms of getting the new products and really just want to wait for Trinity at this point?

Defendant Seifert:

Yes, so they me start with the inventory mix first and how we look at that, and then Lisa and Rory can comment on velocity in the channel. *The inventory build comes really in two parts*. To be very honest, *we had planned for a certain inventory increase*, anyway, *in preparation for the second half*. So I think *about half of the increase is really only attributable to the demand shortfall*.

        The good news is that the inventory is pretty much all current products, and *the part where we saw demand shortfall is pretty much driven by Llano*. We feel confident and our aim, of course, is, as I said before in my script, that we try to manage inventory slightly quarter over quarter. But we have to carefully manage the transition of the new products and how the demand environment is going to change. And regarding velocity, Lisa?

Defendant Su:

Yes, let me make a couple of comments on that. So Llano is a good product. If you look at where we are selling, it's selling into both notebook and desktop OEMs, as well as the channel. We got ourselves a bit out of position, admittedly, and that's a big reason for our shortfall. *But when we look forward, it's really the focus on sellout velocity and getting the overall positioning correct with both the CPUs as well as the motherboards. And we think we're doing that.* Trinity will also be an excellent product that will go into the channel, and I think we will run with both products for some time in the channel.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                                   - 22 -

76. When questioned by analysts, defendants Seifert and Su deceptively dismissed the notion AMD's future gross margins would be adversely affected by the large amount of unsold Llano inventory, stating, in pertinent part, as follows:

Christopher Danely – Analyst, JPMorgan Chase & Co.:

*So it sounds like we're going to get a little more aggressive on price to clear out the inventory at AMD and in the channel.* How long do you think it will take to clear it out? And then, if you *can just talk about gross margin plans beyond Q3 and the impact that that would have on it as well?*

Defendant Seifert:

*With respect to margin, we are here today to talk about Q3* and I'm not going to provide guidance on Q4 margin. With that being said, *we gave guidance for the full year in the range of 44% to 48%, and we are well within this range at this point.*

\*      \*      \*

Stacy Rasgon – Analyst, Sanford C. Bernstein & Company, Inc.:

Yes, but *if you have too much inventory, eventually, you've got to discount it to get rid of it, if it hits gross margin.* So are you still going to be committed to accepting your 2012 forecast as you gave it to them in the beginning of the year, under the way the agreement is currently written?

Defendant Seifert:

*As I said, we are in discussions with all of our part foundry partners to make sure that we manage inventory responsible and working capital responsible, in light of their demand environment as it has developed late in the second quarter.*

77. In response to the above revelations, AMD's stock price fell more than 13%, or $0.64 per share, on heavy volume, to close at $4.22 per share on July 20, 2012, as a portion of the artificial inflation came out of AMD's share price.

78. On August 2, 2012, AMD filed with the SEC its Form 10-Q, signed by defendant Seifert, for the 2012 fiscal second quarter ended June 30, 2012 (the "2012 Q2 Form 10-Q"). The 2012 Q2 Form 10-Q contained materially false and misleading representations about AMD's management's discussion and analysis, risk factors, gross margins and inventories.

79. The 2012 Q2 Form 10-Q also failed to disclose, in violation of Item 303 of Regulation S-K, that AMD had accumulated a large excess of known, but undisclosed, overvalued Llano inventory that was reasonably likely to be written down in value, thereby adversely impacting the Company's gross margins, stating, in pertinent part, as follows:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                      - 23 -

*Gross Margin*

Gross margin as a percentage of net revenue was 45% in the second quarter of 2012 compared to 46% in the second quarter of 2011. Gross margin in the second quarter of 2012 included a $5 million charge recorded to cost of sales related to a legal settlement. Absent the effect of the charge described above, which we believe is not indicative of our ongoing operating performance, our gross margin would have been 46% in the second quarter of 2012. *Gross margin in the second quarter of 2012 compared to the second quarter of 2011 benefited from increased unit shipments of our Llano and Trinity-based APU platforms.* However, this benefit was offset by a decline in average selling price for our microprocessor products.

Gross margin as a percentage of net revenue was 45% in the second quarter of 2012 compared to 2% in the first quarter of 2012. Gross margin in the second quarter of 2012 included a $5 million charge recorded to cost of sales related to a legal settlement. Gross margin in the first quarter of 2012 included a $703 million charge related to the limited waiver of exclusivity from GF. *Absent the effect of the charges described above, which we believe are not indicative of our ongoing operating performance, our gross margin in the first and second quarters of 2012 would have been 46%.* Gross margin in the second quarter of 2012 compared to the first quarter of 2012 benefited from lower manufacturing costs. However, this benefit was offset by overall lower average selling price for our microprocessor products.

