1

2

3

4

5      UNITED STATES DISTRICT COURT

6      NORTHERN DISTRICT OF CALIFORNIA

7

8      **BABAK HATAMIAN, ET AL.,**          Case No.  14-cv-00226-YGR

                 Plaintiffs,

9

          v.                              **ORDER DENYING MOTION TO DISMISS**

10

11     **ADVANCED MICRO DEVICES, INC., ET AL.,**

                 Defendants.

12

13          Plaintiffs Babak Hatamian, *et al.* bring this securities fraud action against defendants

14     Advanced Micro Devices, Inc., *et al*. ("AMD").  Plaintiffs allege a violation of Section 10(b)

15     (Count I) and Section 20(a) (Count II) of the Securities Exchange Act, and Rule 10b-5

16     promulgated thereunder.

17          Defendants have filed a motion to dismiss Count I under Federal Rule of Civil Procedure

18     12(b)(6), arguing that plaintiffs have failed to state a claim.[1]  (Dkt. No. 66.)   Plaintiffs have

19     responded (Dkt. No. 79), and defendants have replied (Dkt. No. 84).

20          Having carefully considered the papers submitted and the pleadings in this action, and for

21     the reasons set forth below, the Court hereby **DENIES** the motion to dismiss.

22

23          ――――――――――――――――

               [1] In support of their motion to dismiss, defendants have also filed a request for judicial
24     notice of twenty documents either referenced in the Corrected Class Action Complaint ("CCAC")
       or public filings AMD made to the Securities Exchange Commission ("SEC").  (Dkt. No. 67.)
25     Plaintiffs concede that judicial notice of the twenty documents is appropriate (*see* Dkt. No. 76 at
       1), and the Court so finds.  *In re Network Assoc., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL
26     24051280, *1 n.3 (N.D. Cal. Mar. 25, 2003) (quoting Fed. R. Evid. 201(b)); *Tellabs, Inc. v. Makor
       Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Defendants' request for judicial notice is
27     therefore **GRANTED**.  To the extent plaintiffs take issue with the statements in these documents
       and defendants' arguments based thereon, such argument belongs in plaintiffs' opposition to
28     defendants' motion to dismiss and thus does not persuade on the question of whether judicial
       notice is proper.

United States District Court
Northern District of California

1   I.    **BACKGROUND**

2         The facts at issue in this case, as pleaded in plaintiffs' 100-plus page Corrected Class

3   Action Complaint ("CCAC") (Dkt. No. 61), are well-known to the parties; relevant facts from the

4   CCAC are set forth below.

5       **A. AMD's Microprocessor Production and Sales Process**

6         Defendant AMD is a semiconductor company whose main products include

7   microprocessors and other component parts, which must be integrated into a larger system in order

8   to function.  (CCAC ¶ 43.)

9         During the defined Class Period, April 4, 2011 to October 18, 2012, computing solutions

10  (microprocessors, chipsets, and embedded solutions), accounted for 76% of AMD's revenue, most

11  of which was generated during back-to-school and holiday periods in the third and fourth fiscal

12  quarters.  (CCAC ¶ 44.)  Microprocessors specifically accounted for approximately 66% of

13  AMD's revenues in 2011 and 61% in 2012.  (CCAC ¶ 45.)

14        Microprocessors specifically serve as the central processing unit ("CPU") of a computer.

15  AMD contracts with manufacturers to produce its microprocessor chips.  The bulk of the

16  microprocessor chips were manufactured by GlobalFoundries ("GF") and, to a lesser extent,

17  Taiwan Semiconductor Manufacturing Company ("TSMC").  (CCAC ¶¶ 48–49.)

18        Manufacturing of these products is a complex process.  A fabrication plant must first create

19  a silicon wafer on which to house the transistor chips that make up the microprocessor.  (CCAC ¶

20  47.)  The silicon wafer is essentially the foundation for the microprocessor chips.  Each wafer can

21  contain hundreds or even thousands of microprocessor chips.  (*Id*.)  The number of working chips

22  that come from a wafer are referred to as the "yield"; thus, the higher the return of working chips

23  per wafer, the higher the "yield."  (*Id*.)

24        AMD sells its microprocessors directly to original equipment manufacturers ("OEM")

25  such as Hewlett Packard, Dell, and Sony, and to authorized third-party distributor channel

26  partners, commonly referred to as "the channel."  (CCAC ¶ 3.)  AMD's sales and marketing teams

27  allegedly work closely with these customers to ensure that AMD products are incorporated into

28  computing systems.  (CCAC ¶ 52.)  In order to do this, AMD must ship its microprocessors to

2

1    customers months ahead of any product launch to the end user, so that the customer can build a

2    system around the microprocessor.  (CCAC ¶ 53.)

3            **B.  Alleged Facts Relevant to this Action**

4            This case arises out of AMD's launch of its revolutionary "Llano" microprocessor, which

5    combined a CPU and a graphics processing unit ("GPU") on a single chip.  The Llano was an

6    accelerated processing unit, or "APU," and allegedly a long-awaited "game changer" in the

7    industry.  (CCAC ¶¶ 4–7.)  Specifically, Llano was called "the most impressive processor in

8    history" due to its ability to "deliver a better end-user experience than anything else on the

9    market."  (CCAC ¶ 72.)  AMD touted Llano as part of its "brilliant, all-new computing

10   experiences" which "enable[d] unprecedented graphics and video performance in notebooks and

11   PCs."  (*Id.*)  The Llano would also allow AMD to compete with Intel's Sandy Bridge processor,

12   although Llano allegedly had a more sophisticated graphics system.  (CCAC ¶ 74.)  In addition,

13   the Llano was considered "highly gross margin accretive."  (CCAC ¶ 70.)

14           Initially, the Llano was set to launch in the fourth quarter of 2010, but problems at GF, the

15   chip manufacturing plant,[2] prevented a timely release.  (CCAC ¶ 7.)  Specifically, AMD

16   announced that GF had been having problems producing sufficient quantities of Llano chips given

17   lower than desired chip "yield."  (*Id.*)  AMD reset the launch date for the Llano for the second

18   quarter of 2011.  (*Id.*)  In the intervening months, AMD made representations that many hardware

19   and software manufacturers — both OEMs and distributors in the channel — were broadly

20   supportive of the Llano, and were prepared to integrate Llano into computing systems.  (CCAC ¶

21   59–61.)

22           On April 4, 2011, the start of the class period, defendants announced that the Llano yield

23   problems had been resolved and were now in the past, and that Llano was set to launch on time in

24   the second quarter.  More specifically, Thomas J. Seifert ("Seifert"), then CEO and CFO of AMD,

25   _____

26           [2] GF produced the bulk of AMD's chips during the class period.  (CCAC ¶ 48.)  GF had
     been created by the divestiture of AMD's manufacturing arm in 2009.  (*Id.*)  At that time, AMD
27   owned 80% of GF; by the end of 2009, AMD owned 32%; by 2010, AMD owned 23%; by 2011,
     AMD owned 10% and had one board seat.  In April 2012, AMD sold its remaining interest.
28   (CCAC ¶ 49.)

United States District Court
Northern District of California

told analysts during an April 4, 2011 conference call that "32 nanometer yields are in line with our expectations" and "on target," and that the "32 nanometer issues" were then "behind" them. (CCAC ¶ 8.)  On that same call, AMD announced "solid" first quarter results and assured the market that "Llano based systems [would be] available in this [the second] quarter."  (CCAC ¶ 84.)  On that call, Seifert represented that there would be "ample . . . product" of the Llano for sale and that AMD was enjoying "very strong channel business."  (CCAC ¶ 84.)  Plaintiffs contend that these representations reassured the market that the yield problem had been solved, particularly because defendants had represented that despite earlier troubles, the yield was "in line with our expectations" and "on target."

Thereafter, defendants allegedly bolstered the market's expectations and claimed that "ample product" was available for the launch, and that it was "well positioned" to take advantage of the high back-to-school selling cycle.  (CCAC ¶ 9.)  For example, during a May 17, 2011 JP Morgan Technology, Media, and Telecom Conference, Seifert allegedly touted the Llano launch, indicated that there was "no tightness in wafer supply," and projected that the Llano would have a meaningful impact on AMD's business in the second half of the year — so much so that AMD had increased its gross margin guidance to a range of 44–48% for the year.  (CCAC ¶ 86.)

Plaintiffs allege that defendants concealed the facts that (i) yield problems still existed and had persisted since 2010, and (ii) AMD was significantly supply-constrained.  (CCAC ¶ 10.)  Due to the supply issues, AMD only shipped Llanos to top-tier OEM customers; channel customers received no Llanos.  (*Id*.)  Plaintiffs allege that despite the critical decision not to supply channel customers with Llanos, defendants continually represented that the Llano devices were faring well in the market.   Furthermore, the CCAC alleges that former employees from AMD and GF confirmed that the Llano yield was "horrible" during the class period and that defendants were fully informed of the yield issues.  (CCAC ¶¶ 11–12.)

Plaintiffs allege that in a series of disclosures, starting in September 2011, AMD began to inform the market of the Llano yield problem and its effects.  On September 28, 2011, defendants admitted that AMD would miss its revenue guidance by four to six percent due to "less than expected supply."  (CCAC ¶ 13.)  Defendants nonetheless touted "strong" customer demand

4

despite the fact that supply could not meet the demand due to the compromising yield problem. (*Id*.)  Defendants continued to downplay the existence and effects of the yield problem during a subsequent earnings call with analysts in October of 2011, although they admitted that there had been some issues with yield that had impacted revenues to that point, maintained that AMD was working with its foundry partner, GF, to solve the yield problems, and continued to state that they were expecting increasing shipments of the Llano.  (CCAC ¶¶ 14; 207-216.)  Defendants made similar statements in the months the followed.

Plaintiffs allege that such statements were materially untrue, because AMD did not begin shipping Llanos to third party channel distributors until December of 2011, and by then, demand had dwindled.  (CCAC ¶¶ 15–16.)  By that point, Llano had missed the back-to-school tech boom and the market had started to shift focus away from designing products compatible with Llano. (*Id*.)  Other vendors moved on to prepare for other, newer emerging technologies, such as AMD's "Trinity" APU, and thus had stopped creating component parts that would be compatible with Llano.  (*Id*.)  The result was an inventory glut of Llanos, AMD's highest inventory in years. Nonetheless, AMD continued to represent that channel sales were strong.

Defendants allegedly made additional public disclosures starting in mid-2012.  In July 2012, AMD announced it would miss second quarter revenue guidance by 14% due to softer than anticipated channel sales in China and Europe, and the impact of weaker than expected consumer buying in AMD's OEM business.  (CCAC ¶ 18.)  Ten days later, on an earnings call, defendants admitted that the "soft" channel sales were due to Llano supply chain problems, which was "largely in AMD's control."  (CCAC ¶ 19.)  AMD nonetheless maintained that the Llano was a good product, and that it would sell well in the coming quarters.  (CCAC ¶ 20.)  Plaintiffs claim that such statements were knowingly misleading, because in the context of a one-year lifecycle (which is allegedly the case for microprocessors like Llano), by missing substantially its slated launch date, the damage to Llano sales had been done.  (CCAC ¶ 21.)

Finally, in October 2012, AMD revealed that it was writing down $100 million of Llano inventory because it was not salable.  (CCAC ¶ 22.)  This would account for 8% of a 15% quarter over quarter decline in gross margin.  (*Id*.)  The stock price fell accordingly.  In total, AMD's

1    stock price dropped $6.17 (nearly 74%) during the class period.  (CCAC ¶ 24.)  Plaintiffs attribute

2    this decline to defendants' allegedly false and misleading statements.  (*Id.*)

3          In their CCAC, plaintiffs name several individual defendants:  Rory P. Read ("Read"),

4    who has been President and CEO of AMD since August 2011, and who serves on AMD's Board

5    of Directors;  Siefert, who joined AMD in October 2009 and served as Senior Vice President and

6    CFO until September 2012; Richard A. Bergman ("Bergman"), who was AMD's Senior Vice

7    President and General Manager of AMD's product group from May 2009 to September 2011; Dr.

8    Lisa T. Su ("Su"), who has served as AMD's Senior Vice President and General Manager of

9    Global Business Unit since January 3, 2012 (collectively, "individual defendants").  (CCAC ¶¶

10   33–36.)  Plaintiffs claim these individuals knew of the alleged falsity and misleading nature of the

11   subject statements, and by virtue of their positions of control and authority, knew and recklessly

12   disregarded that undisclosed facts rendered the representations materially false or misleading.

13   (CCAC ¶¶ 41–42.)

14   **II.    LEGAL STANDARD**

15         A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

16   the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003).  "Dismissal can be

17   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

18   cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

19   All allegations of material fact are taken as true and construed in the light most favorable to the

20   plaintiff.  *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011).  To survive a

21   motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a

22   claim to relief that is plausible on its face.' "  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

23   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  That requirement is met "when the

24   plaintiff pleads factual content that allows the court to draw the reasonable inferences that the

25   defendant is liable for the misconduct alleged."  *Id.*

26         Furthermore, claims for fraud must meet the particularity requirements of Federal Rule of

27   Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with

28   particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b)

United States District Court
Northern District of California

6

1   "requires ... an account of the time, place, and specific content of the false representations as well

2   as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756,

3   764 (9th Cir. 2007) (internal quotation marks omitted).  Further, Plaintiffs are required to state

4   with particularity the facts giving rise to a strong inference of defendants' scienter.  *See* 15 U.S.C.

5   § 78u–4(b)(2).  "[T]he inference of scienter must be more than merely 'reasonable' or

6   'permissible'—it must be cogent and compelling, thus strong in light of other explanations" and a

7   court "'must consider plausible nonculpable explanations for the defendant's conduct." *See*

8   *Tellabs*, 551 U.S. at 324.

9   **III.    COUNT 1: SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5**

10         **A.  LEGAL FRAMEWORK**

11         Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful

12   for any person to "use or employ, in connection with the purchase or sale of any security ... any

13   manipulative or deceptive device or contrivance in contravention of such rules and regulations as

14   the Commission may prescribe as necessary or appropriate in the public interest or for the

15   protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b–5 implements this provision by

16   making it unlawful to "make any untrue statement of a material fact or to omit to state a material

17   fact necessary in order to make the statements made, in the light of the circumstances under which

18   they were made, not misleading."  17 C.F.R. § 240.10b–5(b).

19         In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which

20   includes "exacting pleading requirements," as a check against abusive litigation by private

21   parties.[3]  *Tellabs, Inc.*, 551 U.S. at 313.  Heightened pleading is one of the control measures

22   Congress included to advance "the PSLRA's twin goals: to curb frivolous, lawyer-driven

23   litigation, while preserving investors' ability to recover on meritorious claims."  *Id.* at 322.

24

25         [3] Members of the House and Senate "observed that plaintiffs routinely were filing lawsuits

26   'against issuers of securities and others whenever there [was] a significant change in an issuer's
     stock price, without regard to any underlying culpability of the issuer, and with only faint hope

27   that the discovery process might lead eventually to some plausible cause of action[.]'"
     *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 978 (9th Cir. 1999) (alterations in original)

28   (citation omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

Under the PSLRA's heightened pleading requirement, to state a Section 10(b) claim, plaintiffs must allege facts sufficient to establish:  (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  With respect to the scienter requirement, the Court must view the allegations as a whole and determine whether plaintiff have raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (citing *Tellabs*, 551 U.S. at 326).  When assessing the allegations holistically, the Court views circumstances that are probative of scienter viewed with a practical and common-sense perspective.  *Id*.

Here, defendants challenge the sufficiency of the first two elements:  material misrepresentation or omission and scienter.  The Court discusses each element below.

**B.  DISCUSSION**

**1.  First Element:  Material Misrepresentation or Omission**

**a.  Legal Standard**

To plead falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).  If an allegation regarding the statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed."  *Id.*  "Central to a 10b–5 claim is the requirement that a misrepresentation or omission of fact must be material."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).  A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1976) (quoting *TSC Indus., Inc. v. Northway, Inc.*,

426 U.S. 438, 449 (1976)).  To plead materiality, the complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011) (quoting *Twombly*, 550 U.S. at 556, and *Iqbal*, 556 U.S. at 678) (internal citations and quotation marks omitted).  "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *In re Cutera*, 610 F.3d at 1108 (internal citations and quotation marks omitted).

### b.  Material Misrepresentations or Omissions Requirement Met

Plaintiffs' securities fraud claim centers on two broad categories of statements.  First, plaintiffs take issue with statements that they allege misrepresented the status of Llano chip production.  Second, plaintiffs take issue with statements made by defendants that allegedly misrepresented the availability of Llano to channel customers.  Because the Court finds that plaintiffs have alleged sufficiently the materiality and misleading nature of statements concerning the first category (the status of Llano yield as AMD prepared for its delayed launch of the Llano product), the Court does not address separately the second category of alleged material misstatements or omissions.

With respect to statements concerning Llano yield, the Court finds the relevant allegations to be as follows.  The Class Period starts on April 4, 2011, when, on an analyst call, AMD discussed changes made to its wafer services agreement ("WSA") with GF concerning GF's compensation for production of the Llano 32nm processor.  On that call, Seifert explained that instead of compensating GF on a fixed-cost per wafer basis, AMD would instead only pay for the chips that actually worked.  Seifert explained that the WSA amendment was originally motivated by the initial yields in 2010, which had been lower than expected and precipitated in the delayed launch, but that yields were currently meeting expectations gearing up for the launch two months later.  The specific statements are as follows:

I want to make sure it is clearly understood today, as we've said in the past, we've moved into a new phase of 32 nanometer development with GLOBALFOUNDRIES. *Today 32 nanometer yields are in line with our expectations* and I'm excited to tell you this morning that Llano is now shipping for revenue. Customers are very excited about Llano coming to market and we will look forward to seeing our Llano-based systems in the market this quarter -- the second quarter.

\*\*\*

[W]e are in manufacturing mode and yield improvement, ramping up the yield curve is really manufacturing topics, not technology topics. We have been making very good progress and *yield is on expectations and it allowed us to start shipment for revenue.*

\*\*\*

*32 nanometer today is where we want it to be*.

(CCAC ¶ 154 (citing Apr. 04, 2011 Call Tr. at 3, 10, 13 (emphases supplied)).)

Seifert also represented that (i) any yield problems were behind the AMD, that AMD was not expecting "lower than anticipated yields," and (ii) that the new WSA did not result from yield problems, but provided "downside protection" for AMD.

*And, not that I'm currently expecting any [yield problems], we wanted to ensure better protection for AMD under lower than anticipated yield scenarios.*

\*\*\*

So from today's perspective -- maybe let me go back one step. So the original discussion on this amendment was triggered last year when the 32 nanometer ramp looked a bit more challenging. From today's perspective it's rather more a downside protection. So as we said before, *yields on 32 nanometer are on target*....

\*\*\*

*I think we left now the 32 nanometer issues behind us*.

(CCAC ¶ 155 (citing Apr. 04, 2011 Call Tr. at 3, 5, 12 (emphases supplied)).)

Plaintiffs allege that these statements, as well as subsequent statements and omissions,[4] were misleading. Specifically, plaintiffs contend that such statements led the market to believe

---

[4] The Court understands plaintiffs' argument concerning the misleading nature of subsequent statements to be based in substantial part on their contention that earlier affirmative representations, cited above, constitute material misrepresentations that went uncorrected and affected AMD's ability to supply both OEM and channel customers. (*See* CCAC ¶¶ 154, 155, 156

United States District Court
Northern District of California

that "no tightness in wafer supply" (CCAC ¶ 86) in fact existed, despite persistent yield problems. As stated above, plaintiffs allege that in reality, AMD touted Llano's present success in the market after Llano's 2011 launch, while at the same time, shipped Llanos only to top-tier OEM customers due to supply constraints. As a result, channel customers received very few Llanos. Nonetheless, defendants are alleged to have represented continually that the Llano devices were faring well in the market and maintained that Llano yield was no longer an issue.

Based on the foregoing outline of the allegations, the Court finds that plaintiffs have sufficiently alleged falsity, particularly with respect to present-tense statements of fact.[5] Such statements include: "Today 32 nanometer yields are in line with our expectations"; "yield is on expectations"; "yields on 32 nanometer are on target." Through these statements, notably without qualification, the Court finds that AMD allegedly represented that Llano yields were healthy and

_____

(allegations concerning yield in April 2011); ¶¶ 158-61 (allegations relating to factual statements that allegedly led the market to believe that AMD had overcome its yield issues); ¶¶ 162, 164, 165 (statements of present fact during 1Q11 conference call that led the market to believe that yield was no longer an issue); ¶¶ 167–69 (statements of present or past fact that allegedly led the market to believe that Llano was being shipped to the full market, not simply OEM customers, but channel customers as well); ¶ 173 (statement of past fact touting strong sales in AMD's customer base, omitting information that Llano was not shipping to all of its customer base); ¶¶ 183, 184 (statement that AMD was receiving all the support it needed from GF, allegedly misleading because Llano was at that time suffering from significant yield problems); ¶ 188 (touting strong demand and implying that Llanos were shipped to all customers, including the channel); ¶ 192 (statement concerning status of yield concealed low yield issues); ¶ 199 (statement apprising market about lack of Llano yield at GF, failing to state that yield had been a persistent issue to that point); ¶¶ 204, 205 (statements concerning sales to channel that omitted to mention that the channel had not been supplied fully with Llano); ¶ 209 (statement regarding impact of lack of Llano supply, neglecting to mention that yield had been an issue to that point); ¶ 217 (touting strong customer demand, downplaying yield issues, neglecting to mention that the channel did not receive Llano); ¶ 221 (same); ¶¶ 224, 225 (same); ¶ 228 (touting strong customer demand, downplaying previous yield issues); ¶¶ 231, 232 (same); ¶ 241 (same)).

[5] Although plaintiffs allege further statements in support of the instant claim, the statements the Court finds most central to resolution of the instant motion are those that are statements of past or existing fact that plaintiffs allege differed materially from the state of affairs at the time the statements were made. Given that the Court finds these statements sufficient to state a claim, the Court need not and does not consider plaintiffs' additional statements, which defendants contend are inactionable as forward-looking statements and/or puffery. (See CCAC ¶¶ 162-63, 165, 168, 170, 172, 174-75, 177-83, 185, 195-96, 208-09, 211-13; CCAC ¶¶ 221-22, 228-30, 236-239, 244, 246-47, 253.) Likewise, because the Court finds that plaintiffs have alleged sufficiently the falsity of present-tense statements concerning Llano yield in 2011 for purposes of the instant motion, the Court need not and does not consider independently the sufficiency of plaintiffs' claims concerning later failures to disclose weak channel adoption or the inevitability of AMD's write-down in 2012.

1    in line with what was needed for a successful product launch.  The Court further finds misleading

2    Seifert's statement in May 2011 that "[c]urrently we have no issues, no tightness in wafer supply."

3    (CCAC ¶ 168 (citing May 17, 2011 Call Tr. at 4.))  Given the alleged supply constraints that led

4    AMD to prioritize shipments of Llano to its OEM customers, leaving virtually no Llano product

5    for the important channel customers, the Court finds the falsity requirement satisfied.  This finding

6    is further reinforced by the defendants' alleged failure to disclose AMD's decision not to supply

7    channel customers, while generally representing strong market presence for Llano.

8        In reaching this conclusion, the Court refers principally to two categories of allegations:

9    first, allegations supported by confidential witnesses; and second, allegations concerning the

10   nature of the semiconductor industry and the timing of its production cycle.  As to the first

11   category, plaintiffs maintain that the statements representing that the yield issues were behind

12   AMD as of April 2011 were misleading because at that time, the yield was actually "horrible."

13   (CCAC ¶¶ 11, 95.)  In support thereof, plaintiffs reference several confidential witnesses ("CWs")

14   as attesting to the fact that GF was "struggling" "throughout all of 2011" to improve yields.

15   (CCAC ¶ 93.)  Plaintiffs further reference a CW statement that "everyone at AMD and GF [was]

16   'flipping out' over the Llano yield problem."  (CCAC ¶ 104.)  The Court finds these allegations to

17   support a finding for purposes of the instant motion that the statements indicating "on target" yield

18   were false when made.

19       As to the second category, the Court finds strongly persuasive facts alleged concerning the

20   timing of the Llano production cycle and the Llano yield rates over time.  Specifically, the yield

21   doubled in a quarter, from 3Q11 to 4Q11.  Thus, logic counsels that prior to that point, including

22   when the statements at issue were made, the yield rate had to have been less than 50%.  (CCAC ¶¶

23   124–125.)  This renders plausible plaintiffs' contention that defendants' statements from April

24   2011 that the yields were "on target" were untrue when made.

25       The Court further finds plausible plaintiffs' claim that these statements were false when

26   made in light of allegations based on an expert in the semiconductor industry.[6]  According to

27   _____

28       [6] For these microprocessor chip production statistics, plaintiffs consulted an expert in the
     semiconductor industry who has approximately 25 years of direct industry experience with

United States District Court
Northern District of California

plaintiffs' expert, a typical computer chip production supply chain timeline requires demonstrating good yields six to nine months before consumers can buy retail computers with the new chips. (CCAC ¶ 126.)  An aggressive product launch timeline would require good yields approximately sixteen weeks before launch.  Accordingly, plaintiffs allege that the *latest* AMD would have known about the yield problem would have been in March 2011 — prior to the date of the statements cited above.[7]  (CCAC ¶ 129.)

Defendants' later admissions also make plausible plaintiffs' allegations that statements touting strong Llano supply in April 2011 were false when made.   For example, defendants later admitted that the channel customers were not fully supplied with Llano products until December 2011, and that due to low Llano supply, AMD had elected to supply the OEM customers instead, further reinforces that as of April 2011 the Llano yield issues were not "behind" the Company. (CCAC ¶ 292.)  Had yield not been an issue leading up to the launch, AMD ostensibly would not have had to "slant" the Llano supply "to the OEM" and to the exclusion of channel customers. (*See* Sept. 4, 2012 Conf. Tr. at 4.)

Thus, the Court finds that plaintiffs have alleged facts to support their contention that at the time these statements were made, in April 2011, the yield issues had not resolved.  Statements that

---

microprocessor and chip design, yield, and supply chain management, and gained this experience through various high-level positions at IBM, Intel, Samsung, Sandisk, Texas Instruments, and Qualcomm. The expert was responsible for other new chip launches (including microprocessor design and product launch), scheduling and managing chip output for distribution to OEMs and the channel customers.  (CCAC ¶¶ 112-113.)  The expert was asked to describe, based on his knowledge and expertise: (a) the steps involved in launching a product such as AMD's Llano APU from production to retail shipment, and to construct a timeline illustrating the same; (b) the nature of the manufacturing problem AMD was experiencing with its Llano APU, and the resolution of the problem; (c) Llano product launch milestones from wafer start to retail shipment; (d) based on the production launch timeline and the nature of the yield issues, when the problem would have been identified, and the latest the problem needed to have been fixed in order to launch successfully; (e) the product lifecycle of microprocessors like Llano and how next generation products impact the current product; and (f) how delays in production might impact other companies in the supply chain.  (CCAC ¶ 114.)

[7] Notwithstanding this inferential calculation regarding the latest point in time defendants would have known that yield was an issue likely to impede Llano's second launch attempt, plaintiffs further allege that given the nature of the yield problems at issue with Llano, and the fact that such problems occur early in the manufacturing process, the problems existed "from day one" and had to have existed and been known in 2010.  (*Id.*; *see also id.* ¶ 96 (CW2 attesting that the issues with Llano were "known to the Company [AMD]" when AMD "got [the] first prototypes.")

13

1    the yield was "on target" and "on expectation" and that the previous issues had been resolved

2    therefore created an "impression of a state of affairs that differ[ed] in a material way from the one

3    that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)

4    (quoting *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

5           Defendants' arguments to the contrary do not persuade.  First, defendants characterize

6    plaintiffs' allegations regarding deficient yield as lacking specificity and dismiss the as-pleaded

7    "yield" problem as "a generic thing." (Oct. 28, 2014 Hrg. Tr. at 30:4-9.)  This characterization

8    fails to take into account the import of context, as discussed at length above.  As understood in the

9    context of this case, "yield" carries a specific meaning:  "The number of working chips that come

10    from a wafer are referred to as the "yield." (CCAC ¶ 47.)  It was problems with the "yield" that

11    resulted in Llano's delayed launch.  Thus, by telling the market that the yield issues were "behind"

12    the Company, that AMD was "not . . . currently expecting any [yield problems]," a reasonable

13    investor would have had plausible reason to understand that defendants were referring to the issues

14    that had precipitated in the delayed Llano launch.  To claim non-plausibility at this juncture is

15    premature and not supported by the standard to be applied herein.  By representing that the yield

16    issues had resolved, the market was led to believe that sales in the months to come would not be

17    impeded by similar production issues.  Second, defendants' insistence that "[a] poor yield, by

18    itself, does not necessarily mean a supply constraint, as an increase in wafer capacity could offset

19    the low yield" proves unpersuasive in light of the allegations that yield was the reason that the

20    launch was delayed in 2010, and that AMD ultimately admitted in September 2011 that the yield

21    problems caused it to miss guidance.

22           For these reasons, plaintiffs have adequately alleged falsity.

23           **2.  Second Element: Scienter**

24           **a.  Legal Standard**

25           Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud."

26    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  To plead scienter adequately, the

27    complaint must "state with particularity facts giving rise to *a strong inference* that the defendant

28    acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis supplied).  "The

*United States District Court*
*Northern District of California*

inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted). Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. In determining whether this requirement is met, the Court must view the allegations as a whole and determine whether plaintiffs have raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP*, 542 F.3d at 784 (citing *Tellabs*, 551 U.S. at 326). When assessing allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective. *Id.*

Nonetheless, the PSLRA demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson*, 527 F.3d at 989 (emphasis in original). A strong inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314. The inference must be that "the defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness.*" *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (emphasis supplied) (internal quotation marks omitted). Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP*, 542 F.3d at 782. "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

"[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so [may] provide some reasonable inference of intent," but are not independently sufficient. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 974, *abrogated on other grounds by S. Ferry LP*, 542 F.3d at 784. It may also be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies. *S. Ferry LP*, 542 F.3d at 785–86.

1

**b. Scienter Requirement Met**

2       The Court finds that plaintiffs have adequately alleged scienter. In so finding, the Court

3   views the CCAC as a whole and takes note of the context in which the statements above were

4   made. Well over half of AMD's revenue is derived from its microprocessor sales, and the Llano

5   was intended to be AMD's high-margin accretive microprocessor chip set to launch in December

6   of 2010. Along with being a central piece of AMD's projected revenue and profitability strategy,

7   the Llano was described as a substantial advancement for the "industry moving forward." (*See*

8   CCAC ¶¶ 55–58; 70–75.)

9       In mid-2010, however, due to GF's problems manufacturing sufficient volume of the

10  Llano chip, AMD announced that the launch would be delayed until the second quarter of 2011.

11  Given the import of launch timing to AMD's bottom-line (*i.e.*, AMD's cyclical sales cycle and

12  need to capitalize on the back-to-school and holiday shopping markets) (CCAC ¶ 44), the fact that

13  Llano would miss the original launch date by several months was a critical setback and the market

14  was aware of it. (CCAC ¶ 77 ("AMD's delayed release schedule for its Llano processor [...] puts

15  it at a competitive disadvantage to Intel," and "[...] It's extremely important they execute on the

16  Fusion products that should be rolling out in the next few quarters.").) Against this backdrop,

17  defendants stated in April 2011 that the yield issues had been resolved and represented to the

18  market that Llano yield would no longer be a problem.

19      In support of their contention that defendants possessed scienter when those statements

20  were made, plaintiffs refer to multiple CWs. Plaintiffs' reliance on the CW statements must pass

21  two hurdles. First, a CW must be described with sufficient particularity to establish his or her

22  reliability and personal knowledge. *Zucco Partners*, 552 F.3d at 995. Second, the statements

23  supplied by CWs "with sufficient reliability and personal knowledge must themselves be

24  indicative of scienter." *Id.* Here, the Court finds the standard met. The CWs are described with

25  sufficient specificity to establish reliability — their dates of employment and professional roles are

26  provided, and that information provides a sufficiently reliable basis for the Court to determine that

27  statements attributed to them are indicative of scienter. Plaintiffs' CWs stated generally that both

28  AMD and GF were extremely focused on the Llano yield problem throughout 2011, and both

United States District Court
Northern District of California

companies were devoting considerable resources to fix the yield issues that had stalled the Llano launch. (*See* CCAC ¶ 100.) Specifically, CW7, employed at AMD from June 2007 through November 3, 2011, had reported to Seifert while working there and is knowledgeable about "product roadmaps." CW7 stated that Seifert and Read specifically were kept apprised of Llano production issues. (*See* CCAC ¶ 102.) Plaintiffs allege, referring to CW7, that Seifert and Read were "intimately" involved in any production issues at GF related to Llano, and that Read "owned R&D [research and development of products]" and along with Bergman, attended a "weekly production meeting." (*Id*.) These weekly meetings included discussions regarding the status of chips, launches, and any issues at GF. (*Id*.) Seifert was directly informed about what was discussed at the meetings. (*Id*.)

Moreover, the CWs corroborate one another's statements concerning the fact that AMD and GF were working closely and dedicating substantial resources to fix the yield problem throughout 2011. For example, CW2, who was the director of finance at GF from 2009 until 2012, and who was heavily involved in developing the wafer supply agreement, confirmed that the Llano yields were exceedingly low throughout 2011, as did CW4, who added that GF dedicated approximately $30-40 million to send "ex-pats" to Dresden to improve the yield. CW5 corroborated that AMD sent a team to relocate on-site at GF's Dresden facilities, including at one point Vice President John Dockerty. Statements attributed to CW2 support those statements – according to CW2, AMD dedicated considerable resources to fix the yield problem, and to that end, sent its own employees to work in the fabrication plants. (CCAC ¶¶ 101, 103, 105.) The CWs also corroborate, although not conclusively, the prevalence of meetings relating to the Llano problem, and that such meetings involved both AMD and GF. (CCAC ¶ 106.) Specifically, CW2 attested that there were "so many" daily and weekly meetings between AMD and GF to discuss the Llano yield, and CW4 confirmed the same, albeit from August 2011 onward, when he started working at GF. (*See* CCAC ¶ 103.)

The confluence of these specific allegations supports this Court's finding that the PSLRA's high standard for alleging scienter has been met here. That Llano was allegedly such a critical product for AMD's financial success, that certain of the defendants had been involved when the

17

Llano launch was delayed due to the GF yield issues, that they had attended or been informed of the substance of *weekly* meetings at which the issue continued to be discussed, and the production timeline for the Llano, together support a strong inference that they knew of the shortage in Llano supply that allegedly persisted from 2010 through 2011.  Far from the generic sort of "day-to-day management behavior" that the Ninth Circuit has found insufficient to establish scienter (*see* Dkt. No. 84 ("Reply") at 8-9), these meetings appear to have been targeted to keeping AMD apprised specifically of the ongoing yield issues unique to Llano and GF (*see* CCAC ¶ 102).  That this is the case is reasonably inferred from both plaintiffs' allegations and in view of the broader context in which such meetings occurred.[8]  Moreover, given the highly critical role that yield issues had played in the failure of the initial launch, the statement that such issues were "behind" AMD when they allegedly were not likewise supports the inference that these defendants exhibited an extreme departure from the standards of ordinary care intended to fairly inform reasonable investors.

The Court does not reach this conclusion lightly.  In so holding, the Court has considered possible non-culpable explanations for why defendants might have stated that yields were on track when they were later exposed as not having been.  For example, perhaps GF lacked knowledge or concealed the fact of persistent yield difficulties from AMD.  (*See* Reply at 9 (positing that GF itself might not have had insight into Llano supply, much less that it shared such information with AMD).)  However, allegations in the CCAC render such possibilities relatively less persuasive than the inference that defendants met the scienter requirement of the PSLRA.

The CCAC, read as a whole, and in particular those allegations concerning AMD's own role in trying to resolve the yield problems and the confidential witnesses' alleged statements, undermines the notion that defendants were not privy to the sort of information that would have informed them about the yield issues present from 2010 through 2011.  Indeed, allegations in the CCAC affirm that defendants, particularly Siefert and Read, were informed on a weekly basis about the details concerning Llano supply and customer demand.  Multiple confidential witnesses

---

[8] Furthermore, as explained above, defendants' decision to allocate limited Llano supply to the OEM customers only and not to supply the channel customers with "real" Llano shipments until December 2011, provides additional support for the strong inference that defendants knew that their statements that the yield was "on target" as of April 2011 were false when made.

United States District Court
Northern District of California

attested that both AMD and GF were focused on solving the Llano problem and devoted considerable resources to fix it, and several witnesses attested that GF and AMD were working together closely to attempt to solve the yield problem.  (*See, e.g.*, CCAC ¶¶ 98; 101; 102; 103 (starting early in 2011, GF started transferring substantial numbers of employees to Dresden in an attempt to get the Llano yield up); 105 ("[T]here was active engagement between AMD and GF throughout the process of producing Llano"; AMD "had employees in the plants working in the [GF] Fabs trying to fix" Llano; estimated a 50/50 breakdown on engineers from both companies trying to rectify the Llano problem); 109 ("AMD had a very robust system in place to track production, customer demand, and inventory.").)  The closeness between GF and AMD when it came to the Llano yield issue, combined with the allegations that such yield was woefully low throughout 2010 and 2011, renders it insufficiently probable that GF concealed its yield problems from AMD at the time defendants stated that yields were "on target" in April 2011.

### IV.    CONCLUSION

For the reasons stated above, the Court finds that plaintiffs have alleged sufficiently a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. Accordingly, the motion to dismiss is **DENIED**.  By this Order, the Court takes no position regarding the appropriate length of the class period, given the lack of briefing on the issue of whether the class period should be of plaintiffs' desired length.

This terminates Docket No. 66.

**IT IS SO ORDERED.**

Dated: March 31, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**