# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

_____
BABAK HATAMIAN, et al.,                  )
                                          )
                       Plaintiffs,  )
                                          )
ADVANCED MICRO DEVICES, INC.,  )   Case No. 4:14-CV-00226-YGR
et al.,                                      )
                                          )
                      Defendants.  )
_____)

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

# Table of Contents

**Page**

I.    **INTRODUCTION** ...............................................................................3

II.   **QUALIFICATIONS**.............................................................................3

III.  **SUMMARY OF OPINIONS** .............................................................4

IV.  **OVERVIEW OF AMD AND ALLEGATIONS** ..............................5

V.   **DISCUSSION OF RELIANCE ELEMENT** ...................................10

VI.  *CAMMER* **FACTORS** ....................................................................12

VII. **APPLICATION OF EFFICIENCY FACTORS TO AMD COMMON STOCK**............14

    A.    OVERVIEW...................................................................... 14

    B.    *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ..................................... 15

    C.    *CAMMER* FACTOR 2: ANALYST COVERAGE .................................................. 17

    D.    *CAMMER* FACTOR 3: MARKET MAKERS................................................... 19

    E.    *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY........................................... 21

    F.    *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION................................ 22

    G.    ADDITIONAL FACTOR 1: MARKET CAPITALIZATION................................... 31

    H.    ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ...................................... 33

    I.    ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP ................................... 34

    J.    ADDITIONAL FACTOR 4: AUTOCORRELATION ......................................... 35

    K.    ADDITIONAL FACTOR 5: OPTIONS ................................................... 36

VIII. **DAMAGES**....................................................................................36

IX.   **CONCLUSION** ..............................................................................38

## I.    INTRODUCTION

1.     My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiffs in this matter to examine and opine on whether the market for Advanced Micro Devices, Inc. ("AMD" or the "Company") common stock ("AMD Common Stock" or "Common Stock") was efficient during the Class Period.[1] In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.     The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $575 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.   QUALIFICATIONS

3.     I hold a Bachelor's Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

---

[1] The putative Class Period identified in the Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") is from April 4, 2011 through October 18, 2012 (Complaint ¶ 1).

4.      I, along with several others, founded Global Economics Group in March 2008.[2]
Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over
twelve years where I was responsible for conducting and managing analysis in a wide variety of
areas including securities valuation and damages, labor discrimination, and antitrust. I have been
engaged numerous times as a valuation expert both within and outside the litigation context. My
experience in class action securities cases includes work for plaintiffs, defendants, D&O
insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic
analysis and opinions in dozens of securities class actions as well as other matters. As a result of
my involvement in these cases, much of my career has been spent analyzing and making
inferences about how quickly and reliably, and to what degree, new information impacts
securities prices.

5.      My qualifications are further detailed in my curriculum vitae, which is attached as
**Appendix B**.

## III.  SUMMARY OF OPINIONS

6.      After analyzing AMD Common Stock throughout the Class Period and giving
careful consideration to the efficiency factors described in detail throughout this report, I have
formed the opinion that the market for AMD Common Stock was efficient throughout the Class
Period and that damages can be calculated on a class-wide basis. These opinions are based upon
my analysis described below.

7.      The remainder of this report is organized as follows: **Section IV** of this report
provides an overview of AMD's business operations and the allegations in this case. **Section V**
discusses the reliance requirement and the "fraud on the market" theory. **Section VI** introduces

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

the *Cammer* factors and other factors for evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for the Common Stock during the putative Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

8.     I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF AMD AND ALLEGATIONS

9.     AMD is a global semiconductor company that designs microprocessors for commercial and consumer use, as well as graphics, video, and multimedia products for desktop and mobile devices.[3] The company owns facilities in the United States, Canada, China, Singapore, Malaysia, and elsewhere.[4] AMD was incorporated in 1969 in the State of Delaware and holds its executive offices in Sunnyvale, California.[5] As of December 29, 2012, the company had approximately 10,340 full- and part-time employees worldwide.[6] Approximately 92% of its revenues came from outside the U.S. with 58% of its revenues coming from the Greater China area, its largest revenue market.[7] AMD's revenues primarily came from two product segments: computing solutions and graphics. During the fiscal year ending December 29, 2012, AMD's

---

[3] AMD 10-K for FYE December 29, 2012, p. 2.

[4] AMD 10-K for FYE December 29, 2012, p. 35.

[5] AMD 10-K for FYE December 29, 2012, p. 2.

[6] AMD 10-K for FYE December 29, 2012, p. 16.

[7] AMD 10-K for FYE December 29, 2012, p. 102.

computing solutions segment generated about 74% of sales ($4 billion), and the graphics segment generated about 26% of sales (or about $1.4 billion).[8]

10.     AMD's products are sold primarily through the company's sales force and independent distributors, as well as sales representatives in domestic and international markets who in some cases also sell for AMD's competitors.[9]  Sales agreements are based on product forecasts by the customers, which are not binding for minimum product purchases.[10] Their customer base in the microprocessor market are primarily original equipment manufacturers (OEMs), third party distributor channel partners (or "the channel"), original design manufacturers (ODMs), system builders, and independent distributors with whom the company works closely to customize product features, performance, and timing of new products to meet customers' needs.[11] AMD has special arrangements with manufacturers and test facilities for their products and owns two of their own facilities in Penang, Malaysia, and Suzhou, China.[12] Hewlett-Packard Company ("HP") accounted for more than 10% of AMD's consolidated net revenues in 2012.[13] Other companies, like Apple, Dell, GE, Lenovo, Microsoft, Nintendo, Samsung, Sony, Toshiba, and others, are customers of AMD for their PC technology.[14]

11.     Plaintiffs' Complaint alleges that AMD and Individual Defendants issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to purchasers of AMD Common Stock who unknowingly bought the Common

---

[8] AMD 10-K for FYE December 29, 2012, p. 102.

[9] AMD 10-K for FYE December 29, 2012, p. 9.

[10] AMD 10-K for FYE December 29, 2012, p. 9.

[11] AMD 10-K for FYE December 29, 2012, p. 10.

[12] AMD 10-K for FYE December 29, 2012, p. 15.

[13] AMD 10-K for FYE December 29, 2012, p. 10.

[14] "The AMD Story," at 6 (Nov. 2014) (http://www.amd.com/Documents/The_AMD_Story.pdf).

Stock at artificially inflated prices and were damaged when the stock price ultimately reflected the concealed information.[15]

12.    More specifically, the Complaint alleges that false and misleading statements and material omissions were made with respect to AMD's development and rollout of the 32 nanometer (nm) chip technology which was to be branded under the name "Llano."[16] The development of this Llano chip originated with the intent to compete with Intel's "Sandy Bridge" 32 nm processor, and eventually gain market share.[17] Amidst known problems with the 32 nm processor, the Complaint alleges that in order to conceal and minimize these problems in the eyes of investors, spokespeople for AMD made false statements about the 32 nm processor throughout the Class Period.[18] For instance, at the start of Class Period, AMD announced during a conference call that they amended their Wafer Supply Agreement (WSA) so that AMD would only compensate the manufacturer GlobalFoundries for the chips that actually worked, instead of a fixed-cost per wafer basis.[19] Defendants misleadingly claimed that the amendment to the WSA had nothing to do with low yields of Llano, and instead claimed that the Llano yield problems were now "behind" the Company.[20] To further downplay the 32 nm processor issues, AMD's interim CEO (at the time), Thomas Seifert, stated that "Today 32 nanometer yields are in line with our expectations and I'm excited to tell you this morning that Llano is now shipping for

---

[15] Complaint ¶ 42.

[16] *See* Complaint at Section V. Defendants' Materially False and Misleading Class Period Statements and Analyst and Market Reactions Thereto, ¶¶ 153-281.

[17] Complaint ¶ 6.

[18] *See* Complaint at Section V. Defendants' Materially False and Misleading Class Period Statements and Analyst and Market Reactions Thereto, ¶¶ 153-281.

[19] Complaint ¶ 153.

[20] Complaint ¶ 154-156.

revenue."[21] The Complaint alleges that this statement was misleading because at the time it was made, the Llano yield issue had not been resolved and AMD was significantly supply constrained, such that Llano could not launch successfully.[22] Indeed, Defendants omitted that there was so few Llano chips to go around that AMD could not ship "Llano to a major segment of its customers… [and] was instead prioritizing shipments of the small Llano yield to its top tier OEM customers."[23]

13.    Furthermore, at the announcement of AMD's 1Q2011 earnings, AMD reported positive results and a successful launch of the Llano processor, but these statements were false and misleading to investors given the poor yields and low supply for shipping.[24] During a conference call to discuss the earnings, "Defendants also claimed that AMD's margins would increase later in the year from Llano shipments in the third and fourth quarter."[25] These misleading statements perpetuated the market's belief that AMD was reaching a sufficient yield and shipping to all their customers, which was not actually the case.[26] In filing their 2Q2011 results, AMD also issued a statement providing guidance for their third quarter performance: "AMD expects revenue to increase 10 percent, plus or minus 2 percent, sequentially for the third quarter of 2011."[27]

---

[21] Complaint ¶ 154.

[22] Complaint ¶ 156.

[23] Complaint ¶ 156.

[24] Complaint ¶ 161.

[25] Complaint ¶ 163.

[26] Complaint ¶ 165.

[27] Complaint ¶ 172.

14.     False and misleading statements such as these allegedly continued through the end of 2011 and beginning of 2012 even as some corrective information allegedly began to surface.[28] For instance, a pre-announcement of 3Q2011 earnings on September 28, 2011 decreased the forecasted revenues from 10 percent to 4-6 percent and decreased margins on products by 3 percentage points, from 45 percent.[29] On that day, Defendants told the market that revenues were lower than expected due to lower than expected supply of Llano due to "manufacturing issues."[30] These statements allegedly revealed some of AMD's struggles, but they did not reveal the full truth, such as the continuing inability to ship to a large portion of their market, and the decreasing demand for Llano resulting therefrom.[31] Additional partial corrective disclosures allegedly took place on July 9, 2012, July 19, 2012, and October 11, 2012, with a final disclosure on October 18, 2012.[32] On the final disclosure date, AMD's Llano yield problems and the lasting effects on supply and demand for the product became clear to the market -- margins on AMD's Llano system were negative, and the company lost market share.[33] AMD wrote-off its remaining supply of Llano as unsellable.[34] The revelations of AMD's poor development and rollout of the 32 nanometer processor and Llano system allegedly resulted in the subsequent damages to AMD's standing in the market and harmed investors that had purchased in reliance on the alleged misstatements and omissions.

---

[28] Complaint ¶ 162-281.

[29] Complaint ¶ 199.

[30] Complaint ¶ 199.

[31] Complaint ¶ 202.

[32] Complaint ¶ 255-275.

[33] Complaint ¶ 281.

[34] Complaint ¶ 279.

## V.   DISCUSSION OF RELIANCE ELEMENT

15.   Class members' reliance on the alleged misstatements and material omissions is a required element for Plaintiff's Section 10(b) claims. Plaintiffs assert the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic v. Levinson* and reaffirmed in *Halliburton II*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[35]

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[36]

16.   As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the

---

[35] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[36] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and lack of disclosure by paying the inflated (deflated) price.

17.    Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[37] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[38] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[39]

18.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available

---

[37] To recognize the presumption of reliance, the Court explained, was not "'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.'" [Basic], 485 U.S. at 248 n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id* at 247 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency. Indeed, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.

[38] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

[39] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

material information regarding the company and its business."[40] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.[41]

19.    In the next section, I explain the factors that are regularly considered by courts in determining whether the market for a particular security is efficient.

## VI.  *CAMMER* FACTORS

20.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[42]

21.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[43] As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency.[44] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

---

[40] *Basic,* 485 U.S. at 241.

[41] Indeed, *Halliburton II* sensibly makes clear that the standard is short of some idealized notion of semi-strong efficiency, but rather, "To recognize the presumption of reliance, the Court explained, was not 'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.' *Id*. The Court instead based the presumption on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" 134 S. Ct. at 2410 (internal citations omitted).

[42] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[43] *Cammer,* 711 F. Supp. at 1276, n.17.

[44] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fɪɴ. 383 (1970).

A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

An *efficient market* is one which rapidly reflects new information in price.

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[45]

22.   While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.

23.   In the subsequent sections, I evaluate each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns), and 5) option trading.

---

[45] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)) (emphasis added).

## VII.  APPLICATION OF EFFICIENCY FACTORS TO AMD COMMON STOCK

### A.  OVERVIEW

24.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for AMD Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how for each of the factors examined, the empirical evidence supports a finding that AMD Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays the Common Stock closing price and trading volume for each day throughout the Class Period.

25.    In summary, and as discussed more fully below, AMD Common Stock traded in an efficient market. First, the average weekly trading volume of the Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average daily trading volume for the Common Stock was over 19.6 million shares, which represents an average of 14.06% turnover per week, higher than the average common stock traded on the New York Stock Exchange. Second, there were a large number of securities analysts following and reporting on AMD. Third, AMD Common Stock was actively traded on the NYSE, fulfilling the *Cammer* factor regarding market makers. Fourth, AMD filed several Form S-3s before the Class Period, met the important eligibility criteria, and was apparently eligible to file Form S-3 throughout the Class Period because AMD had previously provided sufficiently high levels of public information to the market in its SEC filings. Fifth, AMD Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Sixth, AMD Common Stock had a low bid-ask spread relative to other exchange-traded stocks. Seventh, institutions, which are considered generally to be well-informed investors, held, on average, over 68% of the public float. Eighth, there was no evidence

of autocorrelation during the Class Period. Ninth, there was considerable trading in AMD

options throughout the Class Period. Finally, there was a strong cause-and-effect relationship

between new Company-specific information and the market price of the Common Stock during

the Class Period. These factors all support the conclusion that AMD's Common Stock traded in

an open, developed, and efficient market throughout the Class Period.

## B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

26.    The first *Cammer* Factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the
> outstanding shares would justify a strong presumption that the market for the
> security is an efficient one; 1% would justify a substantial presumption.[46]

27.    Volume as a fraction of shares outstanding is an important indicator of market

efficiency. First, volume is objectively quantifiable and comparable across securities. Second,

high volume is generally indicative of continuity, liquidity, and market depth – which are highly

indicative of market efficiency.[47] Third, substantial volume would indicate there is likely a

market for the collection and distribution of information about the security. As Thomas and

Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

---

[46] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[47] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276 n.17. Market depth refers to the number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).

information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[48]

28.  AMD Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly turnover for the AMD Common Stock was 14.06%, compared to 2.19% for the NYSE over the Class Period. **Exhibit 3** plots the Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[49] Indeed, the average *daily* volume during the Class Period was over 19.6 million shares.

29.  The volume of trading for the Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

30.  Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* Factor expressed in dollar terms.[50] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio, because I am just multiplying the numerator and denominator by price per share. The advantage of this measure is that once quoted in annualized terms, AMD Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for AMD

---

[48] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[49] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

[50] Turnover velocity is simply the average turnover (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

Common Stock was 726.8%, compared with the NYSE average of 113.3% for the period Class Period.[51] Thus, AMD Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE, further supporting that it traded in an efficient market.

31.    In short, the relatively high trading volume in the Common Stock throughout the Class Period supports the conclusion that the market for the Common Stock was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

32.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[52]

33.    Analyst coverage can be important confirmatory evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

34.    During the Class Period, there was an abundance of analyst coverage for AMD. **Exhibit 4** shows that there were at least 443 reports issued during the Class Period and lists 25 separate firms that had equity analysts issue reports on AMD including major firms such as Wells Fargo, Deutsche Bank, Jefferies, JP Morgan, and Credit Suisse.[53] These reports served the

---

[51] Turnover velocity for the NYSE is calculated from data provided by the World Federation of Exchanges. *See* http://www.world-exchanges.org/statistics.

[52] *Cammer*, 711 F. Supp. at 1286.

[53] I obtained AMD analyst reports from Investext. This source almost certainly understates the total amount of analyst coverage since a number of analyst reports are not available through third party data providers such as Investext. It is quite likely that additional analyst firms covered AMD that were not identified from this source.

purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. In addition, there were reports by Standard & Poor's and Moody's that evaluated AMD's creditworthiness and rated the Company's debt securities.[54] The extensive coverage of AMD by securities analysts supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

35.    Since 1989, when the *Cammer* decision was rendered, there has been a massive increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[55] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

36.    Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of AMD, there were many other sources of public information dissemination. For example, there was substantial public press regarding AMD. A search for articles classified as related to AMD by Factiva over

---

[54] Bloomberg.

[55] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions if the user is interested they can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

the Class Period results in over 7,300 articles.[56] In addition, there were also numerous SEC

filings available online at EDGAR at no out-of-pocket cost as well as various other sources of

public information available throughout the Class Period that I do not attempt to quantify. The

degree of news coverage and publicly available information further supports the conclusion that

there was substantial supply of and demand for information regarding AMD in the public arena

throughout the Class Period.

37.    In summary, the number of analyst reports, rating agency coverage, and the

substantial public dissemination of news and other information regarding AMD, provides

evidence of a robust and active market for public information about AMD and evidence that the

Common Stock traded in an efficient market during the Class Period.

## D. *CAMMER* FACTOR 3: MARKET MAKERS

38.    A market maker is a firm that is ready to buy or sell a particular stock on a regular

and continuous basis.[57] The third *Cammer* Factor states:

> For over the counter markets without volume reporting, the number of
> market makers is probably the best single criterion. Ten market makers for
> a security would justify a substantial presumption that the market for the
> security is an efficient one; five market makers would justify a more modest
> presumption.[58]

39.    The basic premise that the number of market makers can serve as an efficiency

criteria relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks'
> supply and demand conditions (i.e., the "order flow"). Therefore, it is
> believed the larger the number of market makers in a given security, the more

---

[56] Based on a search for "All Sources" with the company field "Advanced Micro Devices, Inc." for the period "April 4, 2011 – October 19, 2012." The Factiva search yielded 7,393 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

[57] *See* http://www.sec.gov/answers/mktmaker.htm.

[58] *Cammer*, 711 F. Supp. at 1293.

information is available about it and the quicker its dissemination in the price.[59]

40.    AMD Common Stock traded on the NYSE with continuous public price and volume reporting (as opposed to an over-the-counter market without volume reporting which is the context in which *Cammer* indicated this was a relevant criterion).[60] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE, which are often assumed to be efficient,[61] report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[62]

41.    The NYSE is one of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike an over-the-counter market that relies on decentralized market makers providing liquidity for trading, the NYSE relies on a computerized system to match orders and provide quotes.[63] The minimum requirements to be listed on the NYSE and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

---

[59] Brad M. Barber et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 291 (1994).

[60] "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System." *Cammer,* 711 F. Supp. at 1292 (quoting Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud*, §8.6 (1988)).

[61] Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert,* (5th ed. 2012).

[62] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market. *See* http://www.nyse.com/equities/nyseequities/1166830723427.html; William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53; Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[63] *See* https://www.nyse.com/market-model/overview#dmms-2; https://www.nyse.com/market-model/dmm-case-studies; and https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.

42.     Nevertheless, according to Bloomberg, during the Class Period, there were 261 market makers for AMD Common Stock.[64] Therefore, AMD Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

### E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

43.     The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[65]

44.     Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[66] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

45.     AMD was apparently S-3 eligible and, in fact, filed several Form S-3s before the Class Period. A Form S-3 allows a company to register unspecified amounts of different

---

[64] Bloomberg, Market Maker Activity function.

[65] *Cammer*, 711 F. Supp. at 1287.

[66] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

specified types of securities using a single form. AMD filed Forms S-3s on 7/13/2007, 11/7/2007, 11/15/2007, and 3/2/2009. Even though AMD did not file an S-3 during the Class Period[67], Defendants admit that, as a registered user, AMD was eligible to file a Form S-3 Registration Statement with the SEC throughout the Class Period.[68] Therefore, AMD meets this *Cammer* efficiency factor, which supports the conclusion that the Common Stock traded in an efficient market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

46.    The fifth *Cammer* Factor relates to how the price of a security reacts to new information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[69]

47.    Establishing a causal connection between new company-specific news events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called the "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[70] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[71]

---

[67] http://www.sec.gov/edgar/searchedgar/companysearch.html.

[68] Defendants' Objections and Responses to Lead Plaintiffs' First Set of Requests for Admissions, at 11:12-16 (Aug. 17, 2015).

[69] *Cammer,* 711 F. Supp. at 1291.

[70] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13 (1997).

[71] John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. 111 (1998).

48.     An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

49.     To analyze cause and effect, I performed an event study to determine whether AMD's Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with the least amount of AMD-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about AMD and the market price of its Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

50.     A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[72] I have performed such an analysis in this matter where I evaluate the relationship between AMD's Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return (the

---

[72] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent" variable). In this case, the daily percentage change in AMD Common Stock (the AMD daily "return") is the dependent variable and the contemporaneous daily returns for a market and industry index are the independent variables. For a general discussion of regression analysis, see Chapters 1-3 in Damodar N. Gujarati, Basic Econometrics, Third Edition, McGraw Hill, 1995.

"Market Index") and a value-weighted S&P 500 Semiconductors Index (excluding AMD),

hereafter referred to as the "Industry Index."[73]

51.    For each trading day analyzed, I constructed a regression model using data from the

prior 120 trading days (roughly six months).[74] By using a "rolling" estimation window of 120

trading days prior to the event of interest, it allows for the relationship between AMD's Common

Stock and the market factors as well as the firm-specific volatility to update over time according

to the data observed over the most recent 120 trading day period. Use of a rolling model to

account for changing volatility and evolving relationships among market indices is accepted in

peer-reviewed literature.[75]

52.    The model indicates that there is a positive correlation between AMD's Common

Stock and the control variables. In other words, the movement of the Market Index and Industry

Index helps explain movements in AMD's stock price. For instance, choosing a day in the Class

Period purely as an example, September 21, 2011, and looking at the regression results based on

the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.46 which means that

a 1% rise in the S&P 500 predicts a 1.46% increase in AMD's Common Stock return. The

estimated coefficient for the Industry Index is 0.75, meaning that the expected return for AMD's

Common Stock is about a 0.75% increase for every 1% increase in the Industry Index over and

above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling

---

[73] In their 10-K filings for 2010 through 2014, AMD identified the following indices as part of a five-year stock performance graph: the S&P 500 Index and the S&P 500 Semiconductors Index (Industry Index). (see, e.g., 2010 10-K, p. 37). In my regression model, the Industry Index returns are calculated as net of the S&P 500 Total Return Index.

[74] *See*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature 13, 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[75] Phillip A. Braun et al., *Good News, Bad News Volatility, and Betas*, 50 J. Fin. 1575, 1597 (1995).

regression models for each day during the Class Period. **Exhibit 5** demonstrates there was a consistently positive relationship between the general market, the Industry Index, and AMD's Common Stock price.

53.     Another important statistic from the regression is the Standard Deviation of the Errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in AMD's Common Stock price movement after controlling for the Market Index and Industry Index. For instance, on the example date, September 21, 2011, the model predicted that absent any new firm-specific information, the price of AMD's Common Stock would decrease by 3.71% because the S&P 500 was down 2.94% and the Industry Index was up 1.11%.[76] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of -3.86%. Thus, the "abnormal return" for this day is -0.15% (the actual return of -3.86% minus the predicted return of -3.71%). I then rely on the Standard Deviation of the Errors from the regression model to tell if this abnormal return of -0.15% is sufficiently large that I reject random movement as the explanation.

54.     The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic", which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of -0.15% represents 0.10 standard deviations or a t-statistic of -0.10 (abnormal return of -0.15% divided by the Standard Deviation of the Errors of 1.56%). Using the standard assumption that, in the absence of new firm-specific news, abnormal returns will be normally distributed around zero,

---

[76] The expected return of -3.71% is found as follows: 1.46 * -2.94% (Coefficient on Market Index *times* Market Index return) + 0.75 * 1.11% (Coefficient on Industry Index Return *times* Industry Index Return) – 0.25% (constant term from regression).

probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should only have a t-statistic greater than 1.96 (or less than -1.96) 5% of the time.[77] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of -0.09, I would say that the abnormal return is not statistically significant at the 95% confidence level and I could not reject randomness as the cause with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

55.    **Exhibit 6** shows that the Standard Deviation of the Errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility as depicted in **Exhibit 6**.

56.    To analyze cause-and-effect, I examined the price response of AMD's Common Stock to earnings announcements that occurred during the Class Period (see **Exhibit 7**). There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that release of company earnings announcements often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[78] Also, newly

---

[77] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

[78] *See, e.g.*, William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research*, Vol. 9, Empirical Research in Accounting:

released earnings reports by the company are an objective set of news to identify and test. Choosing the second earnings report from the Class Period as an example (*i.e.* Q2 2011 results released after market hours on July 21, 2011), the Company reported slightly better than expected results and increased guidance for revenues for Q3 2011 in part due to Llano launch.[79] In response, the market price of AMD's Common Stock increased 19.23%, compared to the predicted return of 1.20%. Thus, the abnormal return on July 22, 2011 was *positive* 18.03%. With a t-statistic of 11.46, this abnormal price movement is statistically significant, and I therefore have scientific evidence that AMD Common Stock reacted rapidly to this new information.

57.    Similar to this example, I analyzed the market reaction to AMD's other earnings announcements throughout the Class Period. I found statistically significant stock price movements on most of the days on which AMD reported earnings. In total, of the 7 regular quarterly earnings announcements and the 3 pre-announcements AMD issued during the Class Period, 7 resulted in statistically significant price movements at the 95% confidence level.[80, 81]

58.    **Exhibit 7** presents a summary of the earnings announcements and **Exhibits 8A – 8J** depicts the intraday price movements for all of these announcement dates.

_____

Selected Studies 1971, pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

[79] See, for instance, "Q2 Hits the Mark with Q3 Top Line Outlook Exceeding Expectations; Increasing PT to $10," *Wedbush*, July 22, 2011 and "Advanced Micro Devices, Inc.: 2011 Strategy Working; 2012 Strategy Unclear," Susquehanna Financial Group, July 22, 2011.

[80] Note that three of the earnings (i.e., Q3 2011, Q2 2012, and Q3 2012) had pre-announcements issued after market hours on September 28, 2011, July 9, 2012, and October 11, 2012, respectively, where AMD gave worse than expected earnings and/or decreased their guidance. See, for instance, "Another Day, Another Negative Preannouncement; AMD Lowers 3Q11 Guidance on Supply Issues," *JP Morgan*, September 29, 2011; "AMD Shares Slide After 2Q Rev Guidance Cut," *Dow Jones*, July 9, 2012; "AMD: Reduces September Guidance - Cutting Estimates," *Wells Fargo Securities*, October 12, 2012.

[81] Note the Class Period ends on October 18, 2012 with the release of Q3 2012 earnings released after market hours; I included the market reaction and news on the next day (i.e. October 19, 2012) as part of this analysis.

59.    I then compared these results against the 44 days during the Class Period when a
Factiva search identified the least amount of AMD-related news and there were no identified
analyst reports or SEC filings issued.[82] Of these 44 days, there were only two statistically
significant price movements. Thus, during the Class Period there was a statistically significant
price reaction on 70% of the earnings announcements, but when compared to days with the least
amount of AMD news, I only observe a statistically significant reaction 4.55% of the time.[83] In
other words, on days when there is an earnings announcement, I observe a statistically significant
stock price movement 15.4 times more often (70% versus 4.55%) when there is little news. For
days with little news, the fact that I observe 4.55% of the days with significant movements is
consistent with what I would expect to observe by randomness alone.[84] This is powerful
scientific evidence of a cause-and-effect relationship between new publicly released information
and changes in AMD's Common Stock price.

60.    Furthermore, on the 44 days with the least amount of news, the average change in
AMD's Common Stock price was 1.05% after controlling for market and industry factors, while
the average change in AMD's Common Stock price on earnings announcements was 8.91%. In
other words, the average magnitude of stock price movement on earnings announcement days
was over 8.5 times higher.[85] Again, this shows that on days when important firm-specific
information is released to the market (earnings announcements), the stock price moves much

---

[82] I identified days with the least amount of news via a Factiva search for "All Sources" with the company field
"Advanced Micro Devices Inc." for the period "April 4, 2011 – October 19, 2012." The Factiva search yielded 7,393
unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search
builder. The number of days with the least amount of news is derived from days with 10 or less published news
articles. Analyst reports, meanwhile, were obtained through Investext.

[83] This difference between 70% and 4.55% is itself statistically significant.

[84] There is no statistically significant difference between 4.55% and 5.00% (the proportion of dates that would be
significant by chance alone when using a 95% confidence interval).

[85] This difference between 8.91% and 1.05% is itself statistically significant.

more than on days where there is a low amount of news. This provides further evidence of a

cause-and-effect relationship between firm-specific news and changes in AMD's Common Stock

price, and thus an efficient market.

  61. The bar charts below summarize this analysis while **Exhibit 9** gives more detail.





62.   Finally, when important firm-specific news is released to the market (e.g. earnings announcements), the daily trading volume also tends to be much higher than on days where there is a low amount of news. For instance, the average daily trading volume of the 7 days with earnings announcements and the 3 days with pre-announcements was 62 million. Compare this to the average daily trading volume of 19 million for all other days in the Class Period. The bar

chart below summarizes this analysis.



The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in AMD's Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with the least amount of news.

63.   The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in AMD's Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with the least amount of news.

64.   In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of AMD's Common Stock.

## G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

65.   In *Krogman v. Sterritt*, the Court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

*Cammer* factors.[86] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[87] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[88] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

66.    AMD Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks combined during the Class Period, thus suggesting this factor is supportive of efficiency. Defendants admit that there were between 685 million and 708 million shares of AMD Common Stock outstanding throughout the Class Period.[89]

67.    Based on the market price, the market capitalization for AMD's Common Stock averaged $4.31 billion during the Class Period. **Exhibit 10** shows AMD's market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, AMD's Common Stock's market capitalization fell between the 67th and 84th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[90] In other words, over the Class Period, AMD Common Stock had a higher market capitalization than at least 67% of the firms on the combined NYSE and NASDAQ.

---

[86] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[87] *Krogman*, 202 F.R.D. at 478.

[88] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 117 (2000).

[89] *See* Defendants' Objections and Responses to Lead Plaintiffs' First Set of Requests for Admissions, at 10:22-26 (Aug. 17, 2015).

[90] Bloomberg terminal, Equity Search function.

68.   Given that the Common Stock's market capitalization was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for the Common Stock.

## H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

69.   The *Krogman* Court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[91] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

70.   I analyzed bid-ask spreads for AMD Common Stock during the Class Period. **Exhibit 12A** shows that during the Class Period, the time-weighted average monthly dollar bid-ask spread was no more than $0.01 per share.[92] Although the average monthly dollar bid-ask spread was generally consistent throughout the Class Period, the stock price was also falling, so the Common Stock's average monthly *percentage* bid-ask spread was rising. During this period, the time-weighted percentage bid-ask spread for AMD Common Stock in each month ranged

---

[91] *Krogman*, 202 F.R.D. at 478.

[92] I calculated a time-weighted average bid-ask spread for AMD Common Stock for each month from April 2011 to October 2012 using data received from TICK database. *See* www.tickdata.com. April 2011 and October 2012 data are limited to the Class Period.

from 0.08% and 0.33%, as shown in **Exhibit 12B**. Despite the rise in the average percentage

spread, it was still well below the mean bid-ask spread of a random sample of 100 other common

stocks trading on the NYSE and NASDAQ in September 2012 (the full month when AMD had

the largest percentage bid-ask spread).[93] **Exhibit 12C** demonstrates that AMD Common stock

had an average bid-ask spread of 0.28% in September 2012, while a randomly selected group of

100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of

0.79%.[94] Accordingly, AMD's bid-ask spread was low during the Class Period in both dollar and

percentage terms, thus this factor further supports market efficiency for AMD Common Stock.

## I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

71.    Institutional investors are considered to be sophisticated and well-informed with

access to most publicly available information for the stocks that they own. These investors

include mutual funds, pension funds, investment banks and other types of large financial

institutions that have substantial resources to analyze the securities they purchase for their

portfolios. Most institutions that hold over $100 million in assets are required to report their

equity holdings on a quarterly basis on SEC Form 13F.[95] As **Exhibit 13** shows, these large

institutions reported owning a majority of AMD Common Stock during the Class Period. For the

quarters spanning the Class Period, 690 institutions owned AMD Common Stock, holding, on

average, 67.73% of the public float. This high level of institutional ownership of AMD Common

---

[93] Although October 2012 shows a greater average percentage bid-ask spread, data is limited to the Class Period; thus, September 2012 is used for comparison. Quote data for AMD and other publicly traded stocks were obtained from the TICK database. *See* www.tickdata.com.

[94] The average bid-ask spread was calculated by taking a time-weighted average of the spread during trading hours on the primary exchange of each security. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. Fin. Econ. 313 (1996).

[95] See http://www.sec.gov/about/forms/form13f.pdf.

Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

### J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

72.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

73.    Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[96]

74.    A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[97] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation. Even if the regression shows a significant result for a certain period, then one must ask whether the effect is persistently significant and large enough to suggest a predictable arbitrage opportunity in the next period.

75.    **Exhibit 14** displays the autocorrelation coefficient for AMD Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class

---

[96] Doron Avramov et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).

[97] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

Period is very close to zero and not statistically significant meaning there is no evidence of autocorrelation (*i.e.*, throughout the Class Period, the coefficient on the previous day's abnormal return averaged -0.02). The t-statistic for this coefficient averaged -0.43, which means that I can confirm with 95% confidence that the variation in abnormal return throughout the Class Period is due to randomness. This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that AMD Common Stock traded in an efficient market throughout the Class Period.

## K.  ADDITIONAL FACTOR 5: OPTIONS

76.    In addition to the factors analyzed above, there was also considerable option trading in AMD during the Class Period.[98] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[99] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[100]

## VIII.  DAMAGES

77.    Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled

---

[98] For instance, according to Bloomberg there were 2.01 million AMD Common Stock put contracts and 3.77 million AMD Common Stock call contracts that traded during the Class Period.

[99] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[100] Raman Kumar et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).

formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[101]

78.     The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

---

[101] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, 109 Stat 737, 748-49.

## IX.   CONCLUSION

79.   In sum, every factor analyzed supports my opinion that AMD's Common Stock traded in an efficient market. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

80.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on September 4, 2015

Chad Coffman

**Exhibit 1**

# Summary of Efficiency Factors for AMD

| Factor | Summary of Factor | AMD |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 14.06%, as a percentage of shares outstanding, well exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 19.6 million shares traded daily on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 25 securities analysts issued 443 analyst reports, which implies that important information relevant to trading AMD's common stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because AMD's shares were exchange-traded on the NYSE during the class period, not over the counter, this factor is satisfied. According to Bloomberg, during the Class Period, there were 261 market makers for AMD Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • AMD met the important eligibility criteria for SEC Form S-3 and was S-3 eligible during the Class Period. Historically, AMD filed Form S-3 on 7/13/2007, 11/7/2007, 11/15/2007, and 3/2/2009; therefore, this factor is satisfied. In addition, Defendants admit that, as a registered user, AMD was eligible to file a Form S-3 Registration Stated with the SEC throughout the Class Period. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for AMD's Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | As of 12/31/2011 and 12/31/2012, AMD's market capitalization was $3.7 billion and $1.7 billion, respectively, which is at or above the 67th percentile of NYSE and NASDAQ stocks. AMD's Common Stock therefore easily meets this criteria. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the bid-ask spread for AMD Common Stock in each month ranged from 0.08% to 0.33%. AMD's average percentage bid-ask spread was well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in September 2012 (the full month when AMD had the largest bid ask spread). This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • 690 institutions held 68% of the public float throughout the class period, on average, which further supports the finding that AMD's Common Stock traded in an efficient market (Note: Institutions held a max of 75% of the public float during the Class Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • No evidence of autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading AMD's Common Stock based solely on its past price movements. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks | • There were 2 million AMD Common Stock put contracts and 3.7 million AMD Common Stock call contracts that traded during the Class Period. AMD's Common Stock therefore easily meets this criteria. |



**Exhibit 2**
**AMD Common Stock Price & Volume**
**04/04/2011 - 12/31/2012**

Sources: Complaint & Bloomberg.

**Exhibit 3**
## AMD Average Weekly Trading Volume as a Percentage of Shares Outstanding
## 04/04/2011 - 10/18/2012



Source: Bloomberg.

Note: Average weekly turnover is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on April 4, 2011 through October 18, 2012. The last week consists of only one trading day (i.e., 10/18/12) and therefore, is excluded from the average and median calculations.

**Exhibit 4**
**Summary of Securities Analyst Reports Issued for AMD**
**During the Class Period[1]**

| | Analyst Name | Reports Issued During the Class Period: 04/04/2011 - 10/18/2012 |
|---|---|---|
| [1] | WELLS FARGO SECURITIES, LLC | 48 |
| [2] | OPPENHEIMER AND CO | 46 |
| [3] | STERNE AGEE | 31 |
| [4] | JEFFERIES | 30 |
| [5] | UBS RESEARCH | 30 |
| [6] | THINKEQUITY LLC | 27 |
| [7] | DEUTSCHE BANK | 26 |
| [8] | CREDIT SUISSE - NORTH AMERICA | 20 |
| [9] | JPMORGAN | 20 |
| [10] | MKM PARTNERS | 18 |
| [11] | CANACCORD GENUITY | 16 |
| [12] | SUSQUEHANNA FINANCIAL GROUP LLLP | 16 |
| [13] | TREFIS | 16 |
| [14] | JMP SECURITIES LLC | 15 |
| [15] | BARCLAYS | 14 |
| [16] | MACQUARIE RESEARCH | 14 |
| [17] | WEDBUSH SECURITIES INC | 14 |
| [18] | BMO CAPITAL MARKETS U.S. | 12 |
| [19] | S&P CAPITAL IQ | 9 |
| [20] | EVERCORE | 7 |
| [21] | MORGAN STANLEY | 5 |
| [22] | AURIGA | 3 |
| [23] | WALL STREET STRATEGIES | 3 |
| [24] | ROTH CAPITAL PARTNERS, LLC | 2 |
| [25] | COWEN AND COMPANY | 1 |
| | **Total** | **443** |

Source: Investext and Counsel.

(1) Many analyst reports are not available through third party data providers (i.e. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for AMD**
**4/4/2011 - 10/18/2012**



Note: The coefficients for each day are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and the S&P 500 Semiconductors Index. AMD has been removed from the S&P 500 Semiconductors Index, and all remaining constituents have been weighted based on market capitalization throughout the class period. AMD compares itself against the S&P 500 Semiconductors Index in its 10-K filings. Alleged corrective disclosure events and earnings announcements have been removed from estimation.

**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for AMD Common Stock**
**04/04/2011 - 10/18/2012**



Note: The standard deviation of the errors on each day are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and the S&P 500 Semiconductors Index. AMD has been removed from the S&P 500 Semiconductors Index, and all remaining constituents have been weighted based on market capitalization throughout the class period. AMD compares itself against the S&P 500 Semiconductors Index in its 10-K filings. Alleged corrective disclosure events and earnings announcements have been removed from estimation.

**Exhibit 7**
**Event Study Analysis of AMD Earnings Dates**

| # | Date | Time | Market Date | Event | Headline | AMD Price | AMD Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | Sig Level[2] |
|---|------|------|-------------|-------|----------|-----------|----------------|-----------------|------------------------|--------|---------|--------------|
| | | | | | | | | | | Rolling Regression Model (120-day rolling window)[1] | | |
| 1 | 4/21/2011 | 4:15 PM | 4/25/2011 | Q1 2011 Earnings Release | AMD Reports First Quarter Results (Market Wire, 4/21/2011, 4:15PM) | $8.70 | -0.11% | -0.70% | -$0.06 | -0.35 | 0.73 | |
| 2 | 7/21/2011 | 4:15 PM | 7/22/2011 | Q2 2011 Earnings Release | AMD Reports Second Quarter Results (Market Wire, 7/21/2011, 4:15PM) | $7.75 | 19.23% | 18.03% | $1.17 | 11.46 | 0.00 | ++ |
| 3 | 9/28/2011 | 4:25 PM | 9/29/2011 | Q3 2011 Pre-Announcement | AMD Announces Preliminary Third Quarter Results (Market Wire, 9/28/2011, 4:25PM) | $5.31 | -13.66% | -13.70% | -$0.84 | -8.92 | 0.00 | -- |
| 4 | 10/27/2011 | 4:15 PM | 10/28/2011 | Q3 2011 Earnings Release | AMD Reports Third Quarter Results (Market Wire, 10/27/2011, 4:15PM) | $5.94 | 7.22% | 7.77% | $0.43 | 4.31 | 0.00 | ++ |
| 5 | 1/24/2012 | 4:17 PM | 1/25/2012 | Q4 2011 Earnings Release | AMD Reports Fourth Quarter and Annual Results (Market Wire, 1/24/2012, 4:17 PM) | $6.73 | 3.06% | 2.30% | $0.15 | 1.22 | 0.22 | |
| 6 | 4/19/2012 | 4:15 PM | 4/20/2012 | Q1 2012 Earnings Release | AMD Reports First Quarter Results (Market Wire, 4/19/2012, 4:15PM) | $7.76 | -2.63% | -1.86% | -$0.15 | -1.23 | 0.22 | |
| 7 | 7/9/2012 | 4:15 PM | 7/10/2012 | Q2 2012 Pre-Announcement | AMD Announces Preliminary Second Quarter Results (Market Wire, 7/9/2012, 4:15PM) | $4.99 | -11.21% | -8.51% | -$0.48 | -5.60 | 0.00 | -- |
| 8 | 7/19/2012 | 4:17 PM | 7/20/2012 | Q2 2012 Earnings Release | AMD Reports Second Quarter Results (Market Wire, 7/19/2012, 4:17PM) | $4.22 | -13.17% | -10.10% | -$0.49 | -6.51 | 0.00 | -- |
| 9 | 10/11/2012 | 4:16 PM | 10/12/2012 | Q3 2012 Pre-Announcement | AMD Announces Preliminary Third Quarter Results (Market Wire, 10/11/2012, 4:16PM) | $2.74 | -14.38% | -13.25% | -$0.42 | -5.87 | 0.00 | -- |
| 10 | 10/18/2012 | 4:15 PM | 10/19/2012 | Q3 2012 Earnings Release | AMD Reports Third Quarter Results and Announces Restructuring (Market Wire, 10/18/2012, 4:15PM) | $2.18 | -16.79% | -12.92% | -$0.34 | -5.44 | 0.00 | -- |

Source: Bloomberg.
Notes:
(1) The results are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and the S&P 500 Semiconductors Index. AMD has been removed from the S&P 500 Semiconductors Index, and all remaining constituents have been weighted based on market capitalization throughout the Class Period.  AMD compares itself against the S&P 500 Semiconductors Index in its 10-K filings. Alleged corrective disclosure events and earnings announcements have been removed from estimation.

(2)  "++" or "--" Denotes statistical significance at the 95% confidence level or greater.



**Exhibit 8A**
**AMD Intraday Price and Volume**
**04/25/2011**

Source: TICK Data.



**Exhibit 8B**
**AMD Intraday Price and Volume**
**07/22/2011**

Source: TICK Data.



**Exhibit 8C**
**AMD Intraday Price and Volume**
**09/29/2011**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| -13.66% | -13.70% | -8.92 |

9/28/2011
4:00 pm - $6.15
**NYSE Close**

9/28/2011 4:25 PM
AMD announces
preliminary 3rd
quarter earnings.

9/29/2011
9:30 am - $5.51
**NYSE Open**

9/29/2011
4:00 pm - $5.31
**NYSE Close**

Source: TICK Data.



**Exhibit 8D**
**AMD Intraday Price and Volume**
**10/28/2011**

Source: TICK Data.



Exhibit 8E
AMD Intraday Price and Volume
01/25/2012

Source: TICK Data.

**Exhibit 8F**
**AMD Intraday Price and Volume**
**04/20/2012**



Source: TICK Data.



**Exhibit 8G**
**AMD Intraday Price and Volume**
**07/10/2012**

Source: TICK Data.



**Exhibit 8H**
**AMD Intraday Price and Volume**
**07/20/2012**

Source: TICK Data.



**Exhibit 8I**
**AMD Intraday Price and Volume**
**10/12/2012**

Source: TICK Data.



**Exhibit 8J**
**AMD Intraday Price and Volume**
**10/19/2012**

Source: TICK Data.

# Exhibit 9

## Comparison of Statistical Significance and Abnormal Returns for AMD Earnings Announcement Dates vs. Days with the Least News[1]

| Statistic | Earnings Announcement Dates | Days with the Least News, No Analyst Reports, and No SEC Filing Dates |
|---|---|---|
| N | 10 | 44 [2] |
| Significant Days at 95% Confidence Level | 7 | 2 |
| % Significant Days at 95% Confidence Level | 70% [3] | 4.55% [4] |
| Average Absolute Abnormal Return | 8.91% [5] | 1.05% |

Notes:

(1) The last earnings release was on October 18, 2012, after market hours, so this analysis was extended one day past the class period to October 19, 2012.

(2) For the purposes of this analysis, I selected the 44 days with the least news, no analyst reports, and no SEC filings.

(3) 70% rate of statistical significance is statistically significantly higher than 4.55% on the basis of either a Chi-Square test or Fisher's Exact Test at the 95% confidence level.

(4) One would expect to observe 5% based on random chance alone. 4.55% is not significantly different from 5% based on results of a t-test at the 95% confidence level.

(5) 8.91% absolute return is statistically significantly higher than 1.05% based on a t-test for difference of means at the 95% confidence level.

**Exhibit 10**
**AMD Common Stock Market Capitalization**
**04/04/2011 - 12/31/2012**



Sources: Complaint & Bloomberg.

**Exhibit 11**
**AMD Common Stock Market Capitalization**
**Compared to Companies Traded on NYSE & NASDAQ**

| Last trading day of: | AMD Market Capitalization (billions) | All Shares Outstanding | |
|---|---|---|---|
| | | Percentile Rank in NYSE | Percentile Rank in NYSE & NASDAQ |
| Q2 - 2011 | $4.81 | 67% | 83% |
| Q3 - 2011 | $3.51 | 65% | 82% |
| Q4 - 2011 | $3.76 | 64% | 81% |
| Q1 - 2012 | $5.60 | 70% | 84% |
| Q2 - 2012 | $4.02 | 65% | 81% |
| Q3 - 2012 | $2.38 | 51% | 73% |
| Q4 - 2012 | $1.71 | 42% | 67% |

Source: Bloomberg.

**Exhibit 12A**
**AMD Common Stock Average Monthly Bid-Ask Dollar Spread per Share**
**04/04/2011 - 10/18/2012**



Source: TICK Data.



**Exhibit 12B**
**AMD Common Stock Average Monthly Bid-Ask Percentage Spread per Share**
**04/04/2011 - 10/18/2012**

Source: TICK Data.



**Exhibit 12C**
**AMD Common Stock Average Monthly Bid-Ask Percentage Spread per Share Compared to a Random Sample of 100  Common Stocks Trading on the NYSE and NASDAQ**
**04/04/2011 - 10/18/2012**

Source: TICK Data.

**Exhibit 13**
**AMD Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float: Shares Outstanding Plus Short Interest (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2011 | 685,230 | 455 | 845 | 60,457 | 744,841 | 0.12% | 502,274 | 73.30% | 67.43% |
| 6/30/2011 | 687,544 | 475 | 845 | 83,572 | 770,270 | 0.12% | 543,045 | 78.98% | 70.50% |
| 9/30/2011 | 691,332 | 440 | 845 | 94,259 | 784,746 | 0.12% | 557,519 | 80.64% | 71.04% |
| 12/31/2011 | 696,923 | 422 | 845 | 89,048 | 785,126 | 0.12% | 553,444 | 79.41% | 70.49% |
| 3/31/2012 | 698,485 | 450 | 1,015 | 65,996 | 763,466 | 0.15% | 570,165 | 81.63% | 74.68% |
| 6/30/2012 | 701,349 | 452 | 1,015 | 85,308 | 785,642 | 0.14% | 582,863 | 83.11% | 74.19% |
| 9/30/2012 | 707,555 | 422 | 1,015 | 142,219 | 848,759 | 0.14% | 531,373 | 75.10% | 62.61% |
| 12/31/2012 | 711,948 | 367 | 720 | 99,527 | 810,755 | 0.10% | 412,363 | 57.92% | 50.86% |
| **Total Institutions over Class Period:** | | **690** | | | | **Average:** | **0.13%** | **76.26%** | **67.73%** |

Sources: Alacra On Demand; Bloomberg; and SEC filings.

**Exhibit 14**
**AMD Common Stock**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day Abnormal Return[1] | T-statistic |
|---|---|---|
| 2011Q2 | -0.03 | -0.22 |
| 2011Q3 | -0.05 | -0.41 |
| 2011Q4 | 0.12 | 0.90 |
| 2012Q1 | 0.13 | 1.02 |
| 2012Q2 | -0.08 | -0.61 |
| 2012Q3 | -0.04 | -0.29 |
| 2012Q4 | -0.29 | -1.04 |
| **Class Period** | **-0.02** | **-0.43** |

Source: Bloomberg.

Note:
(1) For each time period I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. I have excluded earnings dates and alleged disclosure dates from the regression model. These dates are April 25, 2011, July 22, 2011, September 29, 2011, October 28, 2011, January 25, 2012, April 20, 2012, July 10, 2012, July 20, 2012, October 12, 2012, and October 19, 2012.

# Appendix A
# Documents Considered

## Court Documents

- Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws, dated June 10, 2014.
- Defendants' Objections and Responses to Lead Plaintiffs' First Set of Requests for Admissions, dated August 17, 2015.

## Court Decisions and Securities Law

- *Basic v. Levinson*, 485 U.S. 224, 242 (1988).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton v. Erica P. John Fund, Inc*., 573 U.S., 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt* 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act dated December 22, 1995.

## SEC Filings/Forms

- 10-K Annual filings submitted to the SEC during the Class Period:
  - Advanced Micro Devices, Inc. 10-K for the Fiscal Year End 2010, filed February 18, 2011.
  - Advanced Micro Devices, Inc. 10-K for the Fiscal Year End 2011, filed February 24, 2012.
  - Advanced Micro Devices, Inc. 10-K for the Fiscal Year End 2012, filed February 21, 2013.
  - Advanced Micro Devices, Inc. 10-K for the Fiscal Year End 2013, filed February 18, 2014.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.
  10-Q Quarterly filings submitted to the SEC during the Class Period.
- 8-K Current reports submitted to the SEC during the Class Period.
- Def 14A Proxy reports submitted to the SEC during the Class Period.

## Security Data

- Historical data for AMD Common Stock, AMD stock options, the S&P 500 Semiconductors Index, and the S&P 500 Total Return Index were obtained from Bloomberg.
- Trade and quote data for AMD during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for September 2012 were obtained from Tick Data, *see* www.tickdata.com.
- Institutional holdings data obtained from Alacra On Demand.
- Turnover velocity data for NYSE from the World Federation of Exchanges, see http://www.world-exchanges.org/statistics.
- The number of market makers during the Class Period for AMD Common Stock was obtained from Bloomberg.

## AMD News

- AMD news headlines and select articles downloaded from Factiva for the Class Period.
    - News was obtained by executing a search via Factiva for "All Sources" with the company field "Advanced Micro Device, Inc." for the period "April 4, 2011 - October 19, 2012." The Factiva search yielded 7,393 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

## AMD Analyst Reports

- AMD analyst reports supplied by Investext via Thomson Reuters for the period January 4, 2011 to December 7, 2012.
- Analyst reports including, but not limited to:
    - "Q2 Hits the Mark with Q3 Top Line Outlook Exceeding Expectations; Increasing PT to $10," *Wedbush*, July 22, 2011.
    - "Advanced Micro Devices, Inc.: 2011 Strategy Working; 2012 Strategy Unclear," *Susquehanna Financial Group*, July 22, 2011.
    - "Another Day, Another Negative Preannouncement; AMD Lowers 3Q11 Guidance on Supply Issues," *JP Morgan*, September 29, 2011.
    - "AMD Shares Slide after 2Q Rev Guidance Cut," *Dow Jones*, July 9, 2012.
    - "AMD: Reduces September Guidance – Cutting Estimates," *Wells Fargo Securities*, October 12, 2012.

## Academic Articles/Texts

- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.

- Yakov Amihud, Haim Mendelson and Lasse Heje Pedersen, 2006, "Liquidity and Asset Prices," *Foundations and Trends in Finance* Vol. 1(4).
- Doron Avramov, Tarun Chorida, and Amit Goyal, "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance,* Vol. LXI, No. 5, 2006.
- Brad M. Barber, Paul A. Griffin and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law*, Winter 1994, 19 Iowa J. Corp. L.
- William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- John Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* Vol. 11, 1998.
- Phillip A. Braun, Daniel B. Nelson, and Alain M. Sunier, "Good News, Bad News Volatility, and Betas," *Journal of Finance* 50, No. 5, 1995.
- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, 1970.
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Roger D. Huang, Hans R. Stall, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* Vol. 41, 1996.
- Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* Vol. 6, Nos. 2/3, 1978.
- Raman Kumar, Atulya Sarin and Kuldeep Shastri, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance,* Vol. LIII, No. 2, April 1998.
- A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economics Literature*, Volume 35 (1), March 1997.
- Robert D. Mason, Douglas A. Lind, and William G. Marchal, "Describing Data: Measure of Dispersion," *Statistical Techniques in Business and Economics*, Tenth Edition, 1999.
- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research*, Vol. 9, Empirical Research in Accounting: Selected Studies 1971.
- Stephen A. Ross, "Options and Efficiency," *The Quarterly Journal of Economics*, Vol. 90, February 1997.
- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995.

- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert*, Fifth Edition, 2012.
- Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." *Law and Contemporary Problems,* Vol. 63.

**<u>Other</u>**

- http://www.amd.com/Documents/The_AMD_Story.pdf
- http://www.world-exchanges.org/statistics
- http://www.sec.gov/answers/mktmaker.htm
- http://www1.nyse.com/equities/nyseequities/1166830723427.html
- https://www.nyse.com/market-model/overview#dmms-2
- https://www.nyse.com/market-model/dmm-case-studies
- https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf
- http://www.rss-specifications.com/ .
- http://www.rss-specifications.com/what-is-rss.htm.

# Appendix B

## CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:        (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

**EMPLOYMENT:**

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

**EDUCATION:**

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa


**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited
  to:

  - In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income
    Security Act (ERISA) Litigation.  Parties settled for $2.4 billion in which I served as
    Plaintiffs' damages and loss causation expert.
  - In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473
    million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served
    as Plaintiffs' damages and loss causation expert.
  - In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million
    in which I served as Plaintiffs' damages and loss causation expert.
  - Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic
  analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to
  multiple listing of options.  Performed econometric analysis of various measures of option spread
  using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy
  regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500
  companies.  One led to restatement of previously issued financial statements and both involved
  SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York,
  County of New York, Index No. 06-100836.  Filed report re: the fair value of Mr. Kuo's shares.
  Case settled at trial.

- Testifying expert in the matter of Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership
  and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division.

Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc.</u>

and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware. Filed expert report April 23, 2010.

- Testifying expert in Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota. Filed expert report January 14, 2011.

- Testifying expert in Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York. Filed expert report July 18, 2011.

- Testifying expert in Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia. Filed expert report June 1, 2012. Deposition June 19, 2013.

- Testifying expert in Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court, Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014; Filed expert report May 29, 2015.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015.


<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.


<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

       KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
       KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)


**PUBLICATIONS:**

       Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

       Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

     Associate Member CFA Society of Chicago
     Associate Member CFA Institute
     Phi Beta Kappa

**AWARDS:**

     1994  Ford Fellowship Recipient for Summer Research.
     1993  Arnold Prize for Best Research Proposal.
     1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.