1 LATHAM & WATKINS LLP
    Matthew Rawlinson (Bar No. 231890)
2 140 Scott Drive
Menlo Park, California 94025
3 Telephone: +1.650.328.4600
Facsimile: +1.650.463.2600
4 *matt.rawlinson@lw.com*

5 LATHAM & WATKINS LLP
    Melanie Blunschi (Bar No. 234264)
6 505 Montgomery Street, Suite 2000
San Francisco, California, 94111
7 Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095
8 *melanie.blunschi@lw.com*

9 COOLEY LLP
    Patrick E. Gibbs (Bar No. 183174)
10 3175 Hanover Street
Palo Alto, California 94304
11 Telephone:  +1.650.843.5535
Facsimile:  +1.650.849.7400
12 *pgibbs@cooley.com*

13 Attorneys for Defendants
Advanced Micro Devices, Inc.,
14 Rory P. Read, Thomas J. Seifert,
Richard A. Bergman, and Lisa T. Su

15

16 **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
17 **OAKLAND DIVISION**

18 BABAK HATAMIAN and LUSSA DENNJ
SALVATORE, individually and on behalf of
19 all others similarly situated,

20        Plaintiffs,

21        v.

22 ADVANCED MICRO DEVICES, INC.,
RORY P. READ, THOMAS J. SEIFERT,
23 RICHARD A. BERGMAN AND LISA T.
SU,
24        Defendants.

25

26

27

28

CASE NO. 14-cv-00226-YGR

**CLASS ACTION**

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE
TESTIMONY**

Date:     August 22, 2017
Time:     2:00 p.m.
Place:    Courtroom 1, 4th Floor
Judge:    Honorable Yvonne Gonzalez Rogers

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

# TABLE OF CONTENTS

**Pages**

I. INTRODUCTION ............................................................................................................. 1

II. ARGUMENT ................................................................................................................... 2

    A. Professor Kapoor's Opinions Are Admissible in Their Entirety ......................... 2

        1. Professor Kapoor's Opinions ................................................................. 2

        2. The Reasonableness of AMD's Forecasts Is Clearly Relevant ........................................................................................ 5

        3. Professor Kapoor's Opinions Regarding the Causes of the 2Q12 and 3Q12 Shortfalls Are Both Relevant and Reliable ................... 9

    B. Ms. Axelson's Opinions Are Admissible in Their Entirety ............................... 12

        1. Ms. Axelson's Opinions ....................................................................... 12

        2. Ms. Axelson's GAAP Opinions Are Relevant ....................................... 13

        3. Ms. Axelson's Gross Margin Opinions Are Sound ............................... 15

    C. Professor Cornell's Opinions Are Admissible in Their Entirety ....................... 17

        1. Professor Cornell's Opinions Regarding the Riskiness of Investing in AMD Stock Are Relevant ..................................................... 18

        2. Professor Cornell's Opinions Regarding AMD's Unique Exposure to the Effects of Macroeconomic Factors Are Relevant ............................................................................................. 19

        3. Professor Cornell's Opinions Regarding Defendants' Economic Incentives Are Relevant, and His Methodology Is Accepted in the Relevant Scientific Community ............................... 20

    D. Dr. Lisiak's Opinions Are Admissible in Their Entirety .................................... 24

        1. Dr. Lisiak's Opinions ............................................................................ 24

        2. Dr. Lisiak Is Qualified to Opine on Manufacturing Yields .................... 24

        3. Dr. Lisiak's Opinions Are Properly Based on His Experience ............................................................................................ 28

III. CONCLUSION ............................................................................................................... 31

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

i

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allstate Ins. Co. v. Ever Island Elec. Co.*,
2007 WL 2728979 (N.D. Ga. Sept. 17, 2007) ...................................................................11

*In re Ariad Pharms., Inc. Sec. Litig.*,
2014 WL 2119737 (D. Mass. Mar. 25, 2014) ...................................................................21

*Aruliah v. Impax Labs., Inc.*,
2014 WL 7390986 (N.D. Cal. Dec. 10, 2014) ..................................................................21

*Aviva Sports, Inc. v. Fingerhut Direct Mktg. Inc*,
829 F. Supp. 2d 802 (D. Minn. 2011) ..............................................................................16

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) .........................................................................................................18

*Blue v. Int'l Bhd. of Elec. Workers Local Un. 159*,
676 F.3d 579 (7th Cir. 2012) ...........................................................................................20

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) .............................................................................................6

*In re Chemed Corp. Sec. Litig.*,
2014 WL 6867616 (S.D. Ohio Mar. 28, 2014) .................................................................21

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ........................................................................22

*In re Conn's Inc. Sec. Litig.*,
2015 WL 5253203 (S.D. Tex. July 21, 2015) ..................................................................21

*Crowley v. Chait*,
322 F. Supp. 2d 530 (D. N.J. 2004) .................................................................................22

*Czuchaj v. Conair Corp.*,
2016 WL 4414673 (S.D. Cal. Aug. 19, 2016) ..................................................................28

*Dura Pharms. Inc. v. Broudo*,
544 U.S. 336 (2005) .........................................................................................................18

*EEOC v. GLC Rests., Inc.*,
2007 WL 30269 (D. Ariz. Jan. 4, 2007) .......................................................................8, 30

*In re FireEye, Inc. Sec. Litig.*,
2015 WL 7313976 (N.D. Cal. June 29, 2015) ..................................................................21

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

ii

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

*Glore v. SanDisk Corp.*,
   2015 WL 6451040 (N.D. Cal. Aug. 28, 2015) ....................................................................21

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) .........................................................................................18

*Holmes Grp., Inc. v. RPS Prods. Inc.*,
   2010 WL 7867756 (D. Mass. June 25, 2010) ....................................................................16

*Hoppaugh v. K12 Inc.*,
   2012 WL 12135346 (E.D. Va. June 22, 2012) ..................................................................21

*Howard v. Liquidity Servs., Inc.*,
   2014 WL 12537096 (D.D.C. Dec. 15, 2014) ....................................................................21

*In re Intuitive Surgical Sec. Litig.*,
   2017 WL 1206827 (N.D. Cal. Jan. 26, 2017) ...................................................................21

*In re Investment Tech. Grp., Inc.*,
   2015 WL 9875169 (S.D.N.Y. Dec. 14, 2015) ..................................................................21

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
   2015 WL 8786487 (D.S.C. Dec. 9, 2015) .........................................................................21

*In re KBR, Inc. Sec. Litig.*,
   2014 WL 6209014 (S.D. Tex. Oct. 20, 2014) ...................................................................21

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)...........................................................................................................28

*In re Lehman Bros Sec. and ERISA Litig.*,
   131 F. Supp. 3d 241 (S.D.N.Y. 2015)...............................................................................14

*In re Ligand Pharms., Inc. Sec. Litig.*,
   2005 WL 2461151 (S.D. Cal. Sept. 27, 2005)..................................................................18

*Lucido v. Nestle Purina Petcare Co.*,
   2016 WL 6804576 (N.D. Cal. Nov. 17, 2016) ............................................................28, 30

*Martin v. GNC Holdings, Inc.*,
   2016 WL 1391346 (W.D. Pa. Mar. 21, 2016) ..................................................................21

*In re Metro. Sec. Litig.*,
   2010 WL 6783110 (E.D. Wash. Feb. 18, 2010) ...............................................................19

*In re Millennial Media, Inc. Sec. Litig.*,
   2015 WL 1969606 (S.D.N.Y. Apr. 15, 2015)...................................................................21

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ............................................................................................18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

iii

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

*Nagle v. Gusman*,
    2016 WL 560688 (D. La. Feb. 12, 2016)............................................................................11

*In re NETFLIX, Inc., Sec. Litig.*,
    2012 WL 3202465 (N.D. Cal. June 26, 2012) ...................................................................21

*In re Nimble Storage, Inc. Sec. Litig.*,
    2017 WL 354744 (N.D. Cal. Jan. 20, 2017) .....................................................................21

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l Inc.*,
    2013 WL 7128514 (E.D. Ky. Mar. 6, 2013).....................................................................21

*In re Novatel Wireless Sec. Litig.*,
    2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) ...................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*,
    135 S. Ct. 1318 (2015)......................................................................................................14

*Ong v. Chipotle Mexican Grill, Inc.*,
    2017 WL 1313779 (S.D.N.Y. Apr. 7, 2017).....................................................................21

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) .......................................................................................2, 5, 7

*Patel v. Cigna Corp.*,
    2016 WL 7733013 (D. Conn. Nov. 30, 2016) ..................................................................21

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
    2012 WL 10874770 (E.D.N.C. May 4, 2012) ..................................................................21

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ............................................................................21

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Sing.) Pte. Ltd.*,
    2011 WL 5417090 (N.D. Cal. Oct. 27, 2011)...................................................................28

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................................7

*S.E.C. v. Dunn*,
    2012 WL 475653 (D. Nev. Feb. 14, 2012) ......................................................................22

*S.E.C. v. Roszak*,
    495 F. Supp. 2d 875 (N.D. Ill. 2007) ...............................................................................22

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)...............................................................................................22

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ............................................................................................18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

iv

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

*In re STEC, Inc. Sec. Litig.*,
   2012 WL 7177568 (C.D. Cal. Dec. 14, 2012) ........................................................................21

*Tadros v. Celladon Corp.*,
   2016 WL 1576179 (S.D. Cal. Feb. 29, 2016) ........................................................................21

*In re Target Corp. Sec. Litig.*,
   2016 WL 6832695 (D. Minn. Nov. 14, 2016) ........................................................................21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices &
   Prods. Liability Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) ............................................................................16, 17

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ..................................................................................................18

*United States v. Old Chief*,
   519 U.S. 172 (1997) ...............................................................................................................20

*In re Viropharma Inc. Sec. Litig.*,
   2012 WL 6947227 (E.D. Pa. Oct. 19, 2012) ........................................................................21

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
   2014 WL 4387044 (S.D.N.Y. Aug. 12, 2014) ......................................................................21

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ....................................................................................22

**OTHER AUTHORITIES**

Anup Agrawal and Tommy Cooper, *Insider Trading Before Accounting Scandals*,
   34 J. Corp. Fin. 169 (2015) ...................................................................................................23

Bin Ke et al., *What Insiders Know About Future Earnings and How They Use It:
   Evidence from Insider Trades*, 35 J. Acct. & Econ. 315 (2003) ...........................................23

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

v

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

# GLOSSARY OF TERMS USED

The following terms are used in this memorandum:

| | |
|---|---|
| <u>1Q11</u>: | Advanced Micro Devices, Inc.'s First Fiscal Quarter of 2011, ended April 2, 2011 |
| <u>1Q12</u>: | Advanced Micro Devices, Inc.'s First Fiscal Quarter of 2012, ended March 31, 2012 |
| <u>2Q11</u>: | Advanced Micro Devices, Inc.'s Second Fiscal Quarter of 2011, ended July 2, 2011 |
| <u>2Q12</u>: | Advanced Micro Devices, Inc.'s Second Fiscal Quarter of 2012, ended June 30, 2012 |
| <u>3Q11</u>: | Advanced Micro Devices, Inc.'s Third Fiscal Quarter of 2011, ended October 1, 2011 |
| <u>3Q12</u>: | Advanced Micro Devices, Inc.'s Third Fiscal Quarter of 2012, ended September 29, 2012 |
| <u>4Q11</u>: | Advanced Micro Devices, Inc.'s Fourth Fiscal Quarter of 2011, ended December 31, 2011 |
| <u>AMD</u>: | Advanced Micro Devices, Inc. |
| <u>APU</u>: | Accelerated Processing Unit |
| <u>Axelson Rpt.</u>: | Expert Report of Michele Axelson, served December 20, 2016, attached to the Declaration of Jonathan Gardner In Support of Plaintiffs' Motion to Exclude Testimony of Defendants' Experts as Exhibit 2 (Dkt. No. 264-4) |
| <u>CAC</u>: | Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws, Dkt. No. 61 |
| <u>Class Period</u>: | April 4, 2011 through October 18, 2012, inclusive |
| <u>Coffman Reply Rpt.</u>: | Expert Rebuttal Report of Chad Coffman, CFA, served January 17, 2017, attached to the Declaration of Jason C. Hegt as Ex. 340 |
| <u>Coffman Rpt.</u>: | Expert Report of Chad Coffman, CFA, served November 18, 2016, attached to the Declaration of Jason C. Hegt as Ex. 136 |
| <u>Company</u>: | Advanced Micro Devices, Inc. |
| <u>Cornell Rpt.</u>: | Expert Report of Prof. Bradford Cornell, served December 20, 2016, attached the Declaration of Jonathan Gardner In Support of Plaintiffs' Motion to Exclude Testimony of Defendants' Experts as Exhibit 4, Dkt. No. 264-6 |
| <u>CPU</u>: | Central Processing Unit |
| <u>Defendants</u>: | Advanced Micro Devices, Inc., Rory P. Read, Thomas J. Seifert, Richard (Rick) A. Bergman, Dr. Lisa T. Su |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

vi

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

| | |
|---|---|
| Defendants' *Daubert* Motion or Defs.' *Daubert* Mot. | Defendants' Notice of Motion and Motion to Exclude Testimony of Chad Coffman, Scott Thompson, and Jason S. Flemmons, Dkt. No. 255 |
| Defendants' MSJ or Defs.' MSJ | Defendants' Notice of Motion and Motion for Summary Judgment, Dkt. No. 254 |
| Ex. or Exs.: | Exhibit(s).  Exhibits 1–384 are attached to the Declarations of Jason C. Hegt filed in this action on April 25 and 27, 2017 (*see* Dkt. Nos. 257-260, 262-263, 265, 269-276), while Exhibits 385–391 are attached to the May 30, 2017 Declaration of Jason C. Hegt, filed concurrently herewith |
| Flemmons Reply Rpt.: | Expert Rebuttal Report of Jason S. Flemmons, CPA, CFE, CFF, served January 17, 2017, attached to the Declaration of Jason C. Hegt as Ex. 341 |
| Flemmons Rpt.: | Expert Report of Jason S. Flemmons, CPA, CFE, CFF, served November 18, 2016, attached to the Declaration of Jason C. Hegt as Ex. 338 |
| GF: | GLOBALFOUNDRIES, Inc., and subsidiaries and affiliates |
| GPU: | Graphics Processing Unit |
| HP: | Hewlett-Packard Company |
| IDC: | International Data Corporation |
| Individual Defendants: | Rory P. Read, Thomas J. Seifert, Richard (Rick) A. Bergman, and Dr. Lisa T. Su |
| Kapoor Rpt.: | Expert Report of Prof. Rahul Kapoor, served December 20, 2016, attached to the Declaration of Jason C. Hegt as Ex. 61 |
| Lisiak Rpt.: | Expert Report of Dr. Kenneth P. Lisiak, served December 20, 2016, attached to the Declaration of Jonathan Gardner In Support of Plaintiffs' Motion to Exclude Testimony of Defendants' Experts as Exhibit 1, Dkt. No. 264-3 |
| Llano: | AMD A-Series Accelerated Processing Unit product |
| Llano no-GPU: | AMD A-Series Accelerated Processing Unit Llano product that does not contain a working Graphics Processing Unit chip |
| M1 MOF: | Monthly Operating Forecast developed in the first month of Advanced Micro Devices, Inc.'s fiscal quarter |
| Mot.: | Plaintiffs' Motion to Exclude Testimony of Defendants' Experts, Dkt. No. 264 |
| nm: | nanometer |
| OEM or OEMs: | Original Equipment Manufacturer(s) |
| PC or PCs: | Personal Computer(s) |
| Plaintiffs: | Arkansas Teacher Retirement System and KBC Asset Management NV |
| SEC: | U.S. Securities and Exchange Commission |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

vii

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

| Statement Chart: | Exhibit A to March 22, 2017 Letter From Jonathan Garder to Honorable Yvonne Gonzalez Rogers, U.S.D.J., Dkt. No. 251-1 |
| --- | --- |
| SVP: | Senior Vice President |
| Thompson Reply Rpt.: | Reply Expert Report of Professor Scott E. Thompson, served January 17, 2017, attached to the Declaration of Jason C. Hegt as Ex. 23 |
| Thompson Rpt.: | Opening Expert Report of Professor Scott E. Thompson, served November 18, 2016, attached to the Declaration of Jason C. Hegt as Ex. 11 |
| UF: | Defendants' Statement of Undisputed Facts, filed concurrently herewith |
| WSA: | Wafer Supply Agreement |
| Yield: | The number of working chips that are produced by a given silicon wafer.  For example, if a wafer is large enough that it could theoretically be divided into 100 of a particular type of chip and a particular manufacturing process results in 60 functioning chips (or "die") being produced from that wafer, that wafer would have a 60% yield. |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

viii

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

# I.       INTRODUCTION

Plaintiffs' motion to exclude Defendants' experts provides a roadmap to the fundamental weaknesses in Plaintiffs' claims.  As described in Defendants' motion for summary judgment, after two years of extensive discovery, there is no evidence of securities fraud.  To the contrary, undisputed facts confirm that Defendants' statements about Llano yield and supply in 2011 were based on careful estimates of all available data (good and bad), and Plaintiffs admit AMD's guidance for each quarter was accurate when made.  There is, therefore, no dispute that Defendants were surprised when, late in 3Q11, GF (the outside foundry manufacturing Llano) informed AMD it would deliver far fewer chips than AMD imagined under even the worst-case scenario it forecasted at the outset of the quarter.  Likewise, there is no objective evidence substantiating a connection between that 3Q11 Llano supply constraint and reduced Llano sales nearly a year later, and there is certainly no evidence suggesting Defendants knew sales in 2Q12 and 3Q12 would fall short of expectations.

The analysis and opinions offered by Defendants' experts confirm the dispositive failures in Plaintiffs' claims.  For example, Professor Rahul Kapoor evaluated both AMD and market-wide sales and forecasting data and found that there was no relationship between customers who received little Llano in 3Q11 and customers' purchases of Llano in 2Q12 and 3Q12.  He also found that, when AMD was hit by the shift in consumer preferences away from PCs and toward tablets, combined with unfavorable macroeconomic conditions in key markets, Llano sales fell short of expectations in 2Q12 ***by the same amount as all of AMD's other*** microprocessors, and, in 3Q12, Llano sales ***exceeded expectations***.  In other words, there was no Llano-specific shortfall to explain—it performed just like (or even better than) all of AMD's other products.  Both of these conclusions are fatal to Plaintiffs' causation and damages claims, and Plaintiffs have no substantive response to them.  Defendants' experts also explain (i) that AMD's decision not to write-down its Llano inventory prior to 3Q12 based on its belief that it could still sell that inventory was reasonable and consistent with applicable accounting principles (Axelson); (ii) the degree to which macroeconomic and industry conditions caused AMD's underperformance in 2012 (Kapoor and Cornell); (iii) the relative riskiness of AMD stock (Cornell); (iv) economic

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

1

DEFENDANTS' OPP. TO PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY
14-cv-00226-YGR

1    evidence inconsistent with an intent to defraud (Cornell); and (v) that the technical judgments

2    underlying many of the at-issue statements about Llano supply were reasonable (Lisiak).

3         Having no answer to the merits of the opinions and analysis offered by Defendants'

4    experts, Plaintiffs move to exclude much of it in its entirety, claiming the opinions are

5    "irrelevant" or unsupported, or that Defendants' experts are not qualified.  For instance, having

6    premised their entire case on Llano (and AMD) falling short of expectations, Plaintiffs now

7    appear to recognize that AMD's forecasts do not support their case and thus ask the Court to

8    exclude all evidence about how they were created and whether they were reasonable.  But, for

9    the forward-looking statements they challenge, it is Plaintiffs' burden to prove that Defendants

10   lacked a reasonable basis for the statement.  *See, e.g., In re Oracle Corp. Sec. Litig.*, 627 F.3d

11   376, 388 (9th Cir. 2010).  Plaintiffs' attempt to exclude evidence about the reasonableness of the

12   forecasts on which those statements were based is a concession that they simply cannot carry

13   their burden.  Likewise, Plaintiffs claim that Professor Bradford Cornell, a distinguished

14   professor of finance and widely published economist, is unqualified to give opinions on the

15   economic incentives that impact decision-making because he is "not a psychologist."  This claim

16   ignores that this kind of analysis is at the heart of modern economic theory, numerous courts

17   have recognized this type of evidence as directly relevant in securities cases, and Plaintiffs'

18   counsel routinely offers such evidence when it supports an inference of securities fraud.  In short,

19   Plaintiffs' motion amounts to little more than a sustained plea that Plaintiffs be excused from

20   responding to evidence that undermines their claims and to which they have no answer.  As such,

21   it provides a far stronger basis for dismissing Plaintiffs' claims than excluding Defendants'

22   experts.

## II.   ARGUMENT

### A.   Professor Kapoor's Opinions Are Admissible in Their Entirety

#### 1.   Professor Kapoor's Opinions

26   Professor Kapoor is an Associate Professor of Management at the Wharton School of the

27   University of Pennsylvania.  His areas of research and teaching focus on technology

28   management and industry evolution—with a focus on the semiconductor industry—and he has

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

2

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1  written several peer-reviewed articles that pertain to product forecasting, with an emphasis on

2  forecasting in the technology industry.  *See* Kapoor Rpt. ¶¶ 1-6, App'x A; *see also* Ex. 385

3  (Kapoor Tr.) at 26:19-33:18.  In response to Plaintiffs' allegations that supply constraints of

4  AMD's Llano product in 2011 caused AMD to miss its public earnings forecasts in 2Q12 and

5  3Q12, *see, e.g.,* Coffman Rpt. ¶¶ 6-10, 31, 98, 143, Professor Kapoor took a data-driven

6  approach to examine the causes of the 2Q12 and 3Q12 shortfalls.

7       Professor Kapoor first analyzed AMD's sales data to determine whether there was a

8  relationship between the 3Q11 supply constraints and customer activity during 2Q12 and 3Q12.

9  *See* Kapoor Rpt. ¶¶ 97-111.  Based on his examination of AMD's sales data for 2011 and 2012,

10  he concluded that AMD's Llano sales "increased substantially from 2011 to 2012," "peak[ing] in

11  Q1 2012 and continu[ing] at substantial levels throughout 2012," while at the same time "non-

12  Llano sales *decreased* significantly from 2011 to 2012." *Id*. ¶¶ 97-98.  Professor Kapoor also

13  explained that the data indicated "the majority of channel customers who received less Llano in

14  Q3 2011 actually purchased *more* Llano in Q2 and Q3 2012," which "is in direct opposition to

15  Plaintiff's hypothesis regarding the causal relationship between Llano availability in Q3 2011

16  and sales in 2012." *Id*. ¶¶ 100-104 (emphasis added).[1]

17       Because Plaintiffs base their claims entirely on AMD's performance relative to its

18  forecasts, Professor Kapoor also analyzed AMD's detailed, product-level forecasts (and how

19  those forecasts compared to AMD's actual sales), as well as market-wide sales and forecasting

20  data developed by leading industry expert IDC.  *Id*. ¶¶ 112-113, 137-57.  Professor Kapoor

21  explained that he first considered the reasonableness of AMD's process for developing its

22  forecasts because understanding "the general foundations" for the forecasts is necessary to

23  understand the context in which they were developed, and the extent to which they can serve as a

24  benchmark for a "more specific analysis."  Ex. 385 (Kapoor Tr.) at 76:17-77:12; 89:23-91:9; *see*

25

26  [1] Professor Kapoor further explained that Plaintiffs' theory that demand "perish[ed]" because channel customers did not receive Llano products during the back-to-school or holiday sales

27  seasons is "predicated on a fundamental lack of understanding of AMD's sales patterns," as AMD's sales to channel customers (Llano and non-Llano) during this period were "not

28  characterized by back-to-school or late winter holiday seasons."  *See* Kapoor Rpt. ¶¶ 105-06.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1  *also* Ex. 152 (Su Tr.) at 46:1-49:22 (explaining that monthly product-level forecasts reflected

2  AMD's best judgment about expected future supply and demand).

3       In analyzing this data, Professor Kapoor found that AMD's forecast misses were not

4  specific to Llano—rather, the forecast shortfalls were across all microprocessor products and

5  affected both OEM and channel customers.  Kapoor Rpt. ¶ 146.  In fact, sales of AMD's Llano

6  and non-Llano microprocessors fell short of forecast in roughly equal measure in 2Q12.  In

7  3Q12, sales of Llano outperformed AMD's forecast, while non-Llano sales underperformed.  *Id*.

8  ¶ 154.  In other words, though Plaintiffs' causation and damages theory with respect to 2012 is

9  predicated entirely on the fact that Llano shortfalls relative to forecast were the direct (and

10  known) result of Llano-supply issues in 2011, Professor Kapoor's analysis demonstrated that

11  there was, in fact, no Llano specific shortfall to explain:  when the market turned, Llano fell short

12  of its forecast in almost precisely the same proportion as all of AMD's other microprocessors.

13       Given this, Professor Kapoor concluded that the Llano shortfalls, like the non-Llano

14  shortfalls, were almost certainly the result of macroeconomic conditions that emerged late in

15  each quarter.  This conclusion is supported not only by the uniformity of the shortfalls across

16  AMD's microprocessor products, but by a wealth of other objective evidence.  For instance,

17  entering both 2Q12 and 3Q12, AMD and IDC each expected PC (and thus, microprocessor)

18  shipments to increase—as they had for the past several years—but instead, 2Q12 marked the

19  beginning of a multi-year decline in demand for PCs that became even more pronounced during

20  3Q12. *Id*. ¶¶ 114-115.  This downturn affected not only AMD, but its customers—nearly all of

21  whose PC sales experienced a major years-long decline beginning in 2Q12.  *See id*. at Fig. 40.

22       Professor Kapoor also analyzed why this industry-wide phenomenon had a particularly

23  harsh impact on AMD (again, not limited to Llano, but across its portfolio of microprocessors).

24  These factors included weakening macroeconomic conditions in China and Europe (AMD's

25  largest markets) and increasing consumer adoption of handheld devices at the expense of PCs,

26  particularly in the lower-end PC market.  *Id*. ¶¶ 116-122.  In doing so, Professor Kapoor

27  analyzed a number of industry factors—including Intel's dominant market position, AMD's

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

4

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1    position in the PC supply chain,[2] AMD's comparative strength in consumer (as opposed to

2    business) products, and a sales pattern where most sales occur toward the end of the quarter—

3    that had a disproportionately negative and unexpected impact on AMD's forecasting abilities

4    during this period. *Id.* ¶¶ 123-136.

5              **2.     The Reasonableness of AMD's Forecasts Is Clearly Relevant**

6              Plaintiffs now seek to exclude Professor Kapoor's opinions about the reasonableness of

7    AMD's sales forecasting process, arguing that they are "irrelevant."  *See* Mot. at 20-21.  The

8    reasons Plaintiffs seek to exclude this testimony is clear:  far from being "irrelevant," Professor

9    Kapoor's opinions regarding AMD's forecasting process (and his empirical analysis of those

10   forecasts) confirms that there is no basis for any element of Plaintiffs' claims.  In short,

11   Plaintiffs' suggestion that this testimony is irrelevant fails for a variety of reasons.

12             *First*, Professor Kapoor's opinions are relevant as a matter of logic when compared to the

13   premise of Plaintiffs' claims.  Plaintiffs allege that AMD's Llano product fell "short of

14   expectations" for three quarters—3Q11, 2Q12, and 3Q12.  *See, e.g.,* Coffman Rpt. ¶¶ 9-10.

15   Plaintiffs further claim that Defendants knew, as of April 4, 2011, that AMD would fail to meet

16   these expectations, and that this failure was revealed when AMD announced it would not meet

17   previously-issued public guidance for 3Q11, 2Q12, and 3Q12.  *See id.* ¶¶ 8-9.  However, if

18   AMD's forecasts reflecting its expectations about Llano (*see supra* at Section II.A.1) were

19   reasonable and not misleading when made (as Plaintiffs concede by failing to challenge the

20   forecasts, *see* Mot. at 20-21), then it follows that Defendants did not know—much less

21   conceal—that AMD's sales would fall "short of expectations" many months later.  *See, e.g.,*

22   *Oracle*, 627 F.3d at 388 (evaluating forecasting "process" in assessing defendants' "reasonable

23   . . . belief" in their future expectations).  For the same reason, if AMD's forecasts were based

24   upon a reasonable process, then disclosure of snippets of information (negative or positive)

25   allegedly known to Defendants would not have been material, because they would not have

26   _____

27   [2] Professor Kapoor explained that "suppliers of intermediate products" (like AMD) face "even
     greater volatility in orders," known as a "Bullwhip Effect," in which it is difficult for the supplier
28   to gauge demand for its products the further removed it is from the end-product consumer (*i.e.*, a
     PC purchaser).  Kapoor Rpt. ¶¶ 129-134.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

5

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

depicted a "state of affairs that differs in a material way" than portrayed by the challenged statements. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

*Second*, and closely related, the reasonableness of AMD's forecasts is directly and facially relevant to the evaluation of many of the challenged statements. For example, several of the challenged statements by their own terms convey the information contained in AMD's internal and external forecasts. *See, e.g.*, Statement Chart at No. 20 ("We promised we would ship about the same volume of Llano as we shipped in the first quarter of Brazos, and from the demand signals we see today, we expect the ramp to be even higher and better accelerated. ***And this is really driving our guidance for the third quarter***.") (emphasis added); *id.* at No. 22 (discussing GF supply, stating, "We have been putting guidance in place for Q2 that we hit that ***we fully expect to deliver our guidance that we put in front of you today***") (emphasis added); *id.* at No. 33 (stating that "customer acceptance of our APU architecture is quite strong" in response to a question about "the guidance you're giving"). And nearly all of the statements Plaintiffs challenge convey Defendants' expectations of Llano future supply and demand. *See, e.g., id.* at No. 9 ("the volume is actually coming in Q2. So, that's certainly when we expect to ramp production and have platforms launch on Llano"); *id.* at No. 10 ("We think we have ample [] product available in the second quarter"); *id.* at No. 13 (explaining that AMD expected Llano to be a "margin accretive game through price performance and price points at which we can play now");[3] *id.* at No. 19 ("Based on strong demand signals and SKU assortment for the second half of the year, we expect the Llano ramp will outpace the Brazos ramp").[4] Accordingly, whether

---

[3] Plaintiffs also challenge variations of this statement. *See* Statement Chart at Nos. 16, 21.

[4] *See also* Statement Chart at No. 7 ("Well, it wouldn't be good demand if it doesn't help the gross margins."); *id.* at No. 8 ("You should expect to see Llano-based systems widely available in this quarter"); *id.* at No. 17 ("We launched [Llano] this quarter with momentum, but we always said it's going to be a second half of the year effort"); *id.* at No. 18 ("we should be in good shape [with respect to Llano supply] for the second half"); *id.* at No. 25 ("AMD continues to work closely with its key partner [GF] to improve 32nm yield performance in order to satisfy strong demand for AMD products"); *id.* at No. 34 ("our focus on execution around the APUs and around Llano is definitely paying off. And I think as we move forward, we should be able to continue to build on that momentum"); *id.* at No. 36 ("The thing about APUs is where do we think it can go in the market . . . we see [OEM adoption] continuing to grow and the momentum continuing to grow into 2012 and 2013"); *id.* at No. 43 ("Llano is an important product throughout the balance of this year and into 2013"); *id.* at No. 44 ("we'll work through [product

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1   Defendants accurately reported their expectations and whether those expectations were

2   developed using a reasonable process has direct bearing as to whether Defendants' statements

3   were true when made, and whether Defendants' statements were made with scienter.  Professor

4   Kapoor's testimony that AMD used a reasonable process, with numerous inputs, in order to

5   develop expectations about both demand for and supply of its products (Kapoor Rpt. ¶¶ 18, 50),

6   is thus directly relevant to Plaintiffs' claims.  *See Oracle*, 627 F.3d at 388; *see also Police Ret.*

7   *Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058-59 (9th Cir. 2014) (statements

8   like "we continue to expect [] procedures to grow approximately 40%" was an example of the

9   company's revenue projections, and "plainly project[s] expectations for future growth").

10         *Third*, empirical analysis of AMD's forecasts reveals facts that are not merely

11   inconsistent—but rather completely irreconcilable with Plaintiffs' theories.  For example,

12   examination of AMD's forecasts demonstrates that all of AMD's microprocessor products were

13   impacted in a similar way by market conditions during 2Q12 and 3Q12 (and, in fact, Llano fared

14   better in 3Q12 than did AMD's other products).  This analysis is powerful (and Defendants

15   believe dispositive) evidence that the Llano shortfall was a direct result of the market conditions

16   that caused the shortfall of every other product, rather than some earlier fraud that coincidentally

17   impacted Llano products in a similar manner to non-Llano products.  Given this, Professor

18   Kapoor's opinion confirming the reasonableness of AMD's underlying forecasts (both for Llano

19   and other products) is powerful confirmatory evidence of the importance of this comparative

20   analysis and the conclusions that Professor Kapoor draws from it.

21         *Fourth*, Plaintiffs' suggestion that this material is irrelevant is inconsistent with Plaintiffs'

22   own experts' analysis and framing of the case.  Plaintiffs premise their experts' loss causation

23   and damages analysis on the extent to which shortfalls to AMD's public earnings guidance in

24   3Q11, 2Q12, and 3Q12 were "attributable to Llano."  *See, e.g.,* Coffman Rpt. ¶ 86.  Using

25   exactly the same forecasts that Professor Kapoor analyzes, Plaintiffs attempt to identify this

26   portion of the guidance shortfall (and subsequent stock price decline) by analyzing the

27

28   inventory] in each of those next two quarters"); *id*. at No. 45 ("when we look forward, it's really
     the focus on sellout velocity and getting the overall positioning correct . . . .").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

"difference between forecasted and actual revenue" for Llano and changes in those forecasts over time. *See id.* ¶¶ 10, 86, 103, 115.[5]  Plaintiffs' attempt to recover for stock drops following guidance shortfalls, without assuming the burden of demonstrating that the public guidance was false and misleading when issued, is a dispositive failure in their claims.  *See* Defs.' MSJ at 1-6, 23-24.  Given this, Plaintiffs' claim that Professor Kapoor's testimony regarding the reasonableness of such forecasts is irrelevant, *see* Mot. at 20-21, is merely an attempt to avoid the central piece of evidence that confirms AMD's basis for its statements about future Llano supply and demand.[6]  Plaintiffs cannot place AMD's forecasts at the center of their claims, offer testimony about the reasonableness of those forecasts, and, at the same time, seek to exclude Professor Kapoor's testimony regarding the circumstances in which those forecasts were developed.  *See EEOC v. GLC Rests., Inc.*, 2007 WL 30269, at *10 (D. Ariz. Jan. 4, 2007).  The argument that the reasonableness of AMD's forecasts is irrelevant (and presumably that the at-issue statements should be judged by some unknown and undefined measure of "expectations") is flatly inconsistent with how Plaintiffs have framed this case.

In short, the reasonableness of AMD's forecasts, and empirical analysis of those forecasts, directly undermines Plaintiffs' claims of materiality, scienter, causation and damages—each element of Plaintiffs' claims.  Accordingly, the suggestion that this testimony and evidence is irrelevant is nothing more than an attempt by Plaintiffs to ignore its relevance.

---

[5] As explained in Defendants' *Daubert* Motion, Mr. Coffman measures damages using the amount by which AMD's actual results fell short of AMD's internal forecasts for 3Q11 and 2Q12 (and through that analysis, determines what percentage of AMD's stock price drop on the purported corrective disclosure days is related to Llano).  But for 3Q12, where Llano *outperformed* AMD's internal forecast, Mr. Coffman inexplicably switches to another damages metric.  *See* Defs.' *Daubert* Mot. at 15.

[6] Plaintiffs' experts eliminate all doubt as to the relevance of these issues by opining (albeit inconsistently) on the reasonableness of AMD's forecasts themselves.  *See* Coffman Reply Rpt. ¶ 17 (opining that "internal forecasts of Llano's commercial success were overly optimistic and did not necessarily reflect internally known facts"); Flemmons Rpt. ¶¶ 44-47 (opining that AMD's forecasting process was "detailed" and "combined customer sales plans with AMD product roadmaps").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

8

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

### 3. Professor Kapoor's Opinions Regarding the Causes of the 2Q12 and 3Q12 Shortfalls Are Both Relevant and Reliable

#### a. Professor Kapoor's Macroeconomic Opinions Are Relevant

Plaintiffs also seek to exclude Professor Kapoor's opinion that AMD's earnings misses in 2Q12 and 3Q12 were consistent with changes in macroeconomic conditions, because Plaintiffs claim that they do not dispute that "market conditions" were "one of the factors affecting AMD in Q2." *See* Mot. at 22-23.  Put another way, because Plaintiffs concede that macroeconomic conditions had *some* impact, they would like to exclude all other evidence about the extent to which these conditions impacted AMD and Llano sales.

As an initial matter, Plaintiffs misconstrue and oversimplify Professor Kapoor's opinions. Professor Kapoor's opinion is *not* that macroeconomic and industry factors were "***a factor*** that affected AMD in Q2 and Q3 of 2012." *See* Mot. at 22.  His opinion is that the 2Q12 and 3Q12 forecast misses were "the result of profound shifts in the PC market and industry-specific factors"—not Llano supply issues. *See* Kapoor Rpt. ¶¶ 19, 112-113.  Plaintiffs apparently acknowledge as much, as on the very next page of their motion, they confirm their understanding that Professor Kapoor Kapoor's opinion is that the Llano sales shortfalls "in Q2 and Q3 of 2012 are attributable ***solely*** to industry factors." *See* Mot. at 24 (emphasis added).

Moreover, although Plaintiffs claim that they "acknowledge[]" that "there were issues outside of the Llano mis-execution that affected Llano sales," *see* Mot. at 23, that is not the case. Plaintiffs' only "acknowledgement" of macroeconomic and industry factors is through Mr. Coffman's analysis of AMD's stock price.  As explained in Defendants' *Daubert* Motion, this analysis merely compares AMD's stock price to the stock price of selected companies and concludes that certain declines in AMD's stock price cannot be explained by the stock prices of other companies. *See* Defs.' *Daubert* Mot. at 4-5.  This analysis ignores whether AMD's stock price would be expected to be impacted by macroeconomic conditions more than the companies to which AMD was compared.[7]

---

[7] For example, Mr. Coffman compared AMD to companies that produce microprocessors for handheld devices and to Intel—all of whom would be expected to perform better in the particular macroeconomic conditions that existed during 2012. *See* Defs.' *Daubert* Mot. at 14 n.14.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1    More fundamentally for purposes of causation, Plaintiffs' analysis does nothing to

2  measure the impact of these conditions on AMD's sales.  *Id.*  This is no accident.  When

3  Professor Kapoor's macroeconomic analysis is combined with his empirical analysis of the

4  performance of other AMD products, as well as the publicly available evidence about AMD's

5  customers (*see* Defendants' MSJ at 18-19 (showing that AMD's key customers' sales were

6  declining by hundreds of millions)), it provides powerful evidence that:  (i) there was no Llano-

7  specific shortfall; and (ii) AMD suffered a sales shortfall across the entire range of its

8  microprocessors as a result of a sharp downturn that hit its strongest markets particularly hard.

9  *See* Kapoor Rpt. ¶¶ 113-157.  This evidence is obviously fatal to Plaintiffs' claim that there was

10  a Llano-specific shortfall, and to their experts' unsupported conclusions that all of that shortfall

11  could be attributed to supply problems that occurred a year earlier, rather than the same problems

12  that simultaneously impacted the rest of AMD's products.  Indeed, Plaintiffs appear to hope that

13  by excluding this evidence, and ignoring the performance of AMD's other products as well as its

14  customers' own performance, that they can continue to claim that every "lost" Llano sale during

15  2Q12 and 3Q12 was due to earlier "supply issues" that were fraudulently concealed.  But this

16  fiction can only be propped up if one ignores the nearly identical (or greater) shortfalls of

17  AMD's other non-Llano microprocessors, as well as the negative performance of AMD's

18  customers, which resulted from the across-the-board decline in market conditions.

19    Professor Kapoor's analysis of whether, and the extent to which, AMD's 2Q12 and 3Q12

20  sales forecast misses were the result of macroeconomic and industry factors is relevant.  *See id.*

21               **b.    Professor Kapoor's Methodology Is Reliable**

22    Plaintiffs next argue that portions of Professor Kapoor's opinions that the 2Q12 and

23  3Q12 sales shortfalls were the result of macroeconomic and industry-specific factors should be

24  excluded because they are "not grounded in any reliable principle or methodology."  *See* Mot.

25  at 25.  Not so.  Professor Kapoor's opinions are based upon a thorough and systematic analysis

26  of objective data, including:  (i) relevant industry data (including IDC data); (ii) AMD's

27  contemporaneous, product-level forecasting data; (iii) AMD's actual sales data; and (iv)

28  academic and industry literature, which Professor Kapoor applied to the facts of this case.  *See*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

10

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1  *supra* at Section II.A.1.  This extensive, empirical analysis does not "assume[] that Llano was

2  directly impacted by changing market conditions."  *See* Mot. at 25.  Rather, Professor Kapoor

3  assessed both Plaintiffs' theory (that 3Q11 Llano supply constraints caused AMD to miss sales

4  expectations in 2Q12 and 3Q12), as well as alternative theories (including that the 2Q12 and

5  3Q12 sales misses were the result of macroeconomic and industry-specific factors).  *See* Kapoor

6  Rpt. ¶¶ 113-157.  After analyzing objective data regarding both theories, Professor Kapoor

7  concluded that the sales shortfalls were the result of macroeconomic and industry-specific

8  factors.  *See id*.[8]  In fact, it is *Plaintiffs* who assume without basis that their theory is correct—

9  premising their entire case on a selected recitation of anecdotal emails and refusing to consider

10  other theories or evaluate the abundance of data that falsifies their hypothesis.

11       Nor are Plaintiffs correct that Professor Kapoor's opinions are unreliable because he

12  disregards Mr. Read's July 19, 2012 "admission" regarding the cause of the 2Q12 miss.  *See*

13  Mot. at 23-24.  First, contrary to Plaintiffs' argument, Read did not "admit" that "Llano supply

14  problems in 2011 were at the heart of the channel sales problems in 2012."  *See id*.  During the

15  2Q12 earnings call, Read instead explained that the 2Q12 "shortfall was largely driven by two

16  key factors—first, weak sales of desktop processors in the channel, primarily in China and

17  Europe; and, secondly, a soft consumer PC market that impacted OEM notebook processor

18  sales"—factors that are entirely consistent with Professor Kapoor's opinions.[9]  Ex. 318 at 3.

19  _____

20  [8] Professor Kapoor opines that macroeconomic and industry-specific factors were "likely" the
    cause of AMD's 2Q12 and 3Q12 forecast misses, as it is not possible to know with certainty the

21  reason that *every single* customer did not purchase specific types of AMD products without
    asking every single AMD customer or potential customer at the time.  That Professor Kapoor

22  identifies the likely cause of the miss—as opposed to the certain cause of the miss—in no way
    undermines the reliability of his opinions.  *See, e.g., Nagle v. Gusman*, 2016 WL 560688, at *6

23  (D. La. Feb. 12, 2016) (an expert's testimony as to the "most likely causes" of an event are
    admissible); *Allstate Ins. Co. v. Ever Island Elec. Co.*, 2007 WL 2728979, at *3 (N.D. Ga. Sept.

24  17, 2007) (an expert's testimony as to the "most likely cause" of an event were sufficiently
    reliable and were admissible).

25  [9] Plaintiffs further claim that Professor Kapoor ignored internal AMD documents.  *See* Mot. at
    24.  They are wrong.  Professor Kapoor considered the very documents that Plaintiffs contend

26  are "at odds" with his opinion.  *Compare* Pls.' Ex. 14 (Dkt. No. 264-16) with Ex. 387 (AMD-
    011-001603164, cited at Kapoor Rpt. App'x B at 11); *compare also* Pls.' Ex. 15 (Dkt. No. 264-

27  17) (Smith Exhibit 521) *with* Kapoor Rpt. App'x B at 2 (disclosing that Professor Kapoor
    considered the deposition of Darla Smith, with exhibits).  As Professor Kapoor explained, he

28  considered these materials along with a range of other information about market trends that was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

11

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1   Several paragraphs later, Read made a few observations about AMD's channel business over the

2   last few quarters, but did not revise his earlier statement about the causes of the 2Q12 sales

3   shortfalls.  *See id.*[10]  Moreover, as Professor Kapoor explained, Read's "statement was delivered

4   during the first few weeks of a longer-term PC industry shift, which was not visible at the time,"

5   and the data "does not substantiate a causal link between the 2011 Llano supply shortage and the

6   Q2 2012 forecast miss."  *See* Kapoor Rpt. at n.255; *see also* Ex. 385 (Kapoor Tr.) at 159:10-

7   161:5.  Tellingly, Plaintiffs do not challenge Professor Kapoor's analysis of the data—their

8   experts do not attempt to analyze any objective data—choosing instead to recite a handful of out-

9   of-context statements like this one.  Such "analysis" is insufficient to prove Plaintiffs' case and

10  provides no basis to exclude testimony based on careful analysis of a broad range of empirical

11  data.

12              B.     <u>Ms. Axelson's Opinions Are Admissible in Their Entirety</u>

13                     1.     **Ms. Axelson's Opinions**

14          Michele Axelson served as partner at a large, national accounting firm, auditing

15  numerous large technology companies; as the CFO of two publicly traded companies; as a

16  member of the Board and Audit Committees of three companies; and as a member of numerous

17  accounting standard-setting bodies.  *See* Axelson Rpt. ¶¶ 5-8.  Here, Ms. Axelson offers two

18  primary opinions.  First, she responds to Plaintiffs' allegations about AMD's Llano inventory

19  build-up by explaining:  (i) the generally accepted accounting principles ("GAAP") applicable to

20  AMD's inventory; (ii) AMD's process for evaluating its Llano inventory throughout 2012; and

21  (iii) the reasonableness of AMD's conclusion that October 2012 was the first time when it had

22  "unknown at th[e] time" of Mr. Read's statements.  *See* Ex. 385 (Kapoor Tr.) at 122:23-127:14.

23  To the contrary, it is Plaintiffs that fail to consider relevant evidence and, indeed, seek to *exclude*
    the most relevant evidence, including information pertinent to AMD's expectations about Llano

24  supply and demand (embodied in AMD's forecasts and public guidance), because it is fatal to
    their claims.  In any event, the potential remedy for an allegation that an expert did not

25  appropriately weigh all evidence is "cross examination, rather than exclusion."  *See In re Novatel
    Wireless Sec. Litig.*, 2011 WL 5827198, at *5-6 (S.D. Cal. Nov. 17, 2011).

26  [10] To the extent Plaintiffs contend that Mr. Read's comments about Llano supply issues were
    meant to explain the reason for "weak" sales to channel customers, Plaintiffs have offered no

27  explanation for why Mr. Read would have indicated that the primary areas of weakness were in
    China and Europe (both of which were experiencing economic difficulties) if the cause of the

28  "weak" sales was a general issue like supply constraints, not a geographic one.

Llano inventory in excess of demand such that it was required to "write-down" the value of that inventory.  Axelson Rpt. ¶¶ 49-113.  Second, Ms. Axelson responds to Plaintiffs' allegations regarding Llano gross margins, which is a measure of revenue less cost of goods sold.  Plaintiffs' accounting expert, Mr. Jason Flemmons, opines that eight statements pertaining to the "margin accretive" nature of Llano and APUs were false and misleading.  *See* Defs.' *Daubert* Mot. at 24-28.  This opinion is based on Mr. Flemmons's assertion that the term "margin accretive"—when used by Defendants—had one (and only one) meaning, which is that the gross margin percentage for Llano was (or was projected to be) higher than the Company-wide gross margin percentage.  *See id.*; *see also* Flemmons Rpt. ¶ 57.  Ms. Axelson's rebuttal report explains that this conclusion is incorrect, because the term "margin accretive" is not defined by any relevant accounting literature (including GAAP) and has several other meanings.  *See* Axelson Rpt. ¶¶ 114-131.  Ms. Axelson also explained that these other meanings are consistent with contemporaneous internal and public statements made by Defendants (and other AMD employees).  *See id.* ¶¶ 132-162.

## 2. Ms. Axelson's GAAP Opinions Are Relevant

Plaintiffs' first argument for excluding the testimony of Ms. Axelson is another attempt to jettison any objective standard by which Plaintiffs' claims can be judged.  Plaintiffs have alleged that AMD *knew* it had "too much" Llano inventory and that AMD's write-down of approximately $71 million of Llano inventory revealed the "relevant truth" concerning 45 purportedly false and misleading statements about Llano.  *See* Ex. 386 at 23-24.  Plaintiffs' CAC, interrogatory responses, and expert reports are filled with allegations that, if true, would constitute a GAAP violation.  For example, Plaintiffs (and their experts) have claimed that— beginning on April 4, 2011—Defendants "knew, or should have known, that the yield and manufacturing issues would . . . result in excess inventory."  *See* Coffman Reply Rpt. ¶ 22; *see also* CAC ¶¶ 272, 279 (alleging that once GF resolved the Llano supply issues, AMD's customers had "already moved on from Llano," resulting in an "excess volume of Llano processors"); Ex. 169 at 184 (AMD had "excess Llano APU inventory").  As late as July 2012, Plaintiffs challenge AMD's statements about its ability to sell its then-existing Llano inventory. *See* Statement Chart at No. 43 ("Llano is an important product through the balance of this year

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

13

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

and into 2013."); *id.* at No. 44 ("We'll work through [inventory] in each of those next two

quarters."). Plaintiffs contend that the "truth" about these statements was revealed by the

October 11, 2012 write-down announcement. *See* Coffman Rpt. ¶ 119. Eliminating all doubt

about the nature of their claims, Plaintiffs and Dr. Thompson characterize the Llano inventory

"buildup" as "non-sellable" or "unsellable." *See* CAC ¶ 16; Thompson Rpt. ¶ 180.[11]

Plaintiffs nevertheless argue that GAAP is irrelevant because they have not used the

phrase "GAAP" in their allegations. *See* Mot. at 12-13.[12] But as Plaintiffs' own accounting

expert confirmed, when a company has "non-sellable" or excess inventory, the company is

required by GAAP to "either record a reserve or . . . record a write-off of that inventory." *See*

Ex. 34 (Flemmons Tr.) at 231:8-232:10. As with Professor Kapoor's opinions regarding

forecasting, Plaintiffs are eager to exclude any evidence about GAAP because they know this

evidence is fatal to their claims. Ms. Axelson's conclusion that it was consistent with GAAP for

AMD not to write-down any Llano inventory until the end of 3Q12 is dispositive evidence that,

until that time, AMD believed it had sufficient demand to consume its Llano inventory and its

inventory was properly valued. Plaintiffs did not (and cannot) rebut Ms. Axelson's conclusion

on the merits, so they instead ask the Court to throw out the accounting rules and judge AMD's

---

[11] Plaintiffs' primary effort to distance themselves from their allegations that AMD knew the Llano inventory was "unsellable" comes from Mr. Coffman, who claims that Defendants did not know "with specificity" that AMD would be required to write-down certain Llano inventory, but that AMD did know it would have to take *some* action regarding the "excess inventory." *See* Coffman Reply Rpt. ¶ 22. According to Mr. Coffman, the possibilities included not only writing down the "excess," but also selling it "at far lower margins than expected." *Id.* If that were true, it would mean that AMD knew that its gross margin would be negatively impacted. *See id.* ¶¶ 22, 75. But, of course, Plaintiffs do not allege AMD's gross margin guidance was false because that claim requires a showing that Plaintiffs cannot make (*i.e.*, that Defendants had no reasonable basis for such statements). *See* Defs.' MSJ at 1-6, 23-24. Because Plaintiffs do not allege that the gross margin guidance was misleading or that the write-down should have been recorded earlier, they have not offered an explanation of their inventory-related allegations that is consistent with the claims they have actually pled in this case.

[12] Plaintiffs avoid framing their claims as GAAP violations because they know that most statements concerning GAAP compliance are considered statements of opinion and the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, 135 S. Ct. 1318 (2015) makes it "substantially more difficult for a securities plaintiff to allege adequately (or, ultimately, to prove) that such [] statement[s] [are] false." *See In re Lehman Bros. Sec. and ERISA Litig.*, 131 F. Supp. 3d 241, 250-51 & n.44 (S.D.N.Y. 2015).

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SILICON VALLEY

14

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1  public statements about inventory by some as-of-yet-unknown standard of Plaintiffs' own

2  invention.  In other words, Plaintiffs ask the Court to create a circumstance in which AMD's

3  financial statements (prepared under GAAP) accurately reflect AMD's reasonable judgment that

4  it would be able to sell its then-existing Llano inventory, but that Defendants' oral statements

5  made at the same time and conveying the same information should be judged by a different

6  (unspecified) standard, and are therefore misleading.  Even if the Court were inclined to indulge

7  this novel approach of creating dual standards to evaluate a company's accounting judgments,

8  Defendants are entitled to defend the reasonableness of their statements about inventory by

9  reference to the actual standards that applied to their inventory assessments, and Ms. Axelson's

10  opinions are thus admissible.

11  ### 3.  Ms. Axelson's Gross Margin Opinions Are Sound

12  Plaintiffs further argue that Ms. Axelson's opinions should be excluded because she

13  explains what "'margin accretive' *could mean*" rather than stating what Defendants definitively

14  meant when using the phrase.  *See* Mot. at 18-19.  Likewise, Plaintiffs argue that Ms. Axelson

15  should not be permitted to opine that Defendants' statements regarding higher-than-anticipated

16  1Q12 gross margins as a result of "demand for certain 32-nanometer Llano products" could refer

17  to No-GPU Llano because she did not "conclude that what Seifert was referring to in those

18  statements was in fact No GPU Llano."  *Id*. at 19.[13]  Neither argument has merit.  Ms. Axelson

19  identifies dozens of flaws in Mr. Flemmons's conclusion that "margin accretive" had one—and

20  only one—meaning every time it was used by Defendants.  *See* Axelson Rpt. ¶¶ 15, 114-162.

21  This is proper rebuttal testimony.  *See*, *e.g., In re Toyota Motor Corp. Unintended Acceleration*

22  *Mktg., Sales Practices & Prods. Liability Litig.*, 978 F. Supp. 2d 1053, 1069-70 (C.D. Cal. 2013)

23  ("As a rebuttal witness, [an expert] may . . . point out flaws in [other experts'] methodologies or

24

25  [13] There is no dispute that AMD's No-GPU Llano products were margin accretive by any
26  definition in 1Q12.  *Compare* Axelson Rpt. ¶¶ 158-162 *with* Ex. 34 (Flemmons Tr.) at 219:12-
    221:23 (Llano No-GPU margins were approximately 66% in 1Q12); Flemmons Rpt. ¶ 100
27  (AMD's 1Q12 gross margin was 46%).  The only remaining question is whether Mr. Seifert was
    referring to No-GPU Llano when he said that "certain" Llano products were margin accretive.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

15

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1   conclusions"); *Aviva Sports, Inc. v. Fingerhut Direct Mktg. Inc*, 829 F. Supp. 2d 802, 835 (D.

2   Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's

3   methodologies and point out potential flaws in the plaintiff's experts' reports") (collecting

4   cases).  Likewise, the criticism that Ms. Axelson should have opined on exactly what Defendants

5   meant is puzzling given Plaintiffs' recognition elsewhere that experts may not opine on what

6   Defendants knew or meant.  *See* Mot. at 27-28.  Indeed, that is precisely what Mr. Flemmons

7   does by asserting that the "statements that were made to the public by Mr. Seifert [were] relating

8   to gross margin accretion in the context of Llano purportedly being margin accretive to the

9   company's gross margin as a whole," despite admitting that the term "margin accretion" can

10  have many different meanings.  *See* Ex. 34 (Flemmons Tr.) at 17:20-19:9, 129:16-21, 132:18-23;

11  Flemmons Reply Rpt. ¶¶ 12, 14-15.  The fact that Mr. Flemmons attempted to read Defendants'

12  minds and opine on what Defendants meant and understood while Ms. Axelson did not confirms

13  that Mr. Flemmons's opinions are the ones that require exclusion, not Ms. Axelson's.  *See*

14  *Holmes Grp., Inc. v. RPS Prods. Inc.*, 2010 WL 7867756, at *5 (D. Mass. June 25, 2010) ("No

15  level of experience or expertise will make an expert witness a mind-reader.").

16          Plaintiffs' other complaint about Ms. Axelson's gross margin opinions is that she did not

17  provide "calculations of actual Llano margin."  Mot. at 18-19.  This argument is also meritless.

18  Ms. Axelson responded to Mr. Flemmons's opening report, which is devoid of any re-calculation

19  of AMD's financial metrics, including those related to Llano.  Mr. Flemmons's entire "analysis"

20  consists of pasting pictures of AMD's internal documents into his report (or improperly

21  excerpting them) and then claiming that those out-of-context excerpts—on their face—

22  demonstrate that Defendants' statements were "false and misleading at the time they were

23  made."  *See* Flemmons Rpt. ¶¶ 11-17, 57, 59-120; *see also* Defs.' *Daubert* Mot. at 24-30.  Ms.

24  Axelson's report follows the same framework and uses additional documents that Mr. Flemmons

25  ignores to demonstrate that Mr. Flemmons's conclusions are incorrect.  This is the proper role of

26  a rebuttal expert.  *See Toyota*, 978 F. Supp. 2d at 1069-70.  Plaintiffs' demand that Ms. Axelson

27  conduct an unspecified set of calculations in rebuttal to an expert who offers none is baseless.

28  Indeed, Mr. Flemmons's reply to Ms. Axelson's report was the first time he referenced any of his

own calculations of Llano gross margins, declaring that he had now conducted an "extensive analysis" of "management financial reports."  *See* Flemmons Reply Rpt. ¶ 19.  This "extensive analysis" is a four-page document that calculates the gross margin percentage that AMD projected for 3Q11, and calculates Llano actual gross margins for 2011 and 2012.  *See* Ex. 388. These calculations are not referenced in Mr. Flemmons's reports and are not relevant to many of the statements he contends are misleading (*e.g.*, those relating to AMD's gross margin projections for periods other than 3Q11).  Moreover, the figures in his supplemental "analysis" do not even match the figures contained in his report.  *Compare id.* at 2 *with* Flemmons Rpt. at 26. That Mr. Flemmons conducted a handful of slipshod calculations after Ms. Axelson served her report does not suddenly require Ms. Axelson to have done anything further to demonstrate that Mr. Flemmons's opinions lack a reliable basis.[14]

### C.   Professor Cornell's Opinions Are Admissible in Their Entirety

Professor Bradford Cornell has spent a combined three decades as a Professor of Finance at UCLA and a Visiting Professor of Financial Economics at Caltech, and has published roughly 100 peer-reviewed articles on a range of finance and economics topics.  *See* Cornell Rpt. ¶¶ 1-2. Here, Professor Cornell opines on, among other things, (i) the riskiness of investing in AMD's common stock; (ii) the disproportionate impact on AMD during the Class Period of severe macroeconomic conditions and fundamental changes in the semiconductor industry; and (iii) economic evidence that is inconsistent with Plaintiffs' allegations of fraud.  In yet another attempt to exclude evidence unhelpful to Plaintiffs' claims and to which they have no substantive response, Plaintiffs contend each opinion is irrelevant.

---

[14] Plaintiffs also contend that Professor Kapoor's opinions relating to gross margin should be excluded.  *See* Mot. at 21.  In his report, Professor Kapoor explains that while forecasting in general is difficult, forecasting gross margins—which requires a firm to project both its sales *and* its costs—is particularly difficult.  *See* Kapoor Rpt. ¶¶ 83-87.  These opinions are well within Professor Kapoor's expertise as a professor of business, focusing on technology (and, in particular, the semiconductor industry), as well as a former engineer at semiconductor firms.  *See* Kapoor Rpt. ¶¶ 1-7.  Nor does Professor Kapoor ignore relevant data, as Plaintiffs contend (*see* Mot. at 22); rather, he provides relevant context for AMD's gross margin projections.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

17

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1        **1.      Professor Cornell's Opinions Regarding the Riskiness of Investing in
                  AMD Stock Are Relevant**

Plaintiffs contend that "the question of whether investing in AMD stock is particularly

risky is not probative of whether Defendants committed securities fraud."  Mot. at 26.  That is

because Plaintiffs want the at-issue statements to be judged independent of any context that

explains the total mix of information known to investors and factors that caused volatility and

declines in AMD's stock during the Class Period.  This is not the law.  *See, e.g., Basic, Inc. v.*

*Levinson*, 485 U.S. 224, 239-40 (1988) (materiality is evaluated based on the "total mix of

information made available"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)

("Whether information is material also depends on other information already available to the

market . . . ."); *see also Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (a "lower price

may reflect, not the earlier misrepresentation, but changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions, or other events,

which taken separately or together account for some or all of that lower price").  Indeed, the

Ninth Circuit has already considered—and rejected—Plaintiffs' argument that the riskiness of

investing in a particular stock is irrelevant to claims of securities fraud.  *See, e.g., In re Stac*

*Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) ("Analyzing the quoted statements in

context leads to the inexorable conclusion that investors were specifically and adequately

cautioned about the relevant risks").[15]  As this Court has recognized, not all jurors in this District

possess the same level of sophistication about investments and the stock market, *see* Dkt. No.

247 at 42:9-10, and expert testimony on this topic would thus be helpful to a jury.  *See United*

*States v. Litvak*, 808 F.3d 160, 181-83 (2d Cir. 2015) (expert testimony about the market for

mortgage-backed securities would be "highly probative of materiality" and "could [] educate[]

the jury"); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (weighing

"testimony from both sides' experts on the question of materiality"); *In re Metro. Sec. Litig.*,

2010 WL 6783110, at *1 (E.D. Wash. Feb. 18, 2010) ("[O]n numerous occasions, district courts

---

[15] The PSLRA Safe Harbor codified the bespeaks-caution doctrine discussed in *Stac. See In re*
*Ligand Pharms., Inc. Sec. Litig.*, 2005 WL 2461151, at *16 n.12 (S.D. Cal. Sept. 27, 2005).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

18

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1    have admitted expert testimony regarding the issue of materiality.")[16]  Professor Cornell's

2    opinions regarding the riskiness of investing in AMD stock are thus admissible.

3              **2.        Professor Cornell's Opinions Regarding AMD's Unique Exposure to
                           the Effects of Macroeconomic Factors Are Relevant**

4

5            Plaintiffs next argue that Section IV of Professor Cornell's report should be excluded

6    because "Plaintiffs do not contest the existence of macroeconomic market conditions as a factor

7    that affected AMD in Q2 and Q3 of 2012."  Mot. at 27.  However, Professor Cornell does not

8    merely opine on whether or not AMD was impacted by general, unspecified macroeconomic

9    conditions—his opinion concerns the *degree to which* AMD was impacted by specific industry

10   and market conditions:

11           [A]s compared to other firms, AMD was particularly exposed to . . . changes in
             economic conditions due to a confluence of firm-specific factors, including: its
12           technological disadvantages relative to Intel; its outsized exposure to the low-end
             consumer PC space; its lack of any meaningful tablet or smartphone business; and
13           its then-ongoing management and strategic changes.

14   Cornell Rpt. ¶ 30.

15           Plaintiffs argue that they have controlled for the impact of macroeconomic conditions by

16   comparing the declines in the price of AMD's stock to the declines in the price of other stocks

17   during a similar period.  Coffman Reply Rpt. ¶ 30.  But as Professor Cornell explains in his

18   report, this comparison ignores the reasons why AMD would be particularly exposed to certain

19   macroeconomic events and expected to perform worse than certain competitors under the same

20   economic conditions.  Cornell Rpt. ¶¶ 30-39.  Professor Cornell also takes issue with Plaintiffs'

21   assumptions that every "lost" Llano sale was caused by the alleged fraud rather than

22   macroeconomic issues while every "lost" sale of another product was caused by macroeconomic

23   factors that coincidentally had a nearly identical impact on sales.  *Id.* ¶¶ 71-72.  Plaintiffs do not

24   argue that Professor Cornell is unqualified to offer these opinions or that they lack a basis.  They

25   are just asking to exclude these opinions because they have no response and would prefer that the

26   _____

27   [16] As discussed, this testimony is relevant to several elements of Plaintiffs' claims under Section
     10(b) of the Securities Exchange Act of 1934.  Contrary to Plaintiffs' assertion (*see* Mot. at 26-
28   27), it is not being offered in support of an affirmative defense that Defendants are not pursuing.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SILICON VALLEY

19

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

case include only their testimony about the nature and extent to which macroeconomic issues impacted AMD.  This argument is without merit.  *Blue v. Int'l Bhd. of Elec. Workers Local Un. 159*, 676 F.3d 579, 585 (7th Cir. 2012) (citing *United States v. Old Chief*, 519 U.S. 172, 186–89 (1997) ("Within the limits of Federal Rule of Evidence 403, [a party is] entitled to make her case with the evidence of her own choosing.").

### 3.   Professor Cornell's Opinions Regarding Defendants' Economic Incentives Are Relevant, and His Methodology Is Accepted in the Relevant Scientific Community

Plaintiffs' final argument pertains to Professor Cornell's opinions that economic evidence in this case is inconsistent with Defendants having engaged in an intentional fraud.  *See* Mot. at 27-30.  Drawing on foundational economic principles, Professor Cornell explains that "a rational actor would only choose to engage in a fraud to inflate a company's stock price if the expected benefits from engaging in that fraud are greater than the expected costs."  Cornell Rpt. ¶ 41.  After analyzing a number of potential benefits of artificially inflating a company's stock price—*i.e.*, issuing new shares at inflated prices to raise funds, using artificially inflated shares as consideration for the acquisition of another company, or selling shares at inflated prices for personal gain—he concluded that *none* of those factors are present in this case.  *Id.* ¶¶ 40-46.  Indeed, to the contrary, the Individual Defendants accumulated *more* shares of AMD stock throughout the Class Period and personally lost millions of dollars when the stock declined.  *Id.* It is understandable—but meritless—that Plaintiffs would want to exclude this testimony.

Plaintiffs argue that Professor Cornell lacks sufficient experience to testify to these issues because he is "a financial economist and not [] a . . . psychologist," Mot. at 27-28, and that Professor Cornell does not use a reliable methodology in reaching his conclusions.  *Id*. at 28-30.  Neither argument has merit.

*First*, Plaintiffs' counsel have long advocated for the relevance of precisely the type of information they seek to exclude here.  During the past five years alone, the two lead law firms representing Plaintiffs (Labaton Sucharow LLP and Motley Rice LLP) have filed no fewer than 25 different lawsuits touting the existence of stock transactions by insiders as economic

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

20

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

evidence that supports the existence of securities fraud.[17]  These lawsuits allege, for example,

that defendants' stock "selling pattern[s] provide[] strong support for scienter," or the "presence

of early exercise of executive compensation options provides a strong [sic] evidence of scienter,"

or the "sharp contrast between lack of abnormal profitability during the Control Period and the

large profitable trading during the Class Period provides additional strong support for scienter."[18]

They have even used expert testimony from economists to explain more complicated facts they

contend are consistent with fraudulent behavior.[19]  If the existence of these facts is as relevant as

Plaintiffs' counsel routinely claims elsewhere, then the absence of such facts (as is the case here)

is equally relevant.  Courts agree.  *See, e.g.*, *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105–

06 (N.D. Cal. 2006) (noting that "the insiders retained over 99 percent of their total holdings"

---

[17] *See, e.g.*, *Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 1313779, at ¶ 398 (S.D.N.Y. Apr. 7, 2017) ("The Class Period stock sales by the Individual Defendants were highly unusual when analyzed under any of the typical factors used for assessing motive scienter allegations"); *In re Intuitive Surgical Sec. Litig.*, 2017 WL 1206827, at ¶ 159 (N.D. Cal. Jan. 26, 2017) ("The Class Period sales of Intuitive stock . . . were highly unusual and suspicious . . . . [and] therefore raise a strong inference of scienter."); *see also In re Nimble Storage, Inc. Sec. Litig.*, 2017 WL 354744, at ¶ 321 (N.D. Cal. Jan. 20, 2017); *Patel v. Cigna Corp.*, 2016 WL 7733013, at ¶ 173 (D. Conn. Nov. 30, 2016); *In re Target Corp. Sec. Litig.*, 2016 WL 6832695, at ¶ 291 (D. Minn. Nov. 14, 2016); *Martin v. GNC Holdings, Inc.*, 2016 WL 1391346, at ¶ 186 (W.D. Pa. Mar. 21, 2016); *Tadros v. Celladon Corp.*, 2016 WL 1576179, at ¶ 193 (S.D. Cal. Feb. 29, 2016); *In re Investment Tech. Grp., Inc.*, 2015 WL 9875169, at ¶ 284 (S.D.N.Y. Dec. 14, 2015); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2015 WL 8786487, at ¶ 283 (D.S.C. Dec. 9, 2015); *Glore v. SanDisk Corp.*, 2015 WL 6451040, at ¶ 121 (N.D. Cal. Aug. 28, 2015); *In re Conn's Inc. Sec. Litig.*, 2015 WL 5253203, at ¶ 215 (S.D. Tex. July 21, 2015); *In re FireEye, Inc. Sec. Litig.*, 2015 WL 7313976, at ¶ 208 (N.D. Cal. June 29, 2015); *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 1969606, at ¶ 183 (S.D.N.Y. Apr. 15, 2015); *Howard v. Liquidity Servs., Inc.*, 2014 WL 12537096, at ¶ 256 (D.D.C. Dec. 15, 2014); *Aruliah v. Impax Labs., Inc.*, 2014 WL 7390986, at ¶ 86 (N.D. Cal. Dec. 10, 2014); *In re KBR, Inc. Sec. Litig.*, 2014 WL 6209014, at ¶ 117 (S.D. Tex. Oct. 20, 2014); *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2014 WL 4387044, at ¶¶ 127–67 (S.D.N.Y. Aug. 12, 2014); *In re Chemed Corp. Sec. Litig.*, 2014 WL 6867616 at ¶ 219 (S.D. Ohio Mar. 28, 2014); *In re Ariad Pharms., Inc. Sec. Litig.*, 2014 WL 2119737, at ¶¶ 327–72 (D. Mass. Mar. 25, 2014); *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l Inc.*, 2013 WL 7128514, at ¶¶ 175–83 (E.D. Ky. Mar. 6, 2013); *In re STEC, Inc. Sec. Litig.*, 2012 WL 7177568, at ¶¶ 246–52 (C.D. Cal. Dec. 14, 2012); *In re Viropharma Inc. Sec. Litig.*, 2012 WL 6947227, at ¶¶ 160–65 (E.D. Pa. Oct. 19, 2012); *In re NETFLIX, Inc., Sec. Litig.*, 2012 WL 3202465, at ¶¶ 233–64 (N.D. Cal. June 26, 2012); *Hoppaugh v. K12 Inc.*, 2012 WL 12135346, at ¶ 194 (E.D. Va. June 22, 2012); *Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2012 WL 10874770, at ¶¶ 131–34 (E.D.N.C. May 4, 2012).

[18] *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2014 WL 4387044, at ¶¶ 127-67.

[19] *See Pipefitters Local No. 636 Defined Benefit Plan*, 2011 WL 7762953, at *27 (Opposition to Motion to Dismiss filed by Labaton Sucharow LLP) ("Defendants argue that Plaintiffs' [scienter] allegations that . . . [are] based on Professor Khanna's expert opinion cannot support a strong inference of scienter. Defendants are wrong.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

21

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1   during the class period, which "undermines any inference of scienter"); *Wenger v. Lumisys, Inc.*,

2   2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998); *City of Roseville Emps. Ret. Sys. v. Sterling Fin.*

3   *Corp.*, 963 F. Supp. 2d 1092, 1141 (E.D. Wash. 2013) (fact that defendant purchased stock

4   during class period "is wholly inconsistent with fraudulent intent"); *see also San Leandro*

5   *Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996)

6   ("[T]he fact that other defendants did not sell their shares during the relevant class period

7   sufficiently undermines plaintiffs' claim regarding motive.").

8       *Second*, Plaintiffs themselves discuss economic literature on this exact issue.  *See* Mot. at

9   29 & n.58.  It cannot be the case that an economist is only qualified to opine on these issues

10   when they agree with Plaintiffs' position.  Plaintiffs also mention evidence they contend

11   undermines Dr. Cornell's theory.  *Id.* at 29.  But Plaintiffs cannot have it both ways—either this

12   entire analytical approach is a fiction, or it is a legitimate inquiry in which scholars sometimes

13   draw different conclusions from the data.  Plaintiffs' tepid suggestions of why Professor Cornell

14   could be wrong effectively concede that the latter is true, and their decision not to directly

15   counter his conclusions reveals weakness in their claims, not a reason to exclude this testimony.

16       *Third*, Professor Cornell is not offering impermissible state of mind testimony.  *See* Mot.

17   at 29.  Unlike Plaintiffs' experts, Professor Cornell is not offering an opinion that any statement

18   was intentionally false and misleading.  *Cf.* Defs.' *Daubert* Mot. at 28-30.  Rather, he offers

19   economic evidence concerning Defendants' behavior that a jury could weigh (along with other

20   factual evidence) to determine whether Defendants acted with scienter.  Courts routinely permit

21   such testimony.  *See S.E.C. v. Dunn*, 2012 WL 475653, at *2 (D. Nev. Feb. 14, 2012) (admitting

22   expert's opinion regarding "the plausibility of [defendant's] explanation regarding his motivation

23   to trade" in a particular stock); *S.E.C. v. Roszak*, 495 F. Supp. 2d 875, 880-83 (N.D. Ill. 2007)

24   (same); *Crowley v. Chait*, 322 F. Supp. 2d 530, 554-55 (D. N.J. 2004) (denying plaintiff's

25   motion to exclude testimony of economist with expertise in "how economic markets work and

26   how actors within those markets behave," and whose testimony would "demonstrate the

27   implausibility of a scenario in which senior management of [defendant] would attempt to

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

22

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1   enhance the sale value of a company by deliberately accepting insurance coverage that would

2   result in inevitable losses for the company").[20]

3       *Fourth*, Plaintiffs argue that Professor Cornell's testimony should be excluded because

4   their expert, Mr. Coffman, has not seen such evidence in his "15 plus years of experience." Mot.

5   at 30:18-23. That statement raises more questions about Mr. Coffman's experience than

6   Professor Cornell's work. Professor Cornell's analysis is rooted in long-standing economic

7   research examining how rational actors respond in the face of different choices. Here,

8   Defendants faced a choice of whether or not to knowingly make alleged false and misleading

9   statements. Professor Cornell's analysis of the potential costs and benefits of each option permit

10  him to evaluate the course a rational economic actor would choose, and his analysis is based

11  upon, and consistent with, the peer-reviewed studies he cited.[21] For example, researchers have

12  found "evidence that insiders possess, and trade upon, knowledge of specific and economically

13  significant forthcoming accounting disclosures as long as two years prior to the disclosure." *See*

14  Bin Ke et al., *What Insiders Know About Future Earnings and How They Use It: Evidence from*

15  *Insider Trades*, 35 J. Acct. & Econ. 315, 315 (2003). Other researchers have found that where

16  insiders had greater incentives to sell stock before the revelation of accounting problems, they

17  sold substantially more stock than they did prior to the misstated earnings period. The study

18  concluded that "managers' desire to sell their stockholdings at inflated prices is a motive for

19  earnings manipulation." *See* Anup Agrawal and Tommy Cooper, *Insider Trading Before*

20  *Accounting Scandals*, 34 J. Corp. Fin. 169, 188 (2015). That Plaintiffs do not like the

---

[20] Plaintiffs argue that Professor Cornell's failure to evaluate internal AMD emails precludes him from offering the opinions in Section V of his report. *See* Mot. at n.61. This might be a legitimate criticism if Professor Cornell claimed he had reviewed all available evidence so as to offer an opinion on the ultimate question of scienter. But he does not. Professor Cornell is offering a limited opinion about whether the economic evidence is consistent with fraud. The jury can consider that opinion alongside whatever emails Plaintiffs contend compensate for the absence of a rational, economic motive to engage in the fraud they allege occurred here.

[21] Contrary to Plaintiffs' objection (*see* Mot. at n.60), Defendants did not belatedly identify the academic literature on which Professor Cornell relies. Neither Mr. Coffman nor Professor Cornell cited the academic literature underlying their opinions in their opening reports. When Mr. Coffman claimed in his reply report that he had never heard of this type of academic analysis, Professor Cornell identified an illustrative set of material to aid in Mr. Coffman's understanding of these issues. *See* Cornell Rpt. Ex. C, updated Feb. 21, 2017.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1    implications of this analysis is not a basis to exclude it.

2         **D.    Dr. Lisiak's Opinions Are Admissible in Their Entirety**

3              **1.    Dr. Lisiak's Opinions**

4         In response to Plaintiffs' expert, Professor Scott Thompson, Dr. Kenneth Lisiak provides

5    several opinions regarding Llano yields, Llano supply, and the reasons for the Llano supply

6    shortfall in 3Q11.  *See* Lisiak Rpt. ¶ 9.  First, Dr. Lisiak rejects Dr. Thompson's claim that it is

7    "industry standard" not to launch production on a new chip until yields are greater than 60

8    percent, opining that microprocessor yield and production decisions are "driven by economic

9    considerations" and that the range of products, processes, and manufacturers in the

10   semiconductor industry precludes the existence of a single yield standard.  *See, e.g.*, *id.* ¶¶ 9(b),

11   90-120.  Second, Dr. Lisiak considers a range of technical data to evaluate the reasonableness of

12   the judgments of AMD's technical and manufacturing personnel regarding Llano's production

13   status at various points in time.  In particular, he opines that it was reasonable from a technical

14   perspective for AMD to conclude:  (i) in April 2011, that Llano yields would continue to

15   improve; and (ii) that GF would be able to deliver to AMD during 3Q11 at least 85% of what GF

16   promised it would deliver for that quarter.  *See id.* ¶¶ 62-116, 121-139.  Because Plaintiffs cannot

17   challenge these conclusions on the merits, they now seek to exclude Dr. Lisiak's opinions on the

18   basis that (i) he is unqualified to opine on microprocessor manufacturing yields; and (ii) his

19   opinions reflect no methodology and/or are irrelevant.

20             **2.    Dr. Lisiak Is Qualified to Opine on Manufacturing Yields**

21        Dr. Lisiak has nearly 40 years of experience in front-line semiconductor manufacturing

22   positions in which he had direct responsibility for manufacturing processes and improving

23   product yields.  Dr. Lisiak served as an engineering manager at HP where he oversaw the

24   manufacture of microprocessor chips, worked with other semiconductor companies to help them

25   achieve record manufacturing yields, and oversaw the fabrication of microprocessor wafers.  *See*

26   Ex. 389 (Lisiak Tr.) at 96:12-97:18, 101:17-102:17, 106:23-24, 118:10-121:23; Lisiak Rpt. at

27   App'x 1.  Dr. Lisiak also held a variety of positions during a 20-year career at Analog Devices

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1    Inc. ("ADI").  *See* Lisiak Rpt. at App'x 1.[22]  Those positions included yield enhancement

2    manager (where his job was to "double yields on the company's highest-volume products in a

3    matter of months") and external foundry director (where his job was to oversee ADI's

4    relationship with ADI's outside foundry, Taiwan Semiconductor Manufacturing Corporation, or

5    "TSMC," a relationship similar to that between AMD and GF).  *See id.* ¶ 6(b); Ex. 389 (Lisiak

6    Tr.) at 186:4-20, 190:1-7.  As ADI's external foundry director, Dr. Lisiak worked on both logic

7    and memory technologies (on nodes as small as 90nm), and developed manufacturing best

8    practices at TSMC, which resulted in "wide-ranging improvement" to TSMC's yields.  Lisiak

9    Rpt. ¶ 6; Ex. 389 (Lisiak Tr.) at 131:22-132:8.  After retiring from ADI in 2007, he has consulted

10   for private equity firms and their portfolio or target companies to help them achieve their

11   manufacturing goals.  Lisiak Rpt. ¶ 6(e).

12       But now, as part of their ongoing efforts to define an "industry" with a "standard" that

13   would render AMD's conduct unreasonable, Plaintiffs have defined a new industry—"the

14   manufacturing of high-volume leading-edge logic microprocessor chips" industry—and claim

15   Dr. Lisiak is unqualified because he lacks sufficient experience in this latest attempt by Plaintiffs

16   to identify the industry they claim is relevant here.  Mot. at 7.  This argument is meritless.

17       As an initial matter, Plaintiffs themselves are unable to define this "industry"—and,

18   indeed, it appears to have been invented for purposes of this motion.  This term does not appear

19   in either of Dr. Thompson's reports, and Plaintiffs do not cite any source indicating that the

20   microprocessor manufacturing industry is divided into clear sectors, let alone one as narrow as

21   the "high-volume leading-edge logic microprocessor chip" sector they posit.  Indeed, the terms

22   they use to describe this purported sector designate no ascertainable set of products.  For

23   example, microprocessors cannot be easily divided into just "logic" and "memory" chips, *see,*

24   *e.g.*, Ex. 389 (Lisiak Tr.) at 207:6-22, and Plaintiffs have advanced no definition for what

25   qualifies as a "leading-edge" product.  *See id.* at 162:1-15 ("There are many [] dimensions to

26   cutting edge.").  Nor is it clear where the line is drawn between "high-volume" and "low-

27   ───────────────────────

28   [22] ADI employed 9,600 individuals and had $2.5 billion in revenue during its fiscal 2007, when
     Dr. Lisiak was employed by the company.  *See* Ex. 391 at 1, 23.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

25

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

volume." This is intentional. In his opening report, Dr. Thompson opines that the relevant industry standard should be based upon Intel's manufacturing abilities. *See* Thompson Rpt. ¶¶ 46, 22, 57. Then, in response to Dr. Lisiak's argument that comparison to Intel's standards is inappropriate given Intel's dominant market position and in-house manufacturing capabilities (*see* Lisiak Rpt. ¶ 111), Dr. Thompson pivoted—explaining that the relevant industry standard is not just Intel, but is either "basically AMD, Intel, and the industry," or "80 percent of the U.S. semiconductor industry," or companies that manufacture "high-volume microprocessor [chips] with a certain die size." *See* Ex. 342 (Thompson Tr.) at 71:2-76:21. Dr. Lisiak's experience falls squarely within that definition of the relevant industry, but as explained in Defendants' *Daubert* Motion, this "industry" does not have any single standard for the yield at which products should be launched. *See* Defs.' *Daubet* Mot. at 21-24. As a result, and to exclude Dr. Lisiak's testimony, Plaintiffs have reverted to Dr. Thompson's original formulation, arguing that the relevant industry is "high-volume leading-edge logic . . . chips." *See* Mot. at 7, 10.

This industry appears to exist only in Plaintiffs' motion and, as Plaintiffs candidly admit, is meant to impose a requirement that an expert have worked at either "AMD, Intel, or GlobalFoundries." *Id*. at 10. Plaintiffs prefer this standard because they know that (i) someone employed by AMD or GF likely could not serve as an expert here; (ii) Intel's dominant industry position renders it a poor basis of comparison for what could be expected of AMD's manufacturing process; and (iii) Intel does not rely upon a third-party foundry to manufacture its products. *See* Mot. at 8 n.8 (calling Intel the "marquee player" in the industry); Thompson Reply Rpt. ¶ 25 (Intel was "the "market leader" and "enjoyed more time to improve yields before ramping volumes"). Plaintiffs' goal here is simple: to create a universe in which AMD's only "peer" company—supplying the only comparison "standard" for yields, and the only source of experts who could testify—is Intel.[23] Plaintiffs need the only potential experts to be Intel alumni

---

[23] In addition, there is no evidence that AMD ever launched chips on the same terms as Intel. In other words, there was no "standard" that applied to both Intel (the largest chip maker in the world and dominant player in the market) and AMD (its much smaller competitor). Rather, the evidence shows that they faced different cost structures, market incentives, and thus, launch histories. *See, e.g.*, Lisiak Rpt. ¶¶ 42-50, 103-105. Indeed, the only "evidence" Dr. Thompson offered that it would be appropriate to judge AMD by Intel's experience is his misinterpretation

like Dr. Thompson whose views about industry standards are shaped by Intel. *See* Thompson

Rpt. ¶¶ 46, 22, 57 (citing his "experience" and "seventeen years of Intel wafer sort yield data");

Ex. 54 (FBR analyst report noting: "Intel . . . has major scale and cost advantages versus AMD,

and could effectively 'squash' AMD's Fusion efforts").[24]

Even if the "high-volume leading-edge logic microprocessor chip" was an ascertainable

sector that existed somewhere other than Plaintiffs' motion, it has no bearing on this case.

Plaintiffs assert that the broad range of products Dr. Lisiak manufactured during his career are

"radically unlike Llano." *See* Mot. at 7-8. But Llano was one of the first APUs ever created.

Neither Dr. Thompson nor Dr. Lisiak has experience with products that are exactly like Llano, as

APUs (and comparable technology) had not yet been developed, and Plaintiffs do not explain

what products are "similar" to Llano, "unlike" Llano, and "radically unlike" Llano, or why that

matters to this case. Indeed, Dr. Thompson opines at length on purported standards for

manufacturing yield that appear to apply without any regard to how "high-volume" or how

"leading edge" the chip is. *See* Thompson Rpt. ¶¶ 56-58, 66-68, 82, 98-107; Thompson Reply

Rpt. ¶¶ 17-31. The documents he cites recognize no such distinctions, and at deposition, he

testified that his purported standards apply so broadly that "80 percent of the U.S. semiconductor

industry" should be subject to them. *See* Ex. 342 (Thompson Tr.) at 71:2-15. If Dr. Thompson

is correct, it should not matter whether an individual has experience in a particular sub-sector of

that industry. For the same reason, there is no merit to Plaintiffs' claim that Dr. Lisiak lacks

sufficient experience because he did not work in the "relevant" industry between 2010 and 2012.

*See* Mot. at 7. As Dr. Thompson himself explained, it is his view that his purported standard has

been in existence since at least the 1990s. *See* Ex. 342 (Thompson Tr.) at 66:11-67:4, 74:10-14

---

of data from an "obscure" German website he found by "a Google search." But the data Dr.
Thompson found on the Internet was a graph devoid of actual numbers and the actual numbers—
which were produced by AMD but evidently not made available to Dr. Thompson—demonstrate
that AMD has not historically launched products at Dr. Thompson's purported industry standard.
*See* Defs.' *Daubert* Mot. at 21-24.

[24] In his second report, Dr. Thompson claims that his "opinions are based collectively on all [his]
experience, not simply those at Intel." Thompson Reply Rpt. at n.28. However, he provides no
detail concerning his non-Intel experience and he fails to explain how such experience could be
relevant given Plaintiffs' current focus on the purported "high-volume leading-edge logic
microprocessor chip" sector.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

27

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

("So, that standard, . . . in the '90s, appl[ied] to both Intel and AMD").  Dr. Lisiak was deeply involved in chip manufacturing during the precise period when this "standard" purportedly existed—working with TSMC, which Dr. Thompson admits is "the largest foundry" in the world (*see* Ex. 390 (Thompson Tr.) at 94:9-11)—and is thus qualified to testify about its existence or non-existence.

Finally, Plaintiffs' own expert does not have the qualifications that Plaintiffs demand from Dr. Lisiak.  Dr. Thompson has no demonstrable manufacturing experience, having spent 12 years at Intel as a chip designer and serving in academia since 2004.  He has never had responsibility for managing a semiconductor fabrication plant, designing and implementing plans to improve semiconductor manufacturing yield, or working with companies like AMD that are not dominant, "marquee players" with limitless budgets.  Nearly all of Dr. Lisiak's 40-year career in the semiconductor manufacturing industry has been spent in these roles.  The truth is that even if Plaintiffs' latest "industry standard" actually existed, neither Dr. Lisiak's alleged lack of product experience nor Dr. Thompson's alleged lack of manufacturing experience would be sufficient to warrant exclusion of their testimony.[25]  *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Sing.) Pte. Ltd.*, 2011 WL 5417090, at *4 (N.D. Cal. Oct. 27, 2011); *Czuchaj v. Conair Corp.*, 2016 WL 4414673, at *3 (S.D. Cal. Aug. 19, 2016).

### 3.      Dr. Lisiak's Opinions Are Properly Based on His Experience

Plaintiffs' second argument for excluding portions of Dr. Lisiak's testimony is that his "opinions are merely positive spins on cherry-picked facts" and reflect "no methodology."  Mot. at 12.  The Supreme Court has recognized that technical, but non-scientific, testimony is permitted in certain instances.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also Lucido v. Nestle Purina Petcare Co.*, 2016 WL 6804576, at *2 (N.D. Cal. Nov. 17, 2016) ("Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of

---

[25] However, to be sure, Dr. Thompson is not qualified to offer accounting, financial, and sales opinions based on his having read a "fascinating" book and taken a single class about business issues.  *See* Defs.' *Daubert* Mot. at 17 & n.17.

1    reliable expert testimony. . . . [T]he witness must explain how that experience leads to the

2    conclusion reached, why that experience is a sufficient basis for the opinion, and how that

3    experience is reliably applied to the facts.").  Here, Plaintiffs appear to question whether Dr.

4    Lisiak's opinions are adequately rooted in his experience.  As with many of their other

5    arguments to exclude testimony, Plaintiffs focus on testimony that jeopardizes their claims, but

6    for which they have no substantive response—namely, Dr. Lisiak's opinions that it was both

7    reasonable and consistent with available data and industry practice for AMD to:  (i) conclude in

8    early April 2011 that Llano yield would continue to improve (Mot. at 12-13); and (ii) assume GF

9    could deliver roughly 4.2 to 4.6 million units of Llano during 3Q11 for purposes of developing

10   AMD's 3Q11 guidance.  Mot. at 15-16.

11        With respect to his first opinion, Dr. Lisiak details the progress GF made in improving

12   Llano's yield during late 2010 and early 2011 (Lisiak Rpt. ¶¶ 64-84), the data AMD received

13   from GF regarding yield in March 2011, and how that data compared to various internal AMD

14   metrics (see id. ¶¶ 85-93).[26]  Then, based on his long history of conducting similar analyses, Dr.

15   Lisiak explains that it is a "rare event" for yield to improve as sharply and consistently as Llano

16   yield improved in March and to flatten, or even decline, thereafter.  See id. ¶¶ 82, 87 ("As a

17   result, I do not believe anyone at AMD could reasonably have anticipated the sustained decline

18   in yields that GlobalFoundries experienced in 2Q11 and 3Q11.").

19        With respect to his second opinion, Dr. Lisiak again considered a range of information to

20   evaluate whether it was reasonable for AMD to believe in July 2011 that it would receive 4.2 to

21   4.6 million Llano units from GF during 3Q11.  As outlined in Defendants' MSJ, this point is

22   significant because if AMD reasonably and genuinely believed that it would receive that volume

23   of Llano, it could not have intentionally concealed the "fact" that it knew it would ultimately

24

25   [26] After initially claiming yield was "flat" in March 2011, Dr. Thompson now agrees with Dr.
     Lisiak that yield was improving in March 2011.  *Compare* Thompson Rpt. ¶¶ 79-80 & Fig. 16

26   *with* Thompson Reply Rpt. ¶ 32 & Fig. 7 (conducting new analysis, opining that yield was
     increasing 0.7 percentage points per week).  Dr. Lisiak criticized Dr. Thompson's initial
     assessment that the yield curve was "flat" and noted that Dr. Thompson was able to generate a

27   flat curve because that is easy to do "when one is willing to ignore the actual data points."
     Plaintiffs appear to have taken that criticism of Dr. Thompson as an admission that Dr. Lisiak

28   manipulated some sort of data.  *See* Mot. at 14.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

29

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1    receive roughly one million fewer units, nor could its announcement about lower-than-expected

2    supply have revealed a prior relevant truth.  *See* Defs.' MSJ at 29-32, 37-38.  Plaintiffs cannot

3    challenge the soundness of AMD's expectation or Dr. Lisiak's opinion, so they instead argue that

4    Dr. Lisiak is not qualified to offer an opinion regarding the preparation of earnings guidance.

5    Mot. at 15.  Dr. Lisiak agrees, and has explained that he is only offering testimony about the

6    reasonableness from a technical perspective of the assumptions about Llano yield and supply that

7    are reflected in AMD's overall guidance.  *See* Ex. 389 (Lisiak Tr.) at 308:10-18 ("Q.  Okay. Do

8    you feel comfortable giving an opinion on AMD's preparation of public guidance in your report?

9    . . . A.  Again, only to the extent that variables like how many wafers, . . . the number of die, . . .

10   the exact inputs that I provided to my manager."); *see also* Lisiak Rpt. §§  VI.C.2(a)-(b).

11        The suggestion that it is improper for Dr. Lisiak to opine on these issues ignores the

12   nature of Plaintiffs' claims.  Plaintiffs allege that Defendants made false or misleading

13   statements about Llano yield and supply on, among other dates, April 4 and July 21, 2011.  *See*

14   Statement Chart at Nos. 1-24.  Each of those statements was based upon (among other things),

15   views expressed to AMD management by GF and AMD's manufacturing personnel, who were

16   doing exactly what Dr. Lisiak does here—evaluating Llano yield and supply data and drawing

17   conclusions in light of their prior experience.  *See, e.g.*, Exs. 31-32 (AMD personnel commenting

18   that "32nm is virtually done," and AMD "should be [moving] on [to] 28nm"); Ex. 94 (AMD

19   personnel making recommendations regarding estimate of 3Q11 supply for planning purposes).

20   Dr. Lisiak's opinions about the reasonableness of those determinations, based on his extensive

21   experience in nearly identical situations, are well within the scope of permissible expert

22   testimony.  *See, e.g.*, *Lucido*, 2016 WL 6804576, at *3; *EEOC*, 2007 WL 30269, at *10 ("Expert

23   testimony may be admitted to assist the trier of fact to understand the evidence or to determine a

24   fact in issue.  Fed. R. Ev[id]. 702.  The reasonableness of Defendants' conduct is such a fact in

25   issue.").  By contrast, Dr. Thompson ignores the considered judgments made by AMD personnel,

26   instead providing his own narrative of every fact he believes goes to whether the at-issue

27   statements are false or misleading, and then opines on that ultimate issue.  This is improper.  *See*

28   Defs.' *Daubert* Mot. at 28-30.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

30

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR

1

**III.    CONCLUSION**

2          For the foregoing reasons, Defendants respectfully request that Plaintiffs' Motion to

3  Exclude be denied in its entirety.

4

5  Dated:  May 30, 2017                          Respectfully submitted,

6

7                                 By:    /s/ Matthew Rawlinson

   LATHAM & WATKINS LLP
8  Matthew Rawlinson (Bar No. 231890)
   140 Scott Drive
9  Menlo Park, California 94025
   Telephone: +1.650.328.4600
10 Facsimile: +1.650.463.2600

11 Melanie M. Blunschi (Bar No. 234264)
   505 Montgomery Street, Suite 2000
12 San Francisco, California, 94111
   Telephone:  +1.415.391.0600
13 Facsimile: +1.415.395.8095

14 Jason C. Hegt (admitted *pro hac vice*)
   885 Third Avenue, Suite 1000
15 New York, New York 10022
   Telephone:  +1.212.906.1200
16 Facsimile: +1.212.751.4864

17 - and -

18

19 COOLEY LLP
   Patrick Gibbs  (Bar No. 183174)
20 3175 Hanover Street
   Palo Alto, California  94304
21 Telephone:  +1.650.843.5535
   Facsimile:  +1.650.849.7400

22

23 ***Attorneys for Defendants Advanced Micro Devices, Inc., Rory P. Read, Thomas J. Seifert, Richard A. Bergman, and Lisa T. Su***

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

31

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY
14-cv-00226-YGR