**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Katherine C. Lubin (State Bar No. 259826)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Liaison Counsel*

| **LABATON SUCHAROW LLP** | **MOTLEY RICE LLC** |
|---|---|
| Jonathan Gardner (*pro hac vice*) | James M. Hughes (*pro hac vice*) |
| Carol C. Villegas (*pro hac vice*) | William S. Norton (*pro hac vice*) |
| Alec T. Coquin (*pro hac vice*) | Max N. Gruetzmacher (*pro hac vice*) |
| 140 Broadway | Michael J. Pendell (*pro hac vice*) |
| New York, NY 10005 | 28 Bridgeside Blvd. |
| Telephone: (212) 907-0700 | Mt. Pleasant, SC 29464 |
| Facsimile: (212) 818-0477 | Telephone: (843) 216-9000 |
| | Facsimile: (843) 216-9450 |

*Co-Lead Counsel for the Class*          *Co-Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| BABAK HATAMIAN and LUSSA DENNJ SALVATORE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ADVANCED MICRO DEVICES, INC., RORY P. READ, THOMAS J. SEIFERT, RICHARD A. BERGMAN, AND LISA T. SU, <br><br> Defendants. | CASE NO. 4:14-cv-00226-YGR (JSC) <br><br> **CLASS ACTION** <br><br> **JOINT DECLARATION OF JONATHAN GARDNER AND JAMES M. HUGHES IN SUPPORT OF CLASS REPRESENTATIVES' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES** <br><br> Date:   February 27, 2018 <br> Time:  2:00 p.m. <br> Place:  Courtroom 1, 4th Floor <br> Judge: The Hon. Yvonne Gonzalez Rogers |

We, JONATHAN GARDNER and JAMES M. HUGHES, declare as follows pursuant to 28 U.S.C. §1746:

1.    Jonathan Gardner is a partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow") and James M. Hughes is a member of the law firm of Motley Rice LLC ("Motley Rice").  Labaton Sucharow and Motley Rice serve as court-appointed Class Counsel for Class Representatives Arkansas Teacher Retirement System ("ATRS") and KBC Asset Management NV ("KBC") (collectively, "Lead Plaintiffs" or "Class Representatives").[1]  We have been actively involved throughout the prosecution and resolution of the Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon our supervision and participation in all material aspects of the Action.

2.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, we submit this declaration in support of Class Representatives' Motion for Final Approval of Class Action Settlement and Plan of Allocation as well as Class Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses.  Both motions have the full support of the Class Representatives.  *See* Declaration of George Hopkins on Behalf of ATRS and Declaration of Bart Elst  on Behalf of KBC, attached hereto as Exhibits 1 and 2 respectively.[2]

## I.    PRELIMINARY STATEMENT

3.    The Class Representatives have succeeded in obtaining a recovery for the Class in the amount of $29,500,000, in cash, which has been funded by Defendants' insurance carriers and deposited in an interest-bearing escrow account for the benefit of the Class.  As set forth in the Stipulation, in exchange for this payment, the proposed Settlement resolves all claims asserted by the Class Representatives and the Class in the Action and all Released Claims against the Released Defendant Parties.

---

[1]    All capitalized terms not otherwise defined herein have the same meaning as that set forth in the Stipulation and Agreement of Settlement, dated as of October 9, 2017 (the "Stipulation", ECF No. 333-1).

[2]    Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

4.      This case has been vigorously litigated from its commencement in January 2014, through the execution of the Stipulation.  The Settlement was achieved only after Class Counsel, *inter alia*, as detailed herein:  (i) conducted a thorough and wide-ranging investigation concerning the allegedly fraudulent misrepresentations/omissions made by Defendants; (ii) prepared and filed a detailed Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws (the "CAC"); (iii) researched and drafted an opposition to Defendants' comprehensive motion to dismiss the CAC and successfully defeated the motion; (iv) defeated Defendants' motion to strike certain allegations in the CAC; (v) successfully moved for class certification; (vi) engaged in extensive and diligent fact discovery, including participating in 34 depositions (18 merits depositions, seven expert depositions, seven confidential witness depositions, and two Class Representative depositions) and the production and review of more than 2.5 million pages of discovery documents; (vii) engaged in extensive and diligent expert discovery, including submission of expert and rebuttal reports from three experts as well as the review and analysis of reports from Defendants' four experts; (viii) opposed Defendants' motion for summary judgment and moved for partial summary judgment as to certain statements; (ix) exchanged *Daubert* motions with Defendants; and (x) engaged in thorough mediation efforts, which included the exchange of comprehensive mediation statements, and two separate full-day mediation sessions.  At the time the Settlement was reached, Class Counsel had a deep understanding of the strengths and weaknesses of the Parties' positions.

5.      Further, as discussed below, according to the Class Representatives' damages expert, maximum aggregate damages in the Action are approximately $430 million, if the Class Representatives prevailed on each of their claims.  The $29.5 million Settlement, therefore, represents a recovery of approximately 7% of the Class Representatives' expert's maximum estimated damages—an excellent recovery, particularly in light of the countervailing legal and factual arguments and litigation risks.  *See, e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class

action settlements"); *see also* Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation and Memorandum of Points and Authorities in Support Thereof ("Settlement Brief"), §I.B.4.

6.     In choosing to settle, the Class Representatives and Class Counsel took into consideration the significant risks associated with advancing the claims alleged in the CAC, given the pending summary judgment and *Daubert* motions, as well as the duration and complexity of the legal proceedings, including trial, which remained ahead.  The Settlement was achieved in the face of vigorous opposition by Defendants who would have, had the Settlement not been reached, continued to raise serious arguments concerning, among other things, the alleged material falsity of statements and omissions concerning the launch of Llano and loss causation challenges.  In the absence of a settlement, there was a very real risk that the Class could have recovered nothing or an amount significantly less than the negotiated Settlement.

7.     With respect to the proposed Plan of Allocation, as discussed in further detail below and in the Settlement Brief, the proposed Plan of Allocation was developed by the Class Representatives' damages expert, and provides for the fair and equitable distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are approved for payment.

8.     With respect to the Fee and Expense Application, as discussed in Class Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses ("Fee Brief"), the requested fee of 25% of the Settlement Fund is fair both to the Class and to Class Counsel, and warrants the Court's approval.  This fee request is within the range of fee percentages frequently awarded in this type of action, and, under the particular facts of this case, justified in light of the benefits that Class Counsel conferred on the Class, the risks counsel undertook, the quality of their representation, the nature and extent of the legal services, and the fact that Class Counsel pursued the case at their financial risk.

## II.     SUMMARY OF THE CLASS REPRESENTATIVES' CLAIMS

9.     AMD is a multinational semiconductor company.  A majority of AMD's revenue during the Class Period was derived from the sale of computer microprocessors, chipsets, and embedded processors.  CAC ¶3.  The Class Representatives' claims center on the launch of

AMD's "Llano" microprocessor, an Accelerated Processing Unit ("APU") product that combined a Central Processing Unit ("CPU") with a Graphics Processing Unit ("GPU") onto a single computer chip.  AMD touted Llano as part of its "brilliant, all-new computing experiences" which "enable[d] unprecedented graphics and video performance in notebooks and PCs."  *Id.* ¶72.  Llano was set to launch in the fourth quarter of 2010 but problems at GlobalFoundries ("GF") (AMD's chip manufacturing plant) prevented a timely release and the launch was reset for the second quarter of 2011.  *Id.* ¶7.  As set forth in more detail below, the CAC alleges that Defendants made materially false and misleading statements and omissions about Llano's production, launch, demand, sales, and margins, among other things.  In particular, the CAC alleges that Defendants created the misleading impression that the manufacturing problems that affected Llano in 2010 were "behind" the Company and that yield was "on target" and "in line" with expectation.  *E.g. id.*, ¶¶8, 80, 155-56.  Contrary to Defendants' public statements, AMD's yield problems were not "behind" it, but instead remained an acute setback that persisted, unabated, throughout almost all of 2011.  *Id.* ¶¶93-111.

10.     The operative complaint in the Action, the CAC, asserts violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by AMD and Rory P. Read ("Read"), Thomas J. Seifert ("Seifert"), Richard A. Bergman ("Bergman"), and Lisa T. Su ("Su") (collectively, the "Individual Defendants" and with AMD, "Defendants").

## III.     RELEVANT PROCEDURAL HISTORY

### A.     Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel

11.     The Action was commenced on January 15, 2014, by the filing of an initial complaint in the United States District Court for the Northern District of California, alleging violations of the federal securities laws.  ECF No. 1.  On March 17, 2014, three movants, including ATRS (ECF No. 16) and KBC (ECF No. 9), filed motions seeking appointment as lead plaintiff and for approval of their selection of counsel.  By Order dated April 4, 2014, and pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"),

1   the Court appointed ATRS and KBC as Lead Plaintiffs and approved their selection of Labaton

2   Sucharow and Motley Rice to serve as Lead Counsel and Lieff Cabraser Heimann & Bernstein,

3   LLP as Liaison Counsel.  ECF No. 37.

4       **B.      The Corrected Amended Complaint**

5       12.     On May 23, 2014, Lead Plaintiffs filed the Amended Class Action Complaint for

6   Violations of the Federal Securities Laws alleging violations of Sections 10(b) and 20(a) of the

7   Exchange Act of 1934.  ECF No. 56.  On June 11, 2014, Lead Plaintiffs filed the Corrected

8   Amended Class Action Complaint for Violations of the Federal Securities Laws.  ECF No. 61.

9       13.     The CAC was the result of a significant effort by Class Counsel that included,

10  among other things, the review and analysis of:  (i) press releases, news articles, transcripts, and

11  other public statements issued by or concerning AMD and the Individual Defendants;

12  (ii) research reports issued by financial analysts concerning AMD's business; (iii) reports filed

13  publicly by AMD with the U.S. Securities and Exchange Commission (the "SEC"); (iv) news

14  articles, media reports and other publications concerning the microprocessor technology industry

15  and markets; (v) certain pleadings filed in derivative litigation naming AMD as a nominal

16  defendant; (vi) other publicly available information and data concerning AMD, its securities, and

17  the markets therefor; and (vii) information provided by a consultant with expertise in

18  microprocessor fabrication, and the microprocessor market.  The investigation also included

19  Class Counsel's in-house investigators locating numerous potential witnesses and interviewing

20  64 former employees of AMD, GF, and AMD's customers, on a confidential basis (nine of

21  whom were cited in the CAC as confidential witnesses).

22      14.     As noted above, the Class Representatives' claims center on the launch and

23  subsequent lifecycle of AMD's Llano microprocessor.  The first signs of trouble allegedly

24  emerged in 2010 when production difficulties at GF forced AMD to delay Llano's commercial

25  launch until midway through 2011.  CAC ¶7.  As alleged in the CAC however, on April 4, 2011,

26  Defendants told the market that the manufacturing problems that affected Llano were behind the

27  Company and that yield was "on target" and "in line" with expectations.  *Id*. ¶¶8, 80, 153-56.  As

28  detailed in the CAC, these statements were allegedly false and misleading because they led the

1    market to believe that the Company had overcome its yield problem and that Llano processors

2    were being produced in sufficient quantities for a successful launch, when in fact they were not.

3    *Id.* ¶156.

4           15.     The CAC also alleges that throughout the Class Period, Defendants made

5    materially false and misleading statements and omissions by "tout[ing]" strong customer demand

6    despite the fact that supply could not meet the demand due to the compromising yield problem.

7    *E.g.*, *id.*  ¶¶13, 89, 158, 201-02, 230, 236-54.  Defendants continued to state that there was strong

8    customer demand for Llano and that the Company expected a significant increase in shipments,

9    while failing to tell the market that AMD could not supply its channel customer base with Llano.

10   In particular, Defendants failed to tell the market that due to the lack of Llano supply, the

11   Company was prioritizing Llano shipments to only one segment of its customers – its tier 1

12   original equipment manufacturers ("OEM") customers – and neglecting to supply its important

13   distribution channel customers.  *E.g.*, *id.* ¶202.

14          16.     Once AMD was finally able to supply the channel with Llano at the end of 2011,

15   clients had moved on from Llano and were instead focused on a newer and different AMD

16   technology (Trinity) which was set to launch in mid to late 2012.  *E.g.*, *id.* ¶¶16, 78, 133, 135.

17   The excess volume of Llano processors that AMD now had accumulated was virtually unsellable

18   at commercial rates, and caused an inventory glut, resulting in AMD's inventory rising to the

19   highest levels it had been in years.  *E.g.*, *id.* ¶¶16, 19, 143, 230, 263.  The CAC alleges,

20   nonetheless, that Defendants continued to tout Llano as a good product that continued to be

21   important moving forward and would continue to sell well.  *E.g.*, *id.* ¶¶20, 228-29, 246-47.

22          17.     The CAC alleges that on September 28, 2011, AMD made a first partial

23   revelation of the truth, and reported that the Company would miss revenue guidance for the third

24   quarter by four to six percent due to "less than expected supply" of Llano.  *Id.* ¶¶13, 199.

25   AMD's stock price declined nearly 14% following this negative news.  *Id.* ¶¶13, 200.

26   Defendants, however, continued to mislead the market by touting the purported "strong"

27   customer demand for Llano while omitting that the yield problems were so severe that AMD

28

1  prioritized shipments to its top tier OEM customers only, and was not supplying its channel

2  distributors with any Llano product.  *Id*. ¶¶13, 202.

3       18.    A series of additional partial disclosures were made beginning in July 9, 2012,

4  when AMD announced an expected revenue miss of 14% for its fiscal 2012 second quarter, and

5  AMD's stock price fell more than 11% on July 10, 2012.  *Id*. ¶¶225, 255-56.  While the

6  information revealed that AMD had experienced lower channel demand for Llano, it did not

7  fully reveal the extent of the problems and that the issues with the channel stretched back to early

8  2011.  *Id*. ¶258.  Another partial disclosure was made on July 19, 2012, when the Company

9  reported that, among other things, revenue was down 11% from the previous quarter, and during

10 an earnings conference call that same day, when Read and Seifert revealed that AMD's botched

11 rollout of Llano led to weak channel adoption that negatively impacted AMD's business.  *Id*.

12 ¶262.  Another partial disclosure was made on October 12, 2012, when AMD issued a press

13 release revealing that gross margins were expected to decline 13% to 31% and that AMD needed

14 to record an approximate $100 million inventory write-down, mainly attributable to "lower

15 anticipated future demand for certain products."  *Id*. ¶273.

16      19.    Finally, on October 18, 2012, the CAC alleges that for the first time, the Company

17 revealed that the $100 million write-down mainly comprised Llano, which adversely impacted

18 gross margin.  *Id*. ¶¶275-76.  In a conference call on October 18th, AMD's then interim CFO

19 explained that the Llano inventory write-down accounted for approximately 8% of the 15% total

20 quarter-over-quarter decline in AMD's gross margins.  *Id*. ¶277.  The CAC alleges that as of

21 October 18, 2012, the market understood that the Llano yield problems throughout most of 2011

22 delayed availability of the product to an important part of AMD's customers, resulting in the

23 channel failing to adopt the product, and then simply moving on to the next technology.  AMD's

24 stock price fell 17% in response to this news.  In total, AMD's stock price dropped nearly 74%

25 during the Class Period.  *Id*. ¶¶24, 152.

26      **C.    Defendants' Motion to Dismiss the CAC**

27      20.    Defendants filed a motion to dismiss the CAC on July 7, 2014.  ECF No. 66.

28 Defendants argued, among other things, that:  (i) the CAC relied on improper "puzzle pleading";

1   (ii) the CAC contained vague allegations of manufacturing problems and disappointing channel

2   demand that failed to satisfy the PSLRA pleading standards; (iii) certain of the alleged

3   misstatements were non-actionable puffery; for example, Defendants argued that statements that

4   Llano yield was "on target" and "in line with expectations" were not false because plaintiffs

5   failed to state what AMD's expectations were; (iv) the claims were nothing more than improper

6   fraud by hindsight and relied on forward-looking statements that were immune from liability

7   because they were protected by the safe harbor under the PSLRA both because they were

8   accompanied by meaningful cautionary language and because Lead Plaintiffs did not allege facts

9   showing actual knowledge of falsity; and (v) the CAC alleged no particularized facts supporting

10  the required strong inference of scienter.

11      21.     Also on July 7, 2014, Defendants filed a motion to strike certain allegations in the

12  CAC that relied on statements of two former employees of AMD who are identified in the CAC

13  as confidential witnesses.  ECF No. 70.  Lead Plaintiffs opposed Defendants' motion on July 21,

14  2014.  ECF No. 74.  On February 6, 2015, the Court issued an Order denying the motion to

15  strike.  ECF No. 107.

16      22.     The Lead Plaintiffs filed an opposition to Defendants' motion to dismiss the CAC

17  on July 28, 2014.  ECF No 79.  The Lead Plaintiffs argued, among other things, that by touting

18  Llano supply and demand, AMD gave the false impression that Llano yield was healthy and in

19  line with what was needed for a successful product launch to all customers.  As to the falsity of

20  the statements, the Lead Plaintiffs argued, among other things, that:  (i) the safe harbor did not

21  protect certain statements because each of the statements was false when made; (ii) mixed

22  statements of present fact and future prediction are not protected by the PSLRA safe harbor; (iii)

23  the cautionary language Defendants pointed to in the Company's 2011 SEC filings and press

24  releases was not meaningful because the risks disclosed by Defendants had already come to pass;

25  and (iv) Defendants' statements were not puffery.

26      23.     Regarding Defendants' scienter arguments, the Lead Plaintiffs argued that

27  Defendants ignored sections of the CAC that outlined their own admissions about what they

28  knew and when.  For example, the Lead Plaintiffs pointed to Read's admission that Defendants

saw the channel problems begin to manifest in the summer of 2011 when the Llano yield supply was tight.  Further, the CAC contains allegations that Defendants had access to information on the Llano yield given that, for example, Bergman and Read attended weekly production meetings to discuss the status of chips, launches, and issues at GF, with Bergman reporting the discussions to Seifert.

24.   On August 8, 2014, Defendants filed a reply brief in further support of their motion to dismiss the CAC.  ECF No. 84.

### D.   The Court's Order on the Motion to Dismiss

25.   On March 31, 2015, after a hearing and thorough argument on October 28, 2014, the Court issued its Order Denying Motion to Dismiss.  *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149 (N.D. Cal. 2015).  The Court found that the Lead Plaintiffs sufficiently alleged the material and misleading nature of statements concerning the status of Llano yield as AMD prepared for its delayed launch of the Llano product.  *Id*. at 1157.  Specifically, the Court found that present-tense statements of fact, such as "[t]oday 32 nanometer yields are in line with our expectations"; "yield is on expectations"; "yields on 32 nanometer are on target"; and that "the previous issues [with Llano yields] had been resolved," when made without qualification, "created an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'"  *Id*. at 1159.  The Court also held that "the confluence of [Lead Plaintiffs'] specific allegations [regarding Llano yields and supply] supports this Court's finding that the PSLRA's high standard for alleging scienter has been met."  *Id*. at 1163-64.

26.   On May 15, 2015, Defendants filed their Answer to the CAC, denying the CAC's substantive allegations and raising nine affirmative defenses.  ECF No. 119.

### E.   Lead Plaintiffs' Motion for Class Certification

27.   On September 4, 2015, the Lead Plaintiffs moved for certification of a class that included all persons and entities that, during the period from April 4, 2011, through October 18, 2012, inclusive, purchased or otherwise acquired shares of the publicly traded common stock of AMD and were damaged thereby.  ECF No. 143.  The Lead Plaintiffs also moved for

1  appointment as class representatives pursuant to Rules 23(a) and 23(b)(3) and the appointment of

2  Labaton Sucharow LLP and Motley Rice LLC as Class Counsel.  In connection with their

3  motion, the Lead Plaintiffs filed an expert report on market efficiency by Chad Coffman, CFA

4  (ECF No. 144-2) who conducted a detailed event study concerning AMD's stock drops.

5        28.    Defendants opposed the motion on the basis, among others, that there was no

6  meaningful change in AMD's stock price under *Halliburton Co. v. Erica P. John Fund, Inc.*, 134

7  S. Ct. 2398 (2014) and that the Lead Plaintiffs had not proven that they can calculate damages on

8  a class-wide basis under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  ECF No. 155.  In

9  connection with their opposition, Defendants submitted an expert report from Paul A. Gompers,

10  Ph.D. (ECF No. 156-9), who responded to Mr. Coffman's report and opined that Mr. Coffman's

11  event study showed that there was no statistically significant stock price movement and failed to

12  provide any workable methodology for calculating class-wide damages arising from Lead

13  Plaintiffs' liability theories.

14        29.    The Lead Plaintiffs submitted their reply memorandum in further support of class

15  certification on December 7, 2015 (ECF No. 164), and a corrected reply brief on December 14,

16  2015 (ECF No. 169).  Mr. Coffman submitted a rebuttal expert report in connection with Lead

17  Plaintiffs' reply memorandum.  ECF No. 165-2.  Mr. Coffman was deposed, as was Defendants'

18  expert, Professor Gompers.

19        30.    On February 2, 2016, the Court held oral argument on Lead Plaintiffs' class

20  certification motion and on March 16, 2016, the Court issued an Order Granting Plaintiffs'

21  Motion for Class Certification.  ECF No. 181.

22        31.    In connection with the Court's certification of the Class, on October 3, 2016, the

23  Parties filed a joint motion to approve the Class Notice and Summary Notice of Pendency of

24  Class Action.  ECF No. 226.  On October 21, 2016, the Court approved the Class Notice

25  prepared by Class Counsel.  ECF No. 227.  Beginning with the initial mailing on November 11,

26  2016, the Class Notice was mailed to over 135,000 potential Class Members.  ECF No. 239-3

27  ¶11.  The Class Notice notified potential Class Members of, among other things:  (i) the

28  pendency of the Action against Defendants; (ii) the Court's certification of the Action to proceed

1   as a class action on behalf of the Court-certified Class; and (iii) their right to request to be

2   excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the

3   requirements for requesting exclusion.  Fifteen (15) valid requests for exclusion from the Class

4   were received in connection with the Class Notice.  *Id.* ¶¶18-19.

5   **IV.   DISCOVERY**

6          32.     The Class Representatives propounded detailed discovery requests and ultimately

7   reviewed and analyzed hundreds of thousands of documents (totaling millions of pages)

8   produced by Defendants and third parties; took 18 depositions of fact witnesses; participated in

9   seven depositions of confidential witnesses referenced in the CAC; defended two depositions of

10   the Class Representatives; negotiated and resolved myriad discovery disputes (with the

11   assistance of the Court when necessary); took or defended seven expert depositions; and

12   exchanged 11 expert reports.

13          **A.     Discovery Propounded on Defendants**

14          33.     The Class Representatives served their first set of document requests on

15   Defendants on June 3, 2015, and a second set of document requests on AMD on July 28, 2015.

16   Thereafter, the Class Representatives served another three sets of document requests on AMD.

17   The Class Representatives served their first set of interrogatories on AMD on June 9, 2015, a

18   second set of interrogatories on August 10, 2015, and a third set on July 8, 2016.  On July 8,

19   2016, the Class Representatives served their first set of interrogatories on the Individual

20   Defendants.  They served their first set of Requests for Admission on Defendants on July 15,

21   2015, and a second set of Requests for Admission on Defendants on August 11, 2016.  In total,

22   this discovery included five sets of document requests containing 108 individual requests, four

23   sets of interrogatories containing a total of 36 individual interrogatories, and two requests to

24   admit containing 192 requests for admission.

25          34.     Over the span of many months, the Parties engaged in numerous meet-and-confer

26   conferences and exchanged letters, as to the scope and manner of the requested document

27   production, interrogatories, and requests for admission, including issues pertaining to search

28   terms and custodians for electronically stored information ("ESI"), the relevant time period,

privilege log issues, and other disputes related to the requests.  Through this effort, the Parties were able to reach an understanding as to the appropriate scope of Defendants' discovery on many issues, with a few notable exceptions that required the Court's assistance.  *See infra* §IV.E. (Discovery Disputes).

35.     The Class Representatives conducted an efficient review of documents produced by Defendants, which exceeded more 2.3 million pages.  Defendants began a rolling production of documents on or around September 4, 2015.  To facilitate a cost and time-efficient document review process, all of the documents were placed in an electronic database that was maintained at Motley Rice and administered by Ricoh.  A platform called Relativity was used to organize the data.  A team of experienced attorneys was assembled to review and analyze the production. These attorneys were focused on reviewing Defendants' document production for the purpose of preparing for depositions, and ultimately trial, with many of them assisting in additional stages of deposition preparation, as well as providing documents to support statements and assertions in the Class Representatives' responses to interrogatories.

36.     To efficiently focus on the most relevant documents, these attorneys used the document platform and its analytical tools to analyze and search the data.  This was accomplished through TAR (technology assisted review) in culling, searching, and reviewing the documents.  TAR allowed the attorneys to narrow the universe of documents that needed to be reviewed.  Once the universe of documents was narrowed, the attorneys conducted targeted searching through text, author and/or recipients, type of document (e.g., emails, memoranda, SEC filings), date, Bates number, etc. to identify relevant, irrelevant, and hot documents for additional review.

37.     The document review attorneys did not only review documents.  They also participated in frequent meetings with more senior attorneys to discuss important documents, deposition preparation efforts, and case strategy.  The document review attorneys also had direct responsibility for selecting relevant documents for expert review and in putting together binders of evidence for use at deposition.

1      **B.      The Class Representatives' Depositions of Fact Witnesses**

2          38.     Class Counsel conducted 18 fact-witness depositions, including the depositions of

3    the four Individual Defendants, and one 30(b)(6) deposition.  The depositions Class Counsel

4    conducted included:

5              (a)      Scott Kehm (AMD Corporate Vice President and its 30(b)(6)

6    representative) on February 11, 2016, in Austin, Texas;

7              (b)      Derrick Meyer (AMD's former Chief Executive Officer, from 2008

8    through January 10, 2011) on June 7, 2016, in Austin, Texas;

9              (c)      Darren Grasby (AMD's President of EMEA Region and Global Channel

10   Sales) on June 22, 2016, in Austin, Texas;

11             (d)      Devinder Kumar (AMD's former Corporate Controller and current Chief

12   Financial Officer) on June 30, 2016, in Menlo Park, California;

13             (e)      Michael Massetti (former AMD Corporate Vice President, Integrated

14   Supply Chain) on July 1, 2016, in Tampa, Florida;

15             (f)      Dr. Lisa T. Su (Senior Vice President and General Manager of AMD's

16   Global Business Unit, and current AMD CEO) on July 13, 2016, in Austin, Texas;

17             (g)      John Zucker (GlobalFoundries Vice President of Sales) on July 19, 2016

18   on July 19, 2016, in Austin, Texas;

19             (h)      John Docherty (AMD's former Senior Vice President of Manufacturing

20   Operations) on July 22, 2016, in Austin, Texas;

21             (i)      Rory Read (AMD's former President and CEO of AMD) on July 29, 2016,

22   in Austin, Texas;

23             (j)      Richard Bergman (AMD's former Senior Vice President and Head of

24   Products Group) on August 2, 2016, in Palo Alto, California;

25             (k)      Thomas Seifert (AMD's former Interim Chief Executive Officer and Chief

26   Financial Officer) on August 11, 2016, in Menlo Park, California;

27             (l)      Tony A. Prophet (former Hewlett Packard Senior Vice President,

28   Operations Printing & Personal Systems) on August 12, 2016, in Seattle, Washington;

1    (m)    Chris Cloran (former AMD Corporate Vice President and General

2    Manager, Client Business Unit) on August 25, 2016, in Austin, Texas;

3    (n)    Doug Yacek (AMD's Finance Director in the Client Computing Group) on

4    October 20, 2016, in Austin, Texas;

5    (o)    Emilio Ghilardi (AMD's former Chief Sales Officer) on October 25, 2016,

6    in Menlo Park, California;

7    (p)    Ruth Cotter (AMD's Director of Investor Relations and current Chief

8    Human Resources Officer) on October 27, 2016, in Palo Alto, California;

9    (q)    Darla Smith (AMD's Corporate Vice President of Finance) on October 28,

10    2016, in Menlo Park, California; and

11    (r)    Bruce Claflin (Chairman of AMD's Board of Directors) on November 4,

12    2016, in Austin, Texas.

13    **C.    Discovery Propounded on the Class Representatives**

14    39.    Defendants aggressively sought discovery from the Class Representatives.

15    Defendants' discovery requests led to production of thousands of pages of documents, two

16    depositions of the Class Representatives' personnel, participation in multiple meet-and-confer

17    sessions, and contentious motion practice.  Defendants served two sets of document requests on

18    ATRS and KBC.  AMD served one set of interrogatories on ATRS and KBC and Individual

19    Defendant Dr. Lisa T. Su served a separate set of interrogatories on ATRS and KBC.  In all

20    instances, the Class Representative objected on the basis that Defendants' discovery requests

21    were exceedingly broad and sought documents that were protected by various privileges and

22    protections.  As a result of the breadth of Defendants' requests, the Parties engaged in a series of

23    meet-and-confer conferences to negotiate the scope of the Class Representatives' production.

24    While the Parties were able to resolve many disputes, some required the assistance of the Court.

25    *See infra* §IV.E. (Discovery Disputes).

26    40.    Defendants then deposed the Class Representatives.  Defendants deposed Tine

27    Procureur, Legal Advisor for KBC, who testified as a Rule 30(b)(6) witness for KBC, on

28    September 10, 2015, in New York, New York, and deposed Rodney Graves, Senior Investment

1  Manager at ATRS, who testified as a Rule 30(b)(6) witness for ATRS, on September 23, 2015,

2  in Little Rock, Arkansas.

3  **D.    Non-Party Discovery**

4  41.    The Class Representatives served non-party discovery, including a subpoena on

5  GF, on July 16, 2015, seeking documents related to, among many other things, communications

6  concerning Llano production, delayed launch, supply chain issues, and sales and operation

7  planning relating to Llano.  GF produced approximately 148,000 pages of documents.  The Class

8  Representatives also served non-party discovery on Arrow Electronics, Inc., Hewlett-Packard

9  Company, and Ernst & Young, among others.  In total, approximately 200,000 pages of

10  documents were produced by various non-parties.

11  42.    Subpoenas were also served on certain confidential witnesses mentioned in the

12  CAC.  As noted above, the depositions of seven confidential witnesses were taken by the Parties.

13  **E.    Discovery Disputes**

14  43.    As described above, discovery in this matter was both intense and voluminous.

15  The Parties held dozens of meet-and-confer sessions throughout discovery and, for the most part,

16  were able to resolve many disputes in the absence of Court intervention.  On several occasions,

17  however, the Parties sought the assistance of the Court.  All discovery matters were referred to

18  Magistrate Judge Jacqueline Corley.  ECF No. 183.

19  44.    For example, on November 9, 2015, the Class Representatives submitted a

20  discovery letter requesting that the Court compel Defendants to expand the temporal scope of

21  discovery and to produce documents from April 1, 2010, through April 1, 2013, on the ground

22  that, among other reasons, the Class Representatives' allegations were tied to the Llano

23  production issues from 2010.  ECF No. 157.  On November 16, 2015, Judge Corley granted the

24  motion to compel the expansion of the temporal scope of the discovery period, resulting in

25  eleven months of additional pre-class period discovery and approximately two and a half months

26  of post-class period discovery.  ECF No. 162.  The November 9, 2015 discovery letter also asked

27  the Court to compel AMD to identify its customers and other third parties in response to Lead

28  Plaintiffs' First Set of Interrogatories.  Judge Corley ordered AMD to respond to the

interrogatories by providing the identity and requested contact information for its customers and motherboard manufacturers involved with the Llano microprocessing chip at issue in the litigation.  *Id.*

45.     On April 7, 2016, the Class Representatives requested that the Court compel Defendants to add AMD's former CEO Dirk Meyer ("Meyer") as a custodian for collection of ESI for the pre-Class Period timeframe described in the Court's November 16, 2015 Order on the ground that his documents would provide context for the Class Representatives' Class Period allegations given that Meyer would have information relevant to Llano's production status in 2010.  ECF No. 185.  The Court granted the Class Representatives' motion, finding that Defendants had failed to meet their burden of establishing that Meyer should not be a custodian for the pre-Class Period.  ECF No. 189.

46.     On September 9, 2016 and September 23, 2016, the Parties submitted letters to the Court regarding responses to interrogatories.  ECF Nos. 214, 215, & 218.  The Class Representatives asked the Court to compel the Individual Defendants to supplement responses to their first set of interrogatories and Defendants asked the Court to compel plaintiffs to provide further responses to certain interrogatories.  The Court held a hearing on September 27, 2016, during which it discussed with the Parties that fact discovery, with some limited exceptions, was now closed, and that the Parties should be in a position to provide full disclosure of the factual bases for their claims and affirmative defenses.  Given this guidance, the Court required the Class Representatives to supplement their responses to Defendants' interrogatories by November 28, 2016, and Defendants to supplement their responses to the Class Representatives' interrogatories by January 27, 2017.  ECF No. 223.

47.     The number of deponents was also a subject of contention between the Parties. On May 16, 2016, Judge Corley issued an order allowing the Parties to take fifteen depositions and directed the Parties to request additional depositions after the first fifteen had been exhausted.  ECF No. 199.  On August 19, 2016, the Parties submitted a joint status letter to Judge Corley in which the Class Representatives requested permission to take an additional fifteen depositions:  eleven AMD employees or former employees and four third parties.  ECF

1   No. 208.  Judge Corley granted the Class Representatives' request, in part, allowing the Class

2   Representatives to take an additional five depositions.  ECF No. 210.

3        **F.    Expert Discovery**

4        48.    In addition to the expert reports prepared in connection with class certification, on

5   November 18, 2016, the Class Representatives served Defendants with expert reports from the

6   following individuals in connection with formal expert discovery:

7             (a)    Chad Coffman, CFA (materiality, damages, and loss causation expert);

8             (b)    Jason S. Flemmons, CPA, CFE, CFF (forensic and technical accounting

9   expert who provided an expert report on whether Defendants' statements about Llano gross

10  margins were false and misleading); and

11            (c)    Professor Scott E. Thompson, Ph.D. (semiconductor industry expert who

12  provided a report on microprocessor chip manufacturing, supply, and demand as those topics

13  pertain to public statements made by Defendants).

14       49.    Mr. Coffman prepared and served a 68-page report, along with exhibits totaling

15  another 24 pages, in which he opined, *inter alia* that:  (i) the alleged misstatements and

16  omissions in this case were material; (ii) declines in the price of AMD common stock were

17  attributable to and substantially caused by identifiable news events relating to the disclosure of

18  the alleged fraud; (iii) there was an economic link between the alleged misrepresentations and

19  omissions and the foreseeable investor losses that occurred on the corrective disclosure events;

20  (iv) the corrective disclosure events were associated with a statistically significant abnormal

21  price decline in AMD common stock; and (v) the amount of abnormal stock drop was associated

22  with disclosure of the truth.

23       50.    Mr. Flemmons prepared and served a 57-page report, along with exhibits totaling

24  another 16 pages, in which he opined, *inter alia,* that certain statements relating to the nature of

25  Llano margins were false and misleading because they were inconsistent with information

26  available to management.

27       51.    Dr. Thompson prepared and served a 134-page report, along with exhibits totaling

28  another 28 pages, in which he opined, *inter alia,* that certain statements made by Defendants

1  were contrary to internal Company data and internal statements, particularly in such key areas as:

2  (i) the health of the 32 nm manufacturing flow; (ii) 32 nm Llano yield; (iii) GF's manufacturing

3  support for Llano; and (iv) Llano chip demand.

4      52.    On December 20, 2016, Defendants served expert reports on Class

5  Representatives from the following individuals:

6      (a)    Bradford Cornell (submitted a report responding to Mr. Coffman's report);

7      (b)    Michele Axelson (provided her opinion on certain accounting and

8  financial reporting issues at AMD and responded to reports of Dr. Thompson, Mr. Coffman, and

9  Mr. Flemmons);

10      (c)    Rahul Kapoor (provided his opinion on the semiconductor industry, sales

11  forecasting at AMD during the Class Period and responded to the expert reports of Dr.

12  Thompson, Mr. Coffman, and Mr. Flemmons); and

13      (d)    Kenneth P. Lisiak, Ph.D. (industry expert; submitted a report responding

14  to the analyses and opinions of Dr. Thompson).

15      53.    On January 17, 2017, the Class Representatives served the rebuttal expert reports

16  of Mr. Coffman, Mr. Flemmons, and Dr. Thompson.  Additionally, the Class Representatives

17  submitted a supplemental expert report from Mr. Coffman on March 6, 2017.

18      54.    Following the exchange of expert reports, the Parties commenced expert

19  depositions in February 2017.  The Parties took and defended a total of seven expert depositions.

20      55.    Class Representatives deposed Defendants' experts as follows:

21      (a)    Mr. Kapoor on February 16, 2017, in San Francisco, California;

22      (b)    Mr. Cornell on February 22, 2017, in Palo Alto, California;

23      (c)    Dr. Lisiak on March 1, 2017, in Menlo Park, California; and

24      (d)    Ms. Axelson on March 10, 2017, in San Francisco, California.

25      56.    Defendants deposed Class Representatives' experts as follows:

26      (a)    Mr. Coffman on March 7, 2017, in Palo Alto, California;

27      (b)    Mr. Flemmons on February 28, 2017, in San Francisco, California; and

28      (c)    Professor Thompson on March 17, 2017, in New York, New York.

## V.     SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

57.     The Parties attended a pre-filing conference before the Court on March 8, 2017, to discuss the Parties' proposed summary judgment motions.  At the conference, the Court set certain deadlines in connection with summary judgment and related documents.  ECF No. 249.

58.     On March 22, 2017, after careful analysis, the Class Representatives submitted a numbered chart of the 45 remaining statements that they alleged to be false and misleading.  ECF No. 251-1.

59.     On April 25, 2017, Defendants moved for summary judgment on all claims.  ECF No. 254.  Defendants included a 105 page (corrected) statement of facts in support of their motion.  ECF No. 270.  In their motion, Defendants argued, principally, that plaintiffs could not prove material falsity because many of the challenged statements were inactionable puffery or indisputably accurate.  Defendants also argued that plaintiffs' failure to challenge any of AMD's guidance made it impossible for plaintiffs to prove that disclosure of certain undisclosed operational details would have revealed a materially different state of affairs than what was already available to the market.

60.     Regarding scienter, Defendants argued that the undisputed facts showed that Defendants were surprised when they realized that AMD was going to miss the quarterly guidance they had announced several weeks before.

61.     Defendants also argued that plaintiffs could not prove loss causation because:  (i) the purported corrective disclosures neither corrected the allegedly false statements nor did they state that the Company concealed the specific facts that allegedly rendered them misleading; (ii) the information plaintiffs claimed was revealed by the corrective disclosures was already publicly known; and (iii) plaintiffs did not met their burden to separate the impact of the alleged fraud, if any, from the impact of other unrelated facts that affected AMD's share price.  Specifically, Defendants argued that because plaintiffs did not claim that the Company's guidance statements were misleading, the disclosure of missed guidance could not be corrective.

62.     On May 30, 2017, the Class Representatives filed an omnibus memorandum in support of their motion for summary judgment as to falsity for certain of Defendants' supply

1    statements and in opposition to Defendants' motion for summary judgment.  ECF No. 281-3.  In

2    their affirmative motion for summary judgment, the Class Representatives contended, among

3    other things, that there was overwhelming evidence that Defendants made false statements about

4    the Llano yield and manufacturing issues that plagued AMD as of April 2011 and through

5    2Q211 and 3Q11 and, therefore, there are no issues of fact concerning whether the April 4, 2011,

6    April 21, 2011, and May 17, 2011 supply statements were false.

7            63.     In opposing Defendants' summary judgment motion, the Class Representatives

8    argued that the motion should be denied because genuine issues of material fact existed as to

9    material falsity, scienter, and loss causation.  In particular, the Class Representatives argued, as

10   to falsity:  (i) genuine issues of fact preluded summary judgment on Defendants' Llano supply

11   statements and Defendants' statements regarding the demand for Llano;[3] (ii) Defendants'

12   purported forward-looking statements were not protected by the PSLRA's safe harbor; and (iii)

13   Defendants' challenged statements were not puffery.  Regarding scienter, the Class

14   Representatives argued that they supplied voluminous evidence that Defendants had access to

15   weekly yield reports, CFO staff reports, weekly CEO supply reports, and reports sent to

16   Defendants, all sufficient to create a genuine dispute of material fact as to whether the statements

17   were made with scienter.  As to loss causation, the Class Representatives argued, among other

18   things, that the corrective disclosures were sufficiently related to the false and misleading

19   statements, and that the Class Representatives had sufficiently disentangled non-fraud factors.

20   The Class Representatives also filed a 294-page response to Defendants' corrected statement of

21   undisputed material facts.  ECF No. 281-5.

22           64.     On April 25, 2017, Defendants moved to exclude testimony of the Class

23   Representatives' experts, pursuant to Federal Rules of Evidence 403, 702, and 703, and *Daubert*

24   *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  ECF No. 255.  The Class

25   Representatives filed their opposition to this motion on May 30, 2017.  ECF No. 278-3.

26

27   _____

[3]   The Class Representatives also argued that Defendants were not entitled to summary
28   judgment on the falsity of the "margin" statements because Defendants did not challenge those
     statements nor did they make a showing on their affirmative motion for summary judgment that
     those statements can proceed to trial.

1  Defendants submitted a reply brief in further support of their *Daubert* motion on July 5, 2017.

2  ECF No. 309.

3        65.     On April 25, 2017, the Class Representatives moved to exclude testimony of

4  Defendants' experts.  ECF No. 261-3.  Defendants filed an opposition to the Class

5  Representatives' motion on May 30, 2017.  ECF No. 284.  The Class Representatives submitted

6  a reply brief in further support of their motion on July 5, 2017.  ECF No. 306.

7        66.     On July 5, 2017, Defendants submitted an omnibus reply in support of their

8  motion for summary judgment and in opposition to plaintiffs' motion for summary judgment.

9  ECF No. 307-1.  The Class Representatives likewise submitted a reply in further support of their

10  motion for summary judgment as to certain false statements.  ECF No. 316-2.

11        67.     The Parties' respective motions for summary judgment and *Daubert* motions were

12  pending when the Parties agreed to settle the Action.

13  **VI.    RISKS FACED BY THE CLASS REPRESENTATIVES IN THE ACTION**

14        68.     Based on publicly available information and documents obtained through

15  counsel's investigation, discussions with consultants, and the extensive fact and expert discovery

16  conducted in the Action, Class Counsel believe that they have adduced substantial evidence to

17  support the Class Representatives' and the Class's claims and were prepared to proceed to trial.

18  However, this was not a case with a restatement, parallel governmental investigation, or criminal

19  indictment of AMD or any of the Individual Defendants, which would have aided the Class

20  Representatives in proving certain elements of the case, like materiality, falsity, and scienter.

21  Class Counsel also realize that they faced considerable risks and defenses in continuing the

22  Action against Defendants.  The Class Representatives and their counsel carefully considered

23  these risks during the months leading up to the Settlement and throughout the settlement

24  discussions with Defendants and the mediators.

25        69.     In agreeing to settle, the Class Representatives and Class Counsel weighed,

26  among other things, the substantial cash benefit to Class Members against:  (i) the uncertainty of

27  prevailing on some or all of the claims at trial and the difficulties and challenges involved in

28  proving materiality, falsity, and damages; (ii) the uncertainties inherent in the Parties'

1    outstanding summary judgment motions and *Daubert* motions, which could result in the

2    termination of the Action or limit the presentation of documents and witnesses at trial; (iii) the

3    fact that, even if the Class Representatives prevailed at summary judgment and trial, any

4    monetary recovery could have been less than the Settlement Amount; and (iv) the delays that

5    would follow even a favorable jury finding, including appeals.

6        **A.    Risks Concerning Liability**

7        70.    The claims against Defendants presented significant liability risks given, among

8    other things, the highly fact-intensive and intricate nature of the alleged fraud at issue and the

9    vigorous opposition Defendants were advancing.  All elements of liability were vigorously

10   contested by Defendants.

11       **1.    Risks Concerning Falsity of Alleged Misstatements**

12       71.    At trial, Defendants would have undoubtedly argued, as they did at summary

13   judgment, that the majority of the alleged false statements were inactionable puffery or forward-

14   looking statements protected by the PSLRA safe harbor.  Among other things, Defendants would

15   have contended that at least 27 of the at-issue statements were non-actionable puffery, which

16   should be rejected on that ground.  For example, Defendants would argue that there is no

17   objective standard by which to measure whether Llano yield was "good" and whether demand

18   for Llano was "strong" and that courts have consistently rejected claims based on similar

19   statements.  Defendants would also point the jury to "cautionary language" in AMD's public

20   statements that warned of the risks of investing in AMD stock and of the risks associated with

21   AMD's financial projections.  For example, as they argued on summary judgment, the Company

22   specifically highlighted that difficulty in achieving "anticipated manufacturing yields" could

23   cause "supply shortages" that could "have a material adverse impact" on "revenue or gross

24   margins."

25       72.    Defendants would also contend that plaintiffs failed to show that any of the

26   supply, demand, and margin statements at issue were materially false in the face of AMD's

27   unchallenged earnings guidance and other facts known to AMD when the statements were made.

28   For example, Defendants would likely argue, with respect to supply statements made on April 4,

1  2011 (the first day of the Class Period), that the evidence shows that Llano yields were precisely

2  "at target" and that GF's yield projections were increasing.  The Class Representatives would

3  contend that Defendants, among other things, ignore evidence that relevant industry standards

4  exist and that other equally key manufacturing metrics had been deteriorating in the period

5  leading up to April 4, 2011.  Piecing this information together for a jury would have been a

6  substantial undertaking and there were no guarantees that the jury would credit the Class

7  Representatives' interpretation of the evidence over that of Defendants.

8      73.     As to the demand statements, Defendants would argue that the Class

9  Representatives' failure to challenge AMD's revenue guidance is a concession that Defendants'

10  statements regarding demand for Llano were accurate when made.

11                    **2.     Risks in Proving Scienter**

12      74.     The Class Representatives also faced the risk that a jury would conclude that

13  Defendants did not act with the requisite scienter – that Defendants knew or recklessly

14  disregarded facts indicating that their public statements about Llano yield, manufacture, supply,

15  demand, and margins were false when made.  In particular, Defendants would argue that the

16  evidence shows that on April 4, 2011, Defendants did not know what would ultimately occur

17  later that year regarding Llano supply, and, in particular, about the supply shortage that would

18  emerge in 3Q11.  Defendants would offer evidence that AMD did not begin to learn until

19  September 2011 that GF would not be able to supply sufficient units of Llano for AMD to meet

20  its financial guidance.  Defendants would also argue that they reasonably believed that AMD

21  would have sufficient Llano supply in 2011 and demand would carry into 2012.

22      75.     Defendants would also likely focus on the Individual Defendants' accumulation

23  of AMD stock during the Class Period, and that none of the Individual Defendants stood to

24  personally profit from the alleged wrongdoing – undermining motive.

25      76.     In response, Class Representatives would, for example, seek to present evidence

26  that Defendants had information concerning the Llano issues and that Defendants received

27  reports, attended meetings, and generally knew about the issues with Llano, and that given the

28  amount of information Defendants actually reviewed and had access to that was contrary to

public statements, they acted with scienter.  Nonetheless, even if the Court found that there was a genuine issue of material fact as to Defendants' scienter, there remained significant uncertainty as to how a jury would ultimately resolve such factual issues if the Action proceeded to trial.

**B.     Risks in Proving Loss Causation and Damages**

77.     The Class Representatives faced a significant risk in establishing loss causation and resulting damages with respect to all claims asserted against Defendants.  If a jury were to find that any of the alleged corrective disclosures identified in the CAC were not true corrective disclosures, the potential recovery for the Class would be significantly diminished.

78.     Defendants would argue that the "corrective" disclosures do not actually correct any of the allegedly false statements.  For example, Defendants would argue that the only thing "corrected" by the first alleged disclosure on September 28, 2011 – announcing that AMD would fall short of its previously issued guidance and listing a limited supply of Llano as one of the reasons for the miss – is AMD's 3Q11 earnings guidance, which plaintiffs do not challenge.  In fact, Defendants have argued that since each alleged corrective disclosure, particularly those in the later part of the Class Period, occurred when the Company announced quarterly financial results – including that AMD missed its earnings guidance, which the Class Representatives never challenged as false – there can be no loss causation.  Defendants would also argue that even if guidance miss announcements could be broadly corrective of misstatements unrelated to guidance, the Class Representatives cannot show that the facts that caused the stock price to drop after the alleged disclosures were the very facts that were concealed at the time of the challenged statements.

79.     Defendants have also argued that Class Representatives failed to account for July 22, 2011 and October 28, 2011 as inflation causing dates, which they argue should offset the price effect of the alleged corrective disclosures and reduce Class wide damages from the beginning of the Class Period.

80.     Defendants would contend that the Class Representatives had not met their burden of separating the effect of the revelation of the alleged fraud from non-fraud factors.  On

1   each of the alleged corrective disclosure dates, multiple pieces of information – that admittedly

2   were not related to the alleged fraud – were announced to the market.  In response, the Class

3   Representatives would argue that they have adequately disentangled the unrelated news and that

4   their expert's methodology is proper given that Mr. Coffman's event study controls for market

5   and industry wide effects and identifies the relevant percentage of each revenue miss attributable

6   to Llano for each corrective disclosure.

7        81.     Defendants would also dispute Mr. Coffman's methodologies, arguing, among

8   other things, that he failed to conduct an adequate analysis to determine which of the challenged

9   statements were material to the market and he did not determine which corrective disclosures

10   corrected any particular prior statements.

11        82.     Mr. Coffman estimated maximum aggregate damages to be approximately $430

12   million, if the Class Representatives were to prevail on all of their claims, including all five

13   alleged corrective disclosures.  Accordingly, the proposed Settlement represents a recovery of

14   approximately 7% of that maximum amount.  Of course Defendants would argue that damages in

15   the Action are smaller, or none at all.  If Defendants prevailed at summary judgment on their

16   argument that there is no loss causation because each alleged corrective disclosure involved

17   missed earnings guidance, which was never challenged as false, then the Class would have

18   recovered nothing at all.  Additionally, if Defendants prevailed at summary judgment on their

19   argument that the disclosures in the later part of the Class Period (*i.e.*, in connection with claims

20   related to the weak demand for Llano in 2012) must be eliminated, the Class Representatives

21   would have been left with only one corrective disclosure (September 28, 2011), with maximum

22   aggregate damages of approximately $210 million.  Under this scenario, the proposed Settlement

23   would represent a recovery of approximately 14%.  Treating July 22, 2011 and October 28, 2011

24   as inflation causing dates would further reduce the Class' maximum damages, which would

25   equate to a higher percentage of recovery.

26        83.     To recover any damages at trial, the Class Representatives would have to prevail

27   at many stages in the litigation – namely, Defendants' *Daubert* motions and motions for

28   summary judgment and then at trial.  Even if the Class Representatives prevailed at those stages,

1    appeals would likely follow.  At each of turn, there would be significant risks attendant to the

2    continued prosecution of the Action, and no guarantee that further litigation would have resulted

3    in a higher recovery, or any recovery at all.

4          **C.**      **Risks Attendant at Trial**

5          84.      In addition to the specific liability risks discussed above and the usual

6    uncertainties attendant to placing complex issues before a jury, a trial of this case presented its

7    own hurdles.  Given the complex nature of the claims, the Class Representatives intended to rely

8    heavily on their expert in the semiconductor industry and accounting expert.  Like the damages

9    experts, a jury would need to evaluate a "battle of the experts" with no guarantee that the jury

10   would accept the Class Representatives' experts' opinions.

11         85.      Further, at the time the Settlement was reached, the Parties had exchanged

12   *Daubert* motions in which Defendants were seeking to exclude all or most of the testimony that

13   the Class Representatives intended to offer through these experts.  Had Defendants prevailed in

14   excluding any of this testimony, the presentation of many aspects of the Class Representatives'

15   case would have been extremely difficult.

16         86.      Even if the Class Representatives were successful in obtaining a jury verdict on

17   all or part of their claims, it was a foregone certainty that a jury verdict would have been just the

18   beginning of a long and arduous appellate process.  Given the novelty of the issues concerning

19   materiality, falsity, loss causation, damages, and the duties attendant under Section 10(b), an

20   appellate process, with the possibility of reversal, presented a real risk to the Class of obtaining a

21   recovery.

22   **VII.   SETTLEMENT NEGOTIATIONS**

23         87.      In October 2015, before the hearing on Lead Plaintiffs' motion for class

24   certification, the Parties engaged the Honorable Layn R. Phillips (Ret.), a well-respected

25   mediator with extensive experience in mediating complex securities class actions, to assist them

26   with exploring a potential negotiated resolution of the Action.  The Parties attended a private

27   mediation before Judge Phillips in California on January 14, 2016.  The mediation session was

28   preceded by the exchange of mediation statements (with supporting exhibits) detailing the

Parties' respective positions and supporting evidence.  Class Counsel worked diligently and extensively to prepare plaintiffs' mediation statement.  However, the January 14, 2016 mediation did not result in an agreement to settle.  Thereafter, Judge Phillips continued his efforts to facilitate discussion between the Parties.

88.     In April 2017, the Parties agreed to try mediating again before Judge Phillips and the Honorable Gary A. Feess (Ret.).  The mediation took place on August 8, 2017, in California, and was preceded by the exchange of mediation statements that "supplemented" or "updated" the Parties' previously exchanged mediation statements.  At the mediation, the Parties reached an agreement-in-principle the settle the Action, subject to approval by AMD's Board of Directors.

89.     The Parties thereafter memorialized the final terms of Settlement in the Stipulation, which was executed by the Parties on October 9, 2017, and filed with the Court that same day (ECF No. 333-1), along with the Class Representatives' motion and supporting memorandum of points and authorities seeking preliminary approval of the Settlement (ECF No. 332).

## VIII.   CLASS REPRESENTATIVES' COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS

90.     Pursuant to the Preliminary Approval Order, the Court appointed Epiq Class Action & Claims Solutions, Inc. ("Epiq") as the Claims Administrator and instructed Epiq to disseminate copies of the Notice of Proposed Class Action Settlement and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively the "Claim Packet") by mail and to publish the Summary Notice of Proposed Class Action Settlement and Motion for Attorneys' Fees and Expenses.

91.     The Settlement Notice, attached as Exhibit A to the Declaration of Alexander Villanova ("Mailing Declaration") (attached as Exhibit 3 hereto), provides potential Class Members with information about the terms of the Settlement and, among other things:  their right to opt-out of the Class; their right to opt-back into the Class (for those who previously requested exclusion in connection with the Class Notice); their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for

1   submitting a Claim Form to be eligible for a payment from the net proceeds of the Settlement.

2   The Settlement Notice also informs Class Members of Class Counsel's intention to apply for an

3   award of attorneys' fees of no more than 30% of the Settlement Fund and for payment of

4   litigation expenses in an amount not to exceed $3,000,000.

5         92.    As detailed in the Mailing Declaration, on November 8, 2017, Epiq began mailing

6   Claim Packets to potential Class Members as well as banks, brokerage firms, and other third

7   party nominees whose clients may be Class Members.  Ex. 3 ¶¶6-9.  To disseminate the

8   Settlement Notice, Epiq used the names and addresses of potential Class Members from the

9   mailing file that Epiq compiled in connection with the Class Notice, and from banks, brokers,

10  and other nominees.  *Id.* ¶¶3-5.  In total, to date, Epiq has mailed 222,130 Claim Packets to

11  potential nominees and Class Members by first-class mail, postage prepaid.  *Id.* ¶9.

12        93.    On November 20, 2017, Epiq caused the Summary Notice to be published in

13  *Investor's Business Daily* and to be transmitted over the *PR Newswire*.  *Id.* ¶11 and Exhibit C

14  attached thereto.

15        94.    Epiq also maintains and posts information regarding the Settlement on a dedicated

16  website established for the Action, www.AMDSecuritiesLitigation.com, to provide Class

17  Members with information, as well as downloadable copies of the Claim Packet and the

18  Stipulation.  *Id.* ¶17.

19        95.    Pursuant to the terms of the Preliminary Approval Order, the deadline for Class

20  Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense

21  Application, or to request exclusion from the Class is February 6, 2018.  To date, two objections

22  to the Settlement have been received and the Claims Administrator has received six additional

23  requests for exclusion in connection with the Settlement Notice (some of which are duplicates of

24  requests submitted in connection with the Class Notice).  *Id.* ¶¶19-21.

25        96.    Class Counsel's response to these objections is set forth in the Settlement Brief in

26  Section I.B.8.  Class Counsel will respond to any future objections and provide a full report on

27  the exclusion requests in their reply papers, which are due February 13, 2018.

28

## IX.     PLAN OF ALLOCATION

97.     Pursuant to the Preliminary Approval Order, and as set forth in the Settlement Notice, all Class Members who wish to participate in the distribution of the Settlement proceeds must submit a valid Claim Form, including all required information, postmarked no later than February 13, 2018.  As provided in the Settlement Notice, after the deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, and applicable taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

98.     The proposed Plan of Allocation, which was set forth in full in the Settlement Notice (Ex. 3-A at 11-13), is designed to achieve an equitable and rational distribution of the Net Settlement Fund, but it is not a formal damages analysis that would be submitted at trial.  Class Counsel's damages expert developed the Plan of Allocation after careful consideration of plaintiffs' theories of liability and damages, and Class Counsel believe that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

99.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Losses," calculated according to the Plan's formulas, which are consistent with the Class Representatives' theories of liability and damages.  These formulas consider the amount of alleged artificial inflation in the prices of AMD's publicly traded common stock, as quantified by Mr. Coffman.  Mr. Coffman analyzed the movement in the prices of AMD's stock and took into account the portion of the price drops attributable to the alleged fraud.

100.     Claimants will be eligible for a payment based on when they purchased, held, or sold their AMD stock.  The Court-approved Claims Administrator, under Class Counsel's direction, will calculate claimants' Recognized Losses using the transactional information provided in their Claim Forms. The Class Representatives' losses have been calculated in the same manner.  Epiq has calculated KBC's Recognized Losses as totaling $89,888.67.  ATRS's Recognized Losses total $101,056.  *See* Ex.3 ¶18.

101.    Once the Claims Administrator has processed all submitted claims, distributions will be made to eligible Authorized Claimants.  After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of initial distribution, Class Counsel will, if feasible and economical, re-distribute the balance among Authorized Claimants who have cashed their checks.  Re-distributions will be repeated until the balance in the Net Settlement Fund is no longer economically feasible to distribute.  Class Representatives propose that any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not economical to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, be donated in equal amounts to the Bay Area Legal Aid and the Consumer Federation of America – both of which have programs that assist consumers facing financial fraud and other unfair treatment.  *See* Stipulation ¶25.

102.    Bay Area Legal Aid ("BayLegal") is a non-profit organization that provides free legal assistance to low income residents of the San Francisco bay area through offices in Santa Clara, San Mateo, San Francisco, Napa, Marin, Contra Costa, and Alameda Counties. *See* https://baylegal.org/who-we-are/our-mission/.  BayLegal has a Consumer Protection project that advocates on behalf of allegedly wronged consumers by providing them with direct legal representation in cases concerning, among other things, fair credit reporting, fair debt collection practices, and unfair and deceptive advertising of financial products and services.  *See* https://baylegal.org/what-we-do/stability/consumer-protections/.  *Cy pres* funds from the Settlement can be earmarked for the Consumer Protection project so that they directly assist victims of financial fraud.  BayLegal has been approved as a *cy pres* beneficiary in several securities cases in California, including *In re Celera Corp. Securities Litigation*, No. 10-cv-02604-EJD (N.D. Cal.), *Westley, et al. v. Oclaro, Inc., et al.*, No. 11-cv-02448-EMC (N.D. Cal.), and *In re Ubiquiti Networks, Inc. Securities Litigation*, No. 12-cv-04677-YGR (N.D. Cal.).

103.    Consumer Federation of America ("CFA") is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests through policy research, advocacy, and education before the judiciary, Congress, the White House, federal and state

1    regulatory agencies, and state legislatures.  *See generally* www.consumerfed.org.  With respect

2    to victims of financial fraud, CFA has an Investor Protection program that works nationwide to

3    promote consumer-oriented policies that safeguard investors against fraud through: (i) the

4    development of educational material for investors; (ii) drafting policies and legislation; (iii) and

5    providing testimony and comments on legislation and regulations.  *See*

6    www.consumerfed.org/issues/investor-protection.  CFA has been approved as a *cy pres*

7    beneficiary in several securities cases in California, including *In re Vocera Communications, Inc.*

8    *Securities Litigation*, No. 13-CV-03567-EMC (N.D. Cal.), *In re Broadcom Corp. Securities*

9    *Litigation*, No. 01-CV-00275-MLR (C.D. Cal.), and *In re Ubiquiti Networks, Inc. Sec. Litig.*, No.

10   12-cv-04677-YGR (N.D. Cal.).

11        104.    In sum, the proposed Plan of Allocation, developed by the Class Representatives'

12   damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among

13   Authorized Claimants.  Accordingly, Class Counsel respectfully submit that the proposed Plan of

14   Allocation is fair, reasonable, and adequate and should be approved.

15   **X.    CLASS COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES**

16        105.    For their significant efforts on behalf of the Class, Class Counsel are applying for

17   compensation from the Settlement Fund on a percentage basis.  As explained in Class Counsel's

18   Fee Brief, courts within the Ninth Circuit recognize that the percentage method is the appropriate

19   method of fee recovery and the prevailing method of determining attorneys' fees in the Ninth

20   Circuit.

21        106.    Consistent with the Settlement Notice, Class Counsel seek a fee award of 25% of

22   the Settlement Fund.  Class Counsel also request payment of expenses incurred in connection

23   with the prosecution of the Action from the Settlement Fund in the amount of $2,812,817.52.

24   Class Counsel submit that, for the reasons discussed below and in the accompanying Fee Brief,

25   such awards would be reasonable and appropriate under the circumstances before the Court.

26        **A.    The Class Representatives Support the Fee and Expense Application**

27        107.    Class Representative ATRS is an institutional investor that provides retirement,

28   disability, and survivor benefits to the thousands of current and former employees of the

1   Arkansas education community, and manages approximately $16 billion in assets held in trust.

2   Ex. 1 ¶1.

3       108.    Class Representative KBC is an asset management company based in Brussels.

4   As part of KBC's asset management services, it is responsible for managing mutual funds,

5   private funds, and institutional funds. As of year-end 2016, KBC had approximately €213 billion

6   of assets under management.  Ex. 2 ¶1.

7       109.    The Class Representatives played a central role in monitoring and participating in

8   the Action, including, among other things, reviewing pleadings, motions and other court filings;

9   participating in the discovery process, including producing documents and being deposed;

10  attending mediation sessions in person or by telephone; and participating in frequent conference

11  calls and/or in person meetings with Class Counsel.

12      110.    The Class Representatives have evaluated and fully support the Fee and Expense

13  Application.  *See* Ex. 1 ¶6, 13 and Ex. 2 ¶¶6, 10.  In coming to this conclusion, the Class

14  Representatives – which were substantially involved in the prosecution of the Action and

15  negotiation of the Settlement – considered the recovery obtained as well as Class Counsel's

16  substantial effort in obtaining the recovery.  Particularly in light of the considerable risks of

17  litigation, the Class Representatives agreed to allow Class Counsel to apply for 25% of the

18  Settlement Fund.  *See id.*

19      **B.**    **The Favorable Settlement Achieved**

20      111.    Courts have consistently recognized that the result achieved is a major factor to be

21  considered in making a fee award.  *See* Fee Brief, §I.C.1.  Here, the $29,500,000 settlement is a

22  very good result, particularly when considered in view of the substantial risks and obstacles to

23  recovery if the Action was to continue through a decision on summary judgment, to trial, and

24  through likely post-trial motions and appeals.

25      112.    As set forth in detail above, the recovery obtained for the Class was the result of

26  thorough and diligent prosecutorial and investigative efforts, complicated motion practice, and

27  vigorous settlement negotiations.  As a result of this Settlement, thousands of Class Members

28

1   will benefit and receive compensation for their losses and avoid the very substantial risk of no

2   recovery in the absence of a settlement.

3       **C.   The Risks and Unique Complexities of Contingent Class Action Litigation**

4       113.   This Action presented substantial challenges from the outset of the case.  The

5   specific complexities and risks the Class Representatives faced in proving Defendants' liability

6   and damages are detailed in paragraphs 70 to 83, above.  These case-specific risks are in addition

7   to the more typical risks accompanying securities class action litigation, such as the fact that this

8   Action is governed by stringent PSLRA requirements and case law interpreting the federal

9   securities laws and was undertaken on a contingent basis.

10      114.   From the outset, Class Counsel understood that they were embarking on a

11  complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the

12  substantial investment of time and money the case would require.  In undertaking that

13  responsibility, Class Counsel were obligated to ensure that sufficient resources were dedicated to

14  the prosecution of the Action, and that funds were available to compensate staff and to cover the

15  considerable costs that a case such as this requires.  With an average lag time of several years for

16  these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a

17  firm that is paid on an ongoing basis.  Indeed, Class Counsel received no compensation during

18  the four year course of the Action but have incurred 62,765.80 hours of time for a total lodestar

19  of $31,122,958.75 and have incurred $2,812,817.52 in expenses in prosecuting the Action for the

20  benefit of the Class.

21      115.   Class Counsel also bore the risk that no recovery would be achieved (or that a

22  judgment could not be collected, in whole or in part).  Even with the most vigorous and

23  competent of efforts, success in contingent-fee litigation, such as this, is never assured.  Class

24  Counsel know from experience that the commencement of a class action does not guarantee a

25  settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the

26  facts and theories that are needed to sustain a complaint or win at trial, or to convince

27  sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

28

116.    Class Counsel are aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

117.    Federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases.  The many appellate decisions affirming summary judgment and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery.  *See, e.g.*, *Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

118.    Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial.  Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated by Labaton Sucharow, or partially lost, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

119.    Even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).  And, the path to maintaining a favorable jury verdict can be

1    arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-

2    2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL

3    5927988 (9th Cir. June 23, 2010) (trial court tossing unanimous verdict for plaintiffs, which was

4    later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial

5    by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo*

6    *Grp. Inc. v. Police Annuity & Benefit Fund*, 131 S. Ct. 1602 (2011)).

7        120.    Losses such as those described above are exceedingly expensive for plaintiff's

8    counsel to bear.  The fees that are awarded in successful cases are used to cover enormous

9    overhead expenses incurred during the course of litigations and are taxed by federal, state, and

10   local authorities.

11       121.    Courts have repeatedly held that it is in the public interest to have experienced

12   and able counsel enforce the securities laws and regulations pertaining to the duties of officers

13   and directors of public companies.  Vigorous private enforcement of the federal securities laws

14   and state corporation laws can only occur if private plaintiffs can obtain some parity in

15   representation with that available to large corporate defendants.  If this important public policy is

16   to be carried out, courts should award fees that will adequately compensate private plaintiffs'

17   counsel, taking into account the enormous risks undertaken with a clear view of the economics of

18   a securities class action.

19       122.    As discussed in detail above, this case was fraught with significant risk factors

20   concerning liability and damages.  Were this Settlement not achieved, and even if the Class

21   Representatives prevailed at trial, the Class Representatives and Class Counsel faced potentially

22   years of costly and risky appellate litigation against Defendants, with ultimate success far from

23   certain and the prospect of no recovery significant.  Class Counsel therefore respectfully submit

24   that based upon the considerable risk factors present, this case involved a very substantial

25   contingency risk to counsel.

26       **D.    The Work of Plaintiffs' Counsel and the Lodestar Cross-Check**

27       123.    The work undertaken by plaintiffs' counsel in investigating and prosecuting this

28   case and arriving at the present Settlement in the face of serious hurdles has been time-

consuming and challenging.  As explained above, plaintiffs' counsel conducted a comprehensive

investigation into the Class's claims; researched and prepared an amended complaint; briefed a

thorough opposition to Defendants' motion to dismiss the CAC; briefed a thorough opposition to

Defendants' motion to strike certain allegations in the CAC; moved for certification of the Class;

engaged in thorough discovery efforts that led to obtaining more than approximately 2.5 million

pages of documents from Defendants and third-parties; took or defended 34 depositions;

exchanged 11 expert reports; moved for and opposed summary judgment; filed and opposed

*Daubert* motions; and engaged in a hard-fought settlement process with experienced defense

counsel and experienced mediators.

124.    At all times throughout the pendency of the Action, plaintiffs' counsel's efforts

were driven and focused on advancing the litigation to bring about the most successful outcome

for the Class, whether through settlement or trial, by the most efficient means necessary.

125.    Attached hereto are declarations from plaintiffs' counsel, which are submitted in

support of the request for an award of attorneys' fees and payment of litigation expenses.  *See*

Declaration of Jonathan Gardner Filed on Behalf of Labaton Sucharow LLP in Support of

Application for Award of Attorneys' Fees and Expenses (attached as Exhibit 4 hereto); the

Declaration of James M. Hughes filed on Behalf of Motley Rice in Support of Application for

Award of Attorneys' Fees and Expenses (attached as Exhibit 5 hereto); Declaration of Katherine

Lubin filed on Behalf of Lieff Cabraser Heimann & Bernstein, LLP (attached as Exhibit 6

hereto); and Declaration of Stanley D. Bernstein filed on Behalf of Bernstein Liebhard LLP in

Support of Application for Award of Attorneys' Fees and Expenses (attached as Exhibit 7

hereto).

126.    Included with these declarations are schedules that summarize the time of each

firm (including by category of work conducted), as well as the expenses incurred by category

(the "Fee and Expense Schedules").[4]  The attached declarations and the Fee and Expense

Schedules report the amount of time spent by each attorney and professional support staff

---

[4]      Attached hereto as Exhibit 8 is a summary table of the lodestars and expenses of plaintiffs'
counsel.

employed by plaintiffs' counsel and the "lodestar" calculations, i.e., their hours multiplied by their 2017 rates.  *See* Exs. 4 through 7.  As explained in each declaration, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms.

127.    The hourly rates of plaintiffs' counsel here range from $510 to $1050[5] for partners, $675 to $995 per hour for of counsels or senior counsels, and $275 to $800 per hour for other attorneys.  *See* Exs. 4-A; 5-A; 6-A; and 7-A.  It is respectfully submitted that the hourly rates for attorneys and professional staff included in these schedules are reasonable and customary for this type of complex commercial litigation.  Exhibit 9, attached hereto, is a table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2017.  The analysis shows that across all types of attorneys, plaintiffs' counsel's rates are consistent with, or lower than, the firms surveyed, including Latham & Watkins LLP.

128.    Plaintiffs' counsel have collectively expended 62,765.80 hours in the prosecution and investigation of the Action.  *See* Ex. 8.  The resulting collective lodestar is $31,122,958.75, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, and assisting class members.  *Id.*  Pursuant to a lodestar "cross-check," applied within the Ninth Circuit, the requested fee of 25% of the Settlement Fund (or $7,375,000) results in a ***fractional*** "multiplier" of 0.24 on the lodestar.  Accordingly, Class Counsel are seeking approximately 24% of their lodestar.

### E.    The Skill Required and Quality of the Work

129.    Class Counsel Labaton Sucharow and Motley Rice are among the most experienced and skilled securities litigation law firms in the field.  The expertise and experience of their attorneys are described in Exhibits 4-H and 5-H, annexed hereto.

---

[5]    The rates at the end of this range are for one of the founding partners of Bernstein Liebhard who has over 35 years of experience, and a senior partner at Motley Rice who has almost 40 years of experience.  Their combined lodestar is $262,668.75, which is only 0.00844% of the total time.

130.     Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous notable securities class actions throughout the United States.  Here, Labaton Sucharow attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience.  For example, Labaton Sucharow has served as lead counsel in a number of high profile matters:  *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Securities Litigation*, Civil Action No. 08-397 (DMC) (JAD) (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).  *See* Ex. 4-H.

131.     Similarly, Motley Rice, as demonstrated by the firm resume attached to its declaration (Ex. 5-H), is among the most experienced and skilled firms in the securities litigation field, and has a long and successful track record in such cases.  For example, Motley Rice has served as lead or co-lead counsel in a number of high profile matters, including *In re Barrick Gold Securities Litigation*, No. 1:13-cv-03851-RMB (S.D.N.Y.) (representing institutional investors Union Asset Management Holding AG and LRI Invest S.A., and reaching settlement of $140 million); *Bennett v. Sprint Nextel Corp.*, No. 2:09-cv-02122-EFM-KMH (D. Kan.) (representing PACE Industry Union-Management Pension Fund, Skandia Life Insurance Company, and West Virginia Investment Management Board, and reaching settlement of $131 million), and *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, No. 08-6324 (PAM/AJB) (D. Minn.) (representing Oklahoma Teachers' Retirement System, Oklahoma Firefighters Pension Fund, Union Asset Management Holding AG, Danske Invest Management A/S, and Westmoreland County Employees Retirement System, and reaching a settlement of $85 million);

1  *City of Brockton Retirement System v. Avon Products, Inc.*, No. 11 Civ. 4665 (PGG) (S.D.N.Y.)

2  (representing LBBW Asset Management Investmentgesellschaft mbH and Société Générale

3  Securities Services GmbH, and reaching settlement of $62 million).  *See* Ex. 5-H.

4  **XI.     PLAINTIFFS' COUNSEL'S REQUEST FOR LITIGATION EXPENSES**

5          132.    Plaintiffs' counsel seek payment from the Settlement Fund of $2,812,817.52 in

6  litigation expenses reasonably and necessarily incurred in connection with prosecuting the claims

7  against Defendants.  The Settlement Notice informs the Class that Class Counsel will apply for

8  payment of litigation expenses of no more than $3,000,000.  *See* Ex. 3-A at 1, 8.  The amounts

9  requested herein are below this cap.  To date, no objection to Class Counsel's request for

10 expenses has been raised.

11         133.    As set forth in the Fee and Expense Schedules, plaintiffs' counsel have incurred a

12 total of $2,812,817.52 in litigation expenses in connection with the prosecution of the Action.

13 *See* Exs. 4-C through G; 5-C through G, 6-C through D, and 7-C.  As attested to, these expenses

14 are reflected on the books and records maintained by each firm.  These books and records are

15 prepared from expense vouchers, check records, and other source materials and are an accurate

16 record of the expenses incurred.  These expenses are set forth in detail in plaintiffs' counsel's

17 declarations, which identify the specific category of expense – e.g., online/computer research,

18 experts' fees, travel costs, costs related to mediation, duplicating, telephone, fax, and postage

19 expenses.

20         134.    A significant component of plaintiffs' counsel's expenses is the cost of experts,

21 which totals $1,680,536.26 or 60% of total expenses.  As noted above, Class Counsel retained

22 Mr. Coffman to opine on market efficiency, in connection with the Class Representatives' class

23 certification motion.  Mr. Coffman submitted two reports in connection with class certification.

24 Mr. Coffman was also retained, later on in the litigation, to submit an expert report on

25 materiality, causation, and the amount of damages suffered by the Class, and to help develop a

26 fair and reasonable Plan of Allocation.  Class Counsel also retained Professor Scott E.

27 Thompson, Ph.D., a microprocessor industry expert who was retained to opine on chip

28 manufacturing, supply, and demand, as well as Jason S. Flemmons, CPA, CFE, CFF, a forensic

1    and technical accounting expert who provided opinions on whether Defendants' statements about

2    product gross margins were false and misleading.  These professionals were essential to the

3    prosecution of the Action.

4           135.    Class Counsel also seek $323,093.85 (11% of total expenses) relating to litigation

5    support services, such as the costs associated with electronic discovery and adding hyperlinks to

6    court filings.  Expenses totaling $133,871 (5% of total expenses) were also incurred in

7    connection with the 34 depositions taken in the case, and in retaining independent counsel for the

8    confidential witnesses in the case ($56,990.09).

9           136.    Class Counsel were required to work late hours and travel in connection with this

10   Action and incurred costs related to working meals, lodging, and transportation, which total

11   $248,431 or 9% of aggregate expenses.  The travel involved numerous appearances before the

12   Court, attending approximately 34 depositions, two mediations, and other trips related to meeting

13   with witnesses or the Class Representatives.

14          137.    Computerized research totals $73,218 or 3% of total expenses.  These are the

15   charges for computerized factual and legal research services, including LexisNexis, Westlaw,

16   Courtlink, Thompson, and PACER.  These services allowed counsel to perform media searches

17   on AMD, obtain analysts' reports and financial data for AMD, and conduct legal research.

18          138.    Class Counsel also paid $35,147.23 in mediation fees assessed by the mediators in

19   this matter.

20          139.    The other expenses for which Class Counsel seek payment are the types of

21   expenses that are necessarily incurred in litigation and routinely charged to clients billed by the

22   hour.  These expenses include, among others, duplicating costs, long distance telephone and

23   conference call charges, filing fees, and postage and delivery expenses.

24          140.    All of the litigation expenses incurred, which total $2,812,817.52, were necessary

25   to the successful prosecution and resolution of the claims against Defendants.

26          141.    In view of the complex nature of the Action, the expenses incurred were

27   reasonable and necessary to pursue the interests of the Class.  Accordingly, we respectfully

28

1    submit that the expenses incurred by Class Counsel should be paid in full from the Settlement

2    Fund.

3    **XII.    CLASS REPRESENTATIVES' REIMBURSEMENT**
     **PURSUANT TO THE PSLRA**

4

5        142.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), the Class

6    Representatives ATRS and KBC seek reimbursement of their reasonable costs and expenses

7    (including lost wages) incurred in connection with their work representing the Class in the

8    aggregate amount of $23,223.25.  The amount of time and effort devoted to this Action by each

9    of the Class Representatives is detailed in the accompanying Declarations of George Hopkins

10   and Bart Elst, attached hereto as Exhibits 1 and 2.  Class Counsel respectfully submit that the

11   amounts requested by Class Representatives are consistent with Congress's intent, as expressed

12   in the PSLRA, of encouraging institutional investors to take an active role in commencing and

13   supervising private securities litigation.

14       143.    As discussed in the Fee Brief and in the Class Representatives' supporting

15   declarations, the Class Representatives have been committed to pursuing the Class's claims since

16   they became involved in the litigation.  As large institutional investors, the Class Representatives

17   have actively and effectively fulfilled their obligations as representatives of the Class, complying

18   with all of the many demands placed upon them during the litigation and settlement of the

19   Action, and providing valuable assistance to Class Counsel.  For instance, the Class

20   Representatives engaged in time-consuming discovery efforts and searches to locate and produce

21   documents responsive to Defendants' discovery requests.  Ex. 1 ¶4; Ex. 2 ¶4.  In addition, the

22   Class Representatives prepared for, and testified at, depositions in connection with the class

23   certification motion.  *Id*.  These efforts required employees of the Class Representatives to

24   dedicate time and resources to the Action that they would have otherwise devoted to their regular

25   duties.

26       144.    The efforts expended by the Class Representatives during the course of the Action

27   are precisely the types of activities courts have found to support reimbursement to class

28   representatives, and support the Class Representatives' request for reimbursement.

1

### XIII.  THE REACTION OF THE CLASS TO THE FEE AND EXPENSE APPLICATION

2

3      145.    As mentioned above, consistent with the Preliminary Approval Order, a total of

4  222,130 Settlement Notices have been mailed to potential Class Members advising them that

5  Class Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund,

6  and payment of expenses in an amount not greater than $3,000,000.  *See* Ex. 3 ¶9.  Additionally,

7  the Summary Notice was published in *Investor's Business Daily* and disseminated over *PR Newswire*.  *Id.* ¶11.  The Settlement Notice has also been available on the settlement website

8  maintained by the Claims Administrator.  *Id.* ¶17.[6]

9      146.    While the deadline set by the Court for Class Members to object to the requested

10  fees and expenses has not yet passed, to date no one has objected to the fee or expense request.

11  Class Counsel will respond to any additional objections that may be received in their reply

12  papers, which are due February 13, 2018.

13

### XIV.  MISCELLANEOUS EXHIBITS

14      147.    Attached hereto as Exhibit 10 is a true and correct copy of *Securities Class Action*

15  *Settlements:  2016 Review and Analysis* (Cornerstone Research 2017) by Laarni T. Bulan, Ellen

16  M. Ryan & Laura E. Simmons.

17      148.    Attached hereto as Exhibit 11 is a compendium of unreported cases, in

18  alphabetical order, cited in the accompanying Fee Brief.

19

### XV.  CONCLUSION

20      149.    In view of the significant recovery for the Class and the substantial risks of this

21  litigation, as described above and in the accompanying memorandum of law, the Class

22  Representatives and Class Counsel respectfully submit that the Settlement should be approved as

23  fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be

24  approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of

25  substantial risks, the quality and amount of work performed, the contingent nature of the fee, and

26

27  ───────────────────

28  [6]    The Class Representatives' motion for approval of the Settlement and Class Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

1   the standing and experience of Class Counsel, as described above and in the accompanying

2   memorandum of law, Class Counsel respectfully submit that a fee in the amount of 25% of the

3   Settlement Fund be awarded, that litigation expenses in the amount of $2,812,817.52 be paid,

4   and that the Class Representatives be reimbursed $23,223.25 (in the aggregate), pursuant to the

5   PSLRA.

6

7         I declare under penalty of perjury that the foregoing is true and correct.  Executed on

  January 23, 2018.

8

9                                         _____

                                          JONATHAN GARDNER

10

11         I declare under penalty of perjury that the foregoing is true and correct.  Executed on

  January 23, 2018.

12

13

14                                         _____

                                          JAMES M. HUGHES

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  the standing and experience of Class Counsel, as described above and in the accompanying

2  memorandum of law, Class Counsel respectfully submit that a fee in the amount of 25% of the

3  Settlement Fund be awarded, that litigation expenses in the amount of $2,812,817.52 be paid in

4  full, and that the Class Representatives be reimbursed $23,223.25  (in the aggregate), pursuant to

5  the PSLRA.

6          I declare under penalty of perjury that the foregoing is true and correct.  Executed on

7  January 23, 2018.

8

9                                          _____

                                              JONATHAN GARDNER

10         I declare under penalty of perjury that the foregoing is true and correct.  Executed on

11  January 23, 2018.

12

13                                          _____

14                                              JAMES M. HUGHES

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I will mail the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Service List, if any.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 23, 2018

/s/ *Jonathan Gardner*
JONATHAN GARDNER

**Mailing Information for a Case 4:14-cv-00226-YGR**

*Hatamian et al v. Advanced Micro Devices, Inc. et al*

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Melanie Marilyn Blunschi**
  melanie.blunschi@lw.com,christina.teeter@lw.com,#sflitigationservices@lw.com,
  sf-litigation-services-4917@ecf.pacerpro.com,melanie-blunschi-5434@ecf.pacerpro.com
- **Alec T. Coquin**
  acoquin@labaton.com,kgutierrez@labaton.com,electroniccasefiling@labaton.com
- **Jonathan Gardner**
  jgardner@labaton.com,kgutierrez@labaton.com,jjohnson@labaton.com,
  cvillegas@labaton.com,tdubbs@labaton.com,ryamada@labaton.com,cboria@labaton.
  com,acoquin@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,
  agreenbaum@labaton.com
- **Patrick Edward Gibbs**
  pgibbs@cooley.com,bgiovannoni@cooley.com
- **Michael M. Goldberg**
  michael@goldberglawpc.com
- **Max Nikolaus Gruetzmacher**
  mgruetzmacher@motleyrice.com,wtinkler@motleyrice.com
- **Jason C. Hegt**
  jason.hegt@lw.com,jason-hegt-2094@ecf.pacerpro.com
- **James Michael Hughes**
  jhughes@motleyrice.com,mgruetzmacher@motleyrice.com,erichards@motleyrice.com,
  kweil@motleyrice.com
- **Willem F. Jonckheer**
  wjonckheer@schubertlawfirm.com,kmessinger@schubertlawfirm.com,
  epawson@schubertlawfirm.com,paralegal@schubertlawfirm.com
- **Joy Ann Kruse**
  jakruse@lchb.com,kbenson@lchb.com
- **Nicole Catherine Lavallee**
  nlavallee@bermantabacco.com,ysoboleva@bermantabacco.com
- **Sharon Maine Lee**
  slee@lchb.com
- **Katherine Collinge Lubin**
  klubin@lchb.com,rtexier@lchb.com
- **Meredith B. Miller**
  mbmiller@motleyrice.com
- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,kweil@motleyrice.com,
  ajanelle@motleyrice.com
- **William S. Norton**
  bnorton@motleyrice.com
- **Michael J. Pendell**
  mpendell@motleyrice.com

- **Matthew Rawlinson**
  matt.rawlinson@lw.com,zoila.aurora@lw.com,
  matthew-rawlinson3894@ecf.pacerpro.com,jenny.duckworth@lw.com,
  #SVLitigationServices@lw.com
- **Paul J. Scarlato**
  pscarlato@labaton.com
- **Carol C. Villegas**
  cvillegas@labaton.com,kgutierrez@labaton.com,thoffman@labaton.com,
  jchristie@labaton.com,mpenrhyn@labaton.com,acoquin@labaton.com,
  fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com
- **Avraham Noam Wagner**
  avi@thewagnerfirm.com
- **Kara M. Wolke**
  kwolke@glancylaw.com
- **Roger W. Yamada**
  ryamada@labaton.com,kgutierrez@labaton.com,fmalonzo@labaton.com,
  acarpio@labaton.com,electroniccasefiling@labaton.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).

(No manual recipients)