Gross margin as a percentage of net revenue was 22% in the first six months of 2012 compared to 44% in the first six months of 2011. Gross margin in the first six months of 2012 included a $703 million charge related to the limited waiver of exclusivity from GF and a $5 million charge recorded to cost of sales related to a legal settlement. Gross margin in the first six months of 2011 included a $24 million charge recorded in connection with a payment to GF primarily related to certain GF manufacturing assets and a charge of approximately $5 million related to a legal settlement. *Absent the effects of the charges as described above, which we believe are not indicative of our ongoing operating performance, our gross margin would have been 46% in the first six months of 2012 compared to 45% in the first six months of 2011. The improvement in gross margin, as adjusted for the factors described above, was primarily due to increased unit shipments of our Llano and Trinity-based APU platforms, partially offset by a decline in average selling price for our microprocessor products.*

80. The statements referenced above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a) that the Company's Llano inventory experienced a material decline in value;

(b) that the Company and its distributors, ODMs and/or AIBs had accumulated a large excess of known, but undisclosed, overvalued Llano inventory;

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS — 24

1    (c)  that the Company's 2012 Q2 Form 10-Q failed to disclose then presently

2 known trends, events or uncertainties associated with the Llano APU that were reasonably likely to

3 have a material effect on AMD's future operating results; and

4    (d)  that, as a result of (a)-(c) above, defendants lacked a reasonable basis for their

5 positive statements about the Company's Llano APU during the Class Period.

6    81.  On September 17, 2012, AMD announced that defendant Seifert informed the

7 Company of his decision to resign as Senior Vice President and CFO to "pursue other

8 opportunities."

9    82.  On October 11, 2012, AMD issued a press release announcing that the revenue for its

10 fiscal 2012 third quarter, the period ended September 29, 2012, was expected to decrease

11 approximately 10% sequentially.  The Company previously forecasted its fiscal 2012 third quarter

12 revenues to decrease 1%, plus or minus 3%.

13    83.  After the market closed on October 18, 2012, AMD issued a press release announcing

14 its financial results for its fiscal 2012 third quarter.  For the quarter, the Company reported revenue

15 of $1.27 billion, down 10% from the previous quarter but in line with AMD's preliminary 2012 third

16 quarter announcement on October 11, 2012, and a net loss of $157 million, or $0.21 per common

17 share.  The Company also announced that its gross margins its fiscal 2012 third quarter declined

18 more than *31%* from its previous quarter and that AMD recorded an approximate $100 million

19 inventory write-down, mainly attributable to the overstated value of its Llano inventory.

20    84.  Following the Company's 2012 third quarter earnings announcement, AMD held a

21 conference call with analysts and investors to discuss the Company's earnings and operations.

22    85.  During the conference call, Devinder Kumar, AMD's then interim CFO, explained

23 that the Llano inventory write-down accounted for approximately *57%* of the total quarter-over-

24 quarter decline in AMD's gross margins.

25    86.  In reaction to this news, AMD's stock price fell nearly 17%, or $0.44 per share, to

26 close at $2.18 per share on October 19, 2012.

27    87.  The market for AMD common stock was open, well-developed and efficient at all

28 relevant times.  As a result of these materially false and misleading statements and failures to

1   disclose, AMD common stock traded at artificially inflated prices during the Class Period. Plaintiffs

2   and other members of the Class purchased or otherwise acquired AMD common stock relying upon

3   the integrity of the market price of AMD common stock and market information relating to AMD,

4   and have been damaged thereby.

5        88.    During the Class Period, defendants materially misled the investing public, thereby

6   inflating the price of AMD common stock, by publicly issuing false and misleading statements and

7   omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not

8   false and misleading. Said statements and omissions were materially false and misleading in that

9   they failed to disclose material adverse information and misrepresented the truth about the Company,

10   its business and operations, as alleged herein.

11       89.    At all relevant times, the material misrepresentations and omissions particularized in

12   this Complaint directly or proximately caused, or were a substantial contributing cause of, the

13   damages sustained by plaintiffs and other members of the Class. As described herein, during the

14   Class Period, defendants made or caused to be made a series of materially false or misleading

15   statements about AMD's business, prospects, operations and products. These material

16   misstatements and omissions had the cause and effect of creating in the market an unrealistically

17   positive assessment of AMD and its business, prospects, operations and products, thus causing the

18   Company's common stock to be overvalued and artificially inflated at all relevant times.

19   Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs

20   and other members of the Class purchasing the Company's common stock at artificially inflated

21   prices, thus causing the damages complained of herein.

22                     **LOSS CAUSATION**

23       90.    During the Class Period, as detailed herein, defendants engaged in a scheme to

24   deceive the market and a course of conduct that artificially inflated the price of AMD common stock

25   and operated as a fraud or deceit on Class Period purchasers of AMD common stock by failing to

26   disclose and misrepresenting the adverse facts detailed herein. As defendants' prior

27   misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

28

1 │ price of AMD common stock declined significantly as the prior artificial inflation came out of the

2 │ Company's stock price.

3 │     91.    As a result of their purchases of AMD common stock during the Class Period,

4 │ plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal

5 │ securities laws.  Defendants' false and misleading statements had the intended effect and caused

6 │ AMD common stock to trade at artificially inflated levels throughout the Class Period, reaching as

7 │ high as $8.33 per share on March 16, 2012.

8 │     92.    By concealing from investors the adverse facts detailed herein, defendants presented a

9 │ misleading picture of AMD's business and prospects.  As the truth about the Company was revealed

10 │ to the market, the price of AMD common stock fell significantly.  These declines removed the

11 │ inflation from the price of AMD common stock, causing real economic loss to investors who had

12 │ purchased AMD common stock during the Class Period.

13 │     93.    The declines in the price of AMD common stock after the corrective disclosures came

14 │ to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations

15 │ being revealed to investors and the market.  The timing and magnitude of the price declines in AMD

16 │ common stock negate any inference that the loss suffered by plaintiffs and the other Class members

17 │ was caused by changed market conditions, macroeconomic or industry factors or Company-specific

18 │ facts unrelated to defendants' fraudulent conduct.

19 │     94.    During the Class Period, the price of AMD stock declined as the true state of AMD's

20 │ operations was revealed to the investing public.

21 │     95.    The economic loss, *i.e.*, damages, suffered by plaintiffs and the other Class members

22 │ was a direct result of defendants' fraudulent scheme to artificially inflate the price of AMD common

23 │ stock and the subsequent significant decline in the value of AMD common stock when defendants'

24 │ prior misrepresentations and other fraudulent conduct were revealed.

25 │ **APPLICABILITY OF PRESUMPTION OF RELIANCE:**<br>**FRAUD ON THE MARKET DOCTRINE**

26 │

27 │     96.    At all relevant times, the market for AMD common stock was an efficient market for

the following reasons, among others:

28 │

1          (a)     AMD common stock met the requirements for listing, and was listed and

2  actively traded on the NYSE, a highly efficient, national stock market;

3          (b)     as a regulated issuer, AMD filed periodic public reports with the SEC and the

4  NYSE;

5          (c)     AMD regularly communicated with public investors via established market

6  communication mechanisms, including regular disseminations of press releases on the national

7  circuits of major newswire services and other wide-ranging public disclosures, such as

8  communications with the financial press and other similar reporting services; and

9          (d)     AMD was followed by securities analysts employed by major brokerage firms

10  who wrote reports which were distributed to the sales force and certain customers of their respective

11  brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

12     97.     As a result of the foregoing, the market for AMD common stock promptly digested

13  current information regarding AMD from all publicly available sources and reflected such

14  information in the prices of the stock.  Under these circumstances, all purchasers of AMD common

15  stock during the Class Period suffered similar injury through their purchase of AMD common stock

16  at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

18     98.     The statutory safe harbor provided for forward-looking statements under certain

19  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

20  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

21  when made.  To the extent there were any forward-looking statements, there were no meaningful

22  cautionary statements identifying important factors that could cause actual results to differ materially

23  from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

24  statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

25  liable for those false forward-looking statements because at the time each of those forward-looking

26  statements were made, the particular speaker knew that the particular forward-looking statement was

27  false, and/or the forward-looking statement was authorized and/or approved by an executive officer

28  of AMD who knew that those statements were false when made.

# COUNT I

## Violation of §10(b) of the Exchange Act and Rule 10b-5
## Promulgated Thereunder Against All Defendants

99. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

100. During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101. Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

102. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AMD common stock. Plaintiffs and the Class would not have purchased AMD common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

103. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of AMD common stock during the Class Period.

# COUNT II

## Violation of §20(a) of the Exchange Act
## Against the Individual Defendants

104. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

105. The Individual Defendants acted as controlling persons of AMD within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or

1  directors of AMD, and their ownership of AMD common stock, the Individual Defendants had the

2  power and authority to cause AMD to engage in the wrongful conduct complained of herein. By

3  reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

5  WHEREFORE, plaintiffs pray for relief and judgment, as follows:

6  A. Determining that this action is a proper class action, designating plaintiffs as Lead

7  Plaintiffs and certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of

8  Civil Procedure and plaintiffs' counsel as Lead Counsel;

9  B. Awarding compensatory damages in favor of plaintiffs and the other Class members

10  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

11  wrongdoing, in an amount to be proven at trial, including interest thereon;

12  C. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

13  action, including counsel fees and expert fees; and

14  D. Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

16  Plaintiffs hereby demand a trial by jury.

17  DATED: January 15, 2014                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
18                                            SHAWN A. WILLIAMS

19

20                                            _____/s/ Shawn A. Williams_____
                                              SHAWN A. WILLIAMS
21
                                              Post Montgomery Center
22                                            One Montgomery Street, Suite 1800
                                              San Francisco, CA 94104
23                                            Telephone: 415/288-4545
                                              415/288-4534 (fax)
24
                                              ROBBINS GELLER RUDMAN
25                                            & DOWD LLP
                                              DARREN J. ROBBINS
26                                            DAVID C. WALTON
                                              655 West Broadway, Suite 1900
27                                            San Diego, CA 92101-8498
                                              Telephone: 619/231-1058
28                                            619/231-7423 (fax)

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 30 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiffs

S:\CptDraft\Securities\Cpt Advanced Micro Devices.docx

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